# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>XSTREAM SYSTEMS, INC.[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 11-11086 (CSS) |

**MOTION FOR ORDER (A) AUTHORIZING DEBTOR TO OBTAIN INTERIM POST-PETITION FINANCING AND GRANT SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS PURSUANT TO 11 U.S.C. §§ 105, 364(c) AND 364(d); (B) MODIFYING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362; (C) AUTHORIZING DEBTOR TO ENTER INTO AGREEMENTS WITH XSI LLC; AND (D) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001**

The debtor and debtor in possession in the above-captioned case (the "Debtor" or "Borrower"), by this motion (this "Motion"), seeks entry of interim and final orders pursuant to sections 105, 361, 362, 363, 364 and 507(b) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code" or "Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure (the "Local Rules"): (a) authorizing the Debtor to use cash collateral; (b) authorizing the Debtor to obtain postpetition secured financing from XSI, LLC ("XSI"), the Debtor's prepetition secured lender based on the Budget (as defined below) (i) on an interim basis up to an aggregate principal amount of $50,000.000, pursuant to an interim order (the "Interim Order"), and (ii) on a final basis up to an amount that may be agreed upon by and between the Debtor and XSI and approved pursuant to a final order (the "Final Order" and, together with the Interim Order, the "DIP Orders"); (c) granting XSI postpetition liens and

---

[1] The last four digits of the Debtor's federal tax identification number are: 0466. The Debtor's mailing address for purpose of this case is 10305 102nd Terrace, Suite 101, Sebastian, FL 32958.

providing it superpriority administrative expense status; (d) providing XSI adequate protection; (e) modifying the automatic stay in certain respects; (f) scheduling a final hearing; and (g) approving certain notice procedures. In support of this Motion, the Debtor submits: (i) the Budget; and (ii) the Declaration of Kim Hetzel Salbello, Chief Restructuring Officer (the "CRO") in Support of the Debtor's Chapter 11 Petitions and First Day Pleadings (the "Salbello Declaration") filed concurrently herewith, and further states as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

3. The predicates for the relief requested are sections 105, 361, 362, 363, 364 and 507(b) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001 and 9014 and Local Rule 4001-2.

## BACKGROUND

**A. General Background**

4. Contemporaneously with the filing of this Motion (the "Petition Date"), the Debtor commenced its bankruptcy case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor is operating its business as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

5. As more fully explained in the Salbello Declaration, the Debtor is in the business of producing and marketing x-ray diffraction machines for use in pharmaceutical counterfeit detection (the "Devices"). It had been funded by several debt and equity raises over the past three years. However, because of the Debtor's current financial status, it is unable to raise either debt or equity. And because it does not generate any appreciable cash flow from its current business, it is in a state of an acute liquidity crisis.

2

6. Currently, the Debtor's assets consist primarily of intellectual property relating to the design and manufacture of the Devices, along with several Devices and inconsequential office equipment (collectively, the "Assets").

7. Prior to the Bankruptcy filing, the Debtor attempted an initial public offering to raise capital. This effort proved unsuccessful.

8. When it became apparent that the Debtor was unable to raise funds or obtain any further financing from either public or private sources, two individuals, who were insiders of the Debtor, formed XSI for the purpose of providing financing to the Debtor to allow it to file for bankruptcy protection and to provide the Debtor with postpetition Debtor-in-Possession ("DIP") financing.

9. No trustee, examiner, creditors' committee, or other official committee has been appointed in the Debtor's chapter 11 cases.

**B.** *Pre-Petition Financing Agreements.*

10. Prior to the commencement of the Case, XSI made loans and advances (the "Loans") to Borrower pursuant to (1) Letter Agreement, Senior Secured Demand Note, Security Agreement, and Control Agreement, dated March 1, 2011, by and between Lender and Borrower (as the same has heretofore been amended, supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date), and (2) all other agreements, documents, and instruments executed and/or delivered with, to, or in favor of XSI, including, without limitation, the security agreements, notes and Uniform Commercial Code ("UCC") financing statements and all other related agreements, documents, and instruments executed and/or delivered in connection therewith or related thereto, (collectively, the "Pre-Petition Financing Agreements"). Copies of the operative Pre-Petition Financing Agreements are annexed hereto as Exhibit "A".

11. As of the Petition Date, the principal amount of the Loans owed by the Debtor to XSI under and in connection with the Pre-Petition Financing Agreements was an amount not less than $122,000.00, plus all interest accruing thereon, and all fees, costs, expenses, and other charges accrued, accruing, or chargeable with respect thereto totaling $130,662.00 (the "Pre-Petition Obligations"). The Debtor concludes that the Pre-Petition Obligations constitute allowed, legal, valid, binding, enforceable and non-avoidable obligations of the Debtor, and may not be subject to any offset, defense, counterclaim, avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or any other applicable law. The Debtor concludes that it does not possess and may not assert any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of the Pre-Petition Obligations.

12. As of the Petition Date, the Pre-Petition Obligations were fully secured pursuant to the Pre-Petition Financing Agreements by valid, perfected, enforceable and non-avoidable security interests and liens granted by the Debtor to XSI upon all of the Assets existing as of the Petition Date and all rents, issues, profits, proceeds, and products thereof (the "Prepetition Collateral", and collectively, together with any other property of the Debtor's bankruptcy estate (as defined under section 541 of the Bankruptcy Code, the "Estate"). Debtor does not possess and will not assert any claim, counterclaim, setoff or defense of any kind, nature or description, which would in any way affect the validity, enforceability and non-avoidability of any of XSI's liens, claims and/or security interests in the Pre-Petition Collateral.

C. **Need for Access to DIP Financing**

13. As set forth in the Salbello Declaration, the Estate will suffer immediate and irreparable harm if the Debtor does not obtain authorization to use cash collateral and immediate access to the proposed debtor-in-possession financing ("DIP Financing"), as the Debtor does not

have sufficient available sources of working capital to operate its business in the ordinary course without the financing requested herein. The ability of the Debtor to obtain sufficient liquidity through the proposed post-petition financing arrangements with XSI as set forth in this Motion is, therefore, vital to the preservation and maintenance of the Debtor's going concern value. Accordingly, the Debtor has an immediate need to obtain the post-petition financing in order to permit, among other things, the orderly operation of its business and the continued marketing of itself and its assets, thereby allowing it to engage in an orderly sale through an auction pursuant to Section 363 of the Bankruptcy Code; maximizing the potential recovery to all creditors.

14. The Debtor believes that it would be futile, under the circumstances, to pursue alternative post-petition financing in the form of: (1) unsecured credit allowable as an administrative expense under Section 503(b)(1) of the Code; (2) unsecured credit allowable under Sections 364(a) and 364(b) of the Code; or (3) secured credit pursuant to Section 364(c) and/or Section 364(d) of the Code, on more favorable terms and conditions from sources other than XSI. Accordingly, XSI has agreed to fund the Debtor's continued operations in chapter 11 in exchange for the reasonable protections proposed, including first-priority liens on all of the Assets in accordance with Section 364(d) of the Code.

**D.   Proposed Use of Cash Collateral and Proposed DIP Financing**

15. XSI is willing to permit the Debtor to use cash collateral (as defined by Section 363(a) of the Code, including, any pre-petition proceeds and, subject to Section 552 of the Code, any and all post-petition proceeds of the Pre-Petition Collateral (the "Cash Collateral")) and to operate under the Pre-Petition Financing Agreements with the amendments described below.

16. In addition to permitting the use of Cash Collateral, XSI has agreed to provide the Debtor with access to additional postpetition credit (the "DIP Loan") on substantially the same

terms and conditions of the Pre-Petition Financing Agreements prior to the Petition Date, pursuant to the Budget, with the amendments described below.

17. Given the Debtor's current debt obligations and lack of liquidity, the Debtor has had to rely for some time on protective advances from XSI made under the Pre-Petition Financing Agreements to meet daily operating needs and remains unable to satisfy obligations as they come due. As indicated in the 13 week budget, which has been approved by XSI (as amended, modified or supplemented from time to time, the "DIP Budget", a copy of which is annexed hereto as Exhibit "B"), the Debtor will need additional funds from XSI as well as the use of Cash Collateral to operate postpetition.

## RELIEF REQUESTED

18. By this Motion, the Debtor seeks entry of the DIP Orders, *inter alia*:

   a. Authorizing the Debtor to use Cash Collateral; *provided that* all expenditures of Cash Collateral shall be pursuant to the DIP Budget;

   b. authorizing the Debtor to obtain secured debtor-in-possession financing up to an aggregate principal amount of the DIP Loan, *provided that*, prior to the Final Order, the Debtor may only borrow on an interim basis up to an aggregate principal or face amount of $50,000.00, and *provided further* that all interim and final borrowings shall be pursuant to the DIP Budget;

   c. authorizing the Debtor to assume the Pre-Petition Financing Agreements and such additional documents, instruments and agreements as are required to implement the terms of the DIP Order, and to perform such other and further acts as may be required in connection with the DIP Loan Documents;

   d. granting Replacement Liens on all DIP Collateral subject and junior only to the Carve-Out (defined below);

   e. granting security interests, liens and superpriority claims (including a superpriority claim pursuant to section 364(c)(1) of the Bankruptcy Code, liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, and priming liens pursuant to section 364(d) of the Bankruptcy Code) in favor of XSI, to secure the DIP Loan;

   f. modifying the automatic stay imposed by section 362 of the Bankruptcy Code as required to permit XSI to implement the terms of the DIP Order and, upon the occurrence and during the continuance of an Event of

Default, to exercise all rights and remedies in the Pre-Petition Financing Agreements as set forth in the Interim Order;

g. scheduling a final hearing ("Final Hearing"), to be held no later than thirty (30) days after entry of the Interim Order, to consider entry of the Final Order; and

h. approving certain notice procedures for the hearings set forth herein.

19. Pending entry of the Final Order, the Debtor seeks approval of the Interim Order, which will (i) authorize the Debtor to use Cash Collateral as set forth in the DIP Budget; (ii) authorize the Debtor to borrow up to $50,000.00 under the DIP Loan as set forth in the DIP Budget, (iii) grant to XSI the first priority liens and superpriority claims described herein, (iv) schedule the Final Hearing, and (v) approve certain notice procedures.

## SUMMARY OF PRINCIPAL TERMS OF DIP FINANCING

20. The DIP Loan is the product of arm's length negotiations between the Debtor, XSI and their respective advisors.

21. Pursuant to Local Rule 4001-2, the following provisions are highlighted:

a. <u>Grants of Cross-Collateralization (Local Rule 4001-2(a)(i)(A))</u>. The proposed Interim Order (p. 9, §2.1.1) grants XSI a lien on all Pre-petition and Post-petition Collateral (collectively, the "<u>DIP Collateral</u>") of the Debtor to secure repayment of all obligations owed by the Debtor to XSI.

b. <u>Limitations on Investigation (Local Rule 4001-2(a)(i)(B))</u>. The proposed Interim Order (p. 3, §D(iv)) includes stipulations and findings of fact with respect to, among other things, the extent, validity, priority, perfection and enforceability of the claims, liens and security interests of XSI, as well as a waiver of claims held by the Debtor (and any party acting by, through or on behalf of the Debtor) against XSI relating to the DIP Loan Documents. The Interim Order (p. 15, §4.1), however, gives all parties in interest other than the Debtor forty five (45) days after entry of the Interim Order to investigate and, if appropriate, challenge such matters. The Debtor believes that a forty-five day investigation period presents all parties in interest with more than sufficient time within which to conduct any investigation of XSI's Claims. Further, the Interim Order (p. 15, ¶2.3.2) precludes XSI's funds from being used to pay professional fees or expenses incurred in connection with any such challenge.

c.     **Waiver of Surcharge Rights under § 506(c) (Local Rule 4001-2(a)(i)(C)).** The proposed Interim Order (p. 17 § 4.3) provides that, with the exception of certain listed Carve-Out expenses, no costs or expenses of administration shall be charged or assessed against or recovered from XSI's collateral without the prior written consent of XSI.

        **Lien on Avoidance Actions (Local Rule 4001-2(a)(i)(D)).** The proposed Interim Order does not grants XSI a first-priority lien on proceeds of avoidance actions under chapter 5 of the Bankruptcy Code. However, the Debtor will seek such relief in the Final Order. This is appropriate because it is part of the security given for the DIP Loan and because it likely is of little consequence given that XSI has funded the Debtor's operations for several months prior to the Petition Date.

d.     **Provisions that Deem Prepetition Debt to be Postpetition Debt (Local Rule 4001-2(a)(i)(E)).** There are no provisions in the proposed Interim Order that deem prepetition debt to be postpetition debt.

e.     **Provisions with Respect to the Treatment of Professionals Retained by a Creditors' Committee and the Debtor (Local Rule 4001-2(a)(i)(F)).** The proposed Interim Order (p. 2, §2.3.1) provides for a carve-out from XSI's collateral in the amount of $25,000.00 for Professionals retained by any committee.

f.     **Provisions that Prime an Existing Secured Lien Without Such Lienholder's Consent (Local Rule 4001-2(a)(i)(G)).** There exists a judgment docketed against the Debtor in favor of Kimball International, Inc. and Kimball Electronics, Inc. (collectively "Kimball") dated May 19, 2010. Such judgment may act as a lien against the physical Assets located in the State of Florida (but not the Debtor's intellectual property, which constitutes the vast majority of the value of the Debtor's Assets.) The proposed Interim and Final Orders provide XSI first position liens, which would prime any alleged lien Kimball may hold.

22.     Certain key terms of the DIP Loan Documents are as follows:[4]

      a.     **Borrower:** XStream Systems, Inc.

      b.     **Use of DIP Loan:** The DIP Loan shall be used only to the extent that Cash Collateral is not sufficient to pay the Debtor's expenses as set forth in the DIP Budget.

      c.     **DIP Budget:** Payment of any expenses, whether through the use of Cash Collateral or with the proceeds of DIP Advances, shall be made only pursuant to the DIP Budget, provided that (i) total cash expenditures may exceed the amounts set forth in the DIP Budget provided that such cash

---

[4] This summary is qualified in its entirety by reference to the DIP Loan Documents. To the extent there is any inconsistency between this Motion and the DIP Loan Documents, the latter shall govern.

expenditures do not, in the aggregate, exceed 110% of the total cash expenditures set forth in the DIP Budget for any week without the prior written consent of XSI.

d. <u>Interest Rate</u>: The DIP Loan shall bear interest at the rate of twelve percent.

e. <u>Origination Fee</u>: Consistent with the Pre-Petition Financing Agreements, each advance of the DIP Loan will include a five percent origination fee.

f. <u>Term:</u> The DIP Loan shall expire on the earlier of (a) June 15, 2011, or (b) an event of default shall have occurred.

g. <u>Security and Superpriority</u>: The Prepetition Obligations shall be secured by the Replacement Liens (as defined below). The DIP Loan shall be secured, and all interest that accrues thereon shall be secured, by the DIP Loan Documents, the Replacement Liens and by post-petition liens pursuant to sections 363(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code. In addition, the DIP Loan shall have superpriority administrative expense status under section 364(c)(1) of the Bankruptcy Code.

23. The DIP Loan contains a carve-out (the "<u>Carve-Out</u>") from XSI's Collateral with the following terms:

a. <u>The Debtors Professional Carve-Out</u>. The unpaid and outstanding reasonable fees and expenses actually incurred on or after the Petition Date, and approved by a final order of the Court pursuant to sections 326, 328, 330, or 331 of the Bankruptcy Code (collectively, the "<u>Allowed Professional Fees</u>") by attorneys, accountants and other professionals retained by the Debtor under section 327 or 1103(a) of the Bankruptcy Code (the "Debtor's Professionals"), less the amount of any retainers, if any, then held by each, aggregate not to exceed $160,000.00 (the "<u>Debtor's Professional Fee Carve-Out</u>").

b. <u>The Committee Professional Carve-Out</u>. The unpaid and outstanding Allowed Professional Fees by attorneys, accountants and other professionals retained by any Committee(s) under section 327 or 1103(a) of the Bankruptcy Code (collectively, the "Committee Professionals"), less the amount of any retainers, if any, then held by each Professionals, in a cumulative, aggregate sum not to exceed $25,000.00 (the "<u>Committee Professional Fee Carve-Out</u>" and with the Debtor's Professional Fee Carve-Out, the "<u>Professional Fee Carve-Out</u>").

c. <u>Excluded Professional Fees</u>. The Professional Fee Carve-Out shall not be used to pay any Allowed Professional Fees or any other fees and/or expenses incurred by any Professional in connection with any of the

9

following: (a) an assertion or joinder in (but excluding any investigation into) any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief: (i) challenging the legality, validity, priority, perfection, or enforceability of the Obligations or XSI's liens on and security interests in the Collateral, (ii) invalidating, setting aside, avoiding, or subordinating, in whole or in part, the Obligations or XSI's liens on and security interests in the Collateral, or (iii) preventing, hindering, or delaying XSI's assertion or enforcement of any lien, claim, right or security interest or realization upon any Collateral, (b) a request for authorization to obtain debtor-in-possession financing or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code other than from XSI without the prior written consent of XSI, (c) the commencement or prosecution of any action or proceeding of any claims, causes of action, or defenses against XSI or any of their respective officers, directors, employees, agents, attorneys, affiliates, assigns, or successors, including, without limitation, any attempt to recover or avoid any claim or interest from XSI under Chapter 5 of the Bankruptcy Code, or (d) any act which has the effect of materially and adversely modifying or compromising the rights and remedies of XSI, or which is contrary, in a manner that is material and adverse to XSI to any term or condition set forth in or acknowledged by the Financing Agreements or the Interim Order and which results in the occurrence of an Event of Default under the Financing Agreements and/or the Interim Order.

d. <u>Carve Out Reserve</u>. At XSI's sole discretion, it may, at any time and in any increment in accordance with the DIP Loan Documents, establish an Availability Reserve against the amount of Loans and other credit accommodations that would otherwise be made available to the Debtor pursuant to the lending formulae contained in the DIP Loan Documents in respect of the Professional Fee Carve-Out and the other Carve-Out Expenses.

e. <u>Payment of Carve-Out Expenses</u>. Any payment or reimbursement made either directly by or on behalf of XSI at any time or by or on behalf of the Debtor on or after the occurrence of an Event of Default (as defined in the Pre-Petition Financing Agreements) in respect of any Allowed Professional Fees or any other Carve-Out Expenses shall, in either case, permanently reduce the Professional Fee Carve-Out for such Professional, on a dollar-for-dollar basis. XSI's decision, if any, to fund or otherwise pay the Professional Fee Carve Out and the other Carve-Out Expenses shall be added to and made a part of the Obligations, secured by the Collateral, and entitle XSI to all of the rights, claims, liens, priorities and protections under the Interim Order, the Financing Agreements, the Bankruptcy Code, and/or applicable law. Payment of any Carve-Out Expenses, whether by or on behalf of XSI, shall not and shall not be

deemed to reduce the Obligations and shall not be deemed to subordinate any XSI's liens and security interests in the Collateral or their Super-Priority Claim to any junior pre-petition or post-petition lien, interest, or claim in favor of any other party. XSI shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any Professionals incurred in connection with this Case.

## BASIS FOR RELIEF

### A. Basis for Emergency Relief

24. As set forth in the Salbello Declaration, the Debtor brings this Motion on an expedited basis to avoid the immediate and irreparable harm that will be suffered by the Estate if the Debtor does not obtain the liquidity needed to operate its business during this chapter 11 case. The DIP will be used to fund daily business operations as well as fund the expenses necessary to market and sell the Debtor or its assets through an auction pursuant to Bankruptcy Code Section 363. The ability of the Debtor to obtain sufficient liquidity through the proposed post-petition financing arrangements with XSI as set forth in this Motion is, therefore, vital to the preservation and maintenance of the Debtor's going concern value. Accordingly, the Debtor has an immediate need to obtain the post-petition financing in order to permit, among other things, the orderly operation of its business and the continued marketing of itself and its assets, thereby allowing it to engage in an orderly sale through an auction pursuant to Section 363 of the Bankruptcy Code; maximizing the potential recovery to all creditors.

25. Local Rule 4001(b) provides that the Court may grant interim relief when it is necessary to avoid immediate and irreparable harm to the estate. Bankruptcy Rule 4001(c) provides that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than fifteen (15) days after the service of such motion. Upon request, however, this Court is empowered to conduct an interim expedited

hearing on motion at which time it may authorize a debtor to obtain credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate. Pursuant to Bankruptcy Rule 4001(c) and Local Rule 4001(b), the Debtor requests that the Court conduct an expedited Interim Hearing as soon after the Petition Date as the Court's schedule permits.

26. The Debtor has determined, in consultation with its advisors, that it would not be able to obtain alternative financing on terms superior to the terms of the DIP Loan, and such terms are market terms that represent the best terms reasonably available to the Debtor.

**B.** **The Court Should Permit the Debtor's Use of Cash Collateral**

27. Section 363(c)(2) of the Bankruptcy Code provides that debtors may not use, sell or lease cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). "Cash collateral" is defined to mean "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest." 11 U.S.C. § 363(a).

28. Section 363(e) of the Bankruptcy Code provides that upon request of an entity that has an interest in property to be used by a debtor, the Court shall prohibit or condition such use as is necessary to provide adequate protection of such interest. Although "adequate protection" is not defined in the Bankruptcy Code, section 361 of the Bankruptcy Code provides the following three non-exclusive examples of what may constitute adequate protection:

>    (1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the . . . use . . . under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;
>    
>    (2) providing to such entity an additional or replacement lien to the extent that such . . . use . . . results in a decrease in the value of such entity's interest in such property; or

>   (3) granting such other relief ... as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361.

29. According to the legislative history, a finding of adequate protection is "left to case-by-case interpretation and development. It is expected that the courts will apply the concept in light of facts of each case and general equitable principals." H.R. Rep. No. 595, 95th Cong., 2nd Sess. 339 (1977), reprinted in 1978 U.S.C.C.A.N. 5787, 6295. *See In re O'Connor*, 808 F.2d 1393, 1396-97 (10th Cir. 1987); *In re Nashua Trust Co.*, 73 B.R. 423, 430-31 (Bankr. D. N.J. 1987). The purpose is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Pursuit Athletic Footwear, Inc.*, 193 B.R. 713, 716 (Bankr. D. Del. 1996); *In re Planned Sys., Inc.*, 78 B.R. 852, 861-62 (Bankr. S.D. Ohio 1987).

30. XSI has consented to the Debtor's use of Cash Collateral on the terms and conditions set forth in the DIP Loan Documents and Interim Order. XSI has conditioned its consent to the use of Cash Collateral and funding the DIP Loan on their receipt of replacement liens on all DIP Collateral (the "Replacement Liens") for their interest in the Prepetition Collateral (the "Adequate Protection"). They further require, as Adequate Protection, that the Replacement Liens be deemed perfected automatically upon entry of the Interim Order, without the necessity of the filing of any UCC financing statement, state or federal notice, mortgage or similar instrument or document in any state or public record or office and without the necessity of taking possession or "control" (within the meaning of the Uniform Commercial Code) of any Collateral.

31. The Debtor submits that the foregoing protections to be granted to XSI will provide XSI with sufficient adequate protection.

## C. The Court Should Permit the Debtors to Obtain Secured DIP Financing

32. Section 364 of the Bankruptcy Code authorizes this Court to allow the Debtor to obtain postpetition financing in the manner proposed. As security for all obligations owed under the DIP Loan, the Debtor proposes to grant to XSI, subject to the Carve-Out (as defined below), a superpriority claim and perfected first-priority security interests and liens on the DIP Collateral.

33. Section 364 of the Bankruptcy Code provides as follows:

(c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt —

(1) with priority over any and all administrative expenses of the kind specified in section 503(b) and 507(b) of this title;

(2) secured by a lien on property of the estate that is not otherwise subject to a lien;

(3) secured by a junior lien on property of the estate that is subject to a lien.

(d) (1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if-

(A) the trustee is unable to obtain such credit otherwise; and

(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364.

34. Generally, sections 364(c) and (d) of the Bankruptcy Code require a debtor to demonstrate that alternative sources of post-petition credit are not available under sections 364(a) or (b). However, where few lenders are likely able or willing to extend the credit required, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for

financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Savings Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989).

35. The universe of lenders who would commit to meet the Debtor's postpetition financing requirements is very limited. Given the Debtor's precarious financial condition and existing financing arrangements, the Debtor determined in consultation with its advisors that it would not be able to obtain unsecured credit or other financial accommodations allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code. DIP financing is not otherwise available without the Debtor (i) granting, pursuant to section 364(c)(1) of the Bankruptcy Code, claims having priority over any and all administrative expenses of the kinds specified in sections 503(b) and 507(b), of the Bankruptcy Code, other than in respect of the Carve-Out; and (ii) securing, pursuant to section 364(c)(2) and (3) and 364(d) of the Bankruptcy Code, superpriority claims, security interests, and liens on the Assets (*i.e.*, the DIP Collateral).

36. The Debtor has determined, in consultation with its advisors, that the terms of financing proposed by XSI are the most favorable available under the circumstances. This is particularly true given: (i) the Debtor's current financial condition; (ii) the delay and cost attendant to soliciting proposals from new lenders, which would require additional due diligence and related fees; and (iii) that the Debtor cannot survive through use of unencumbered property.

37. The Debtor negotiated the best financing arrangement that it can reasonably expect under the circumstances. The fees are customary and reasonable, and courts routinely authorize similar lender incentives beyond the explicit liens and rights specified in section 364 of the Bankruptcy Code. *See In re Defender Drug Stores, Inc.*, 145 B.R. 312, 316 (9th Cir. BAP 1992). Moreover, the alternatives are dire; without liquidity the Debtor cannot continue operations and will be forced to dismiss these cases or convert to chapter 7.

### D. The Court Should Allow the DIP to Prime Kimball's Lien

38. While Kimball may hold a judgment against the Debtor, it does not have a lien against the overwhelming majority of the Assets; namely the Debtor's intellectual property. The Debtor is a Delaware corporation. As such, its intellectual property must be deemed to be located in that state. Thus, any security interest in the Debtor's intellectual property must be filed with the Delaware Secretary of State. (*See* Del. Art. 9-501, requiring the filing of liens against collateral in the state with the Delaware Secretary of the State.) A review of a lien search for the State of Delaware reveals no lien filed by Kimball against the Debtor.

39. The balance of the Assets, office equipment, Devices, etc, are mostly located in Florida. While Kimball may, allegedly, have a lien against this personal property by reason of it docketing the judgment in Florida, any lien Kimball holds does not cover the Debtor's intellectual property.

40. Based on the foregoing, the Debtor requests that the Court approve the DIP Loan as described herein.

### E. XSI is Entitled to the "Good Faith" Protections of Section 364(e) of the Bankruptcy Code

41. The terms and conditions of the DIP Loan are fair and reasonable. Such terms and conditions were negotiated in good faith and at arm's length at all times by the Debtor, XSI and their respective advisors. The Debtor and XSI have conducted extensive negotiations concerning the DIP Budget, which requires the immediate use of cash collateral and access to the DIP Loan from XSI.

42. In light of the foregoing, XSI should be accorded the benefits and protections of section 364(e) of the Bankruptcy Code with respect to the DIP Loan; specifically, any loans,

advances or other financial accommodations that XSI makes or causes to be made from time-to-time to the Debtor on the terms and conditions set forth in the DIP Loan should be deemed to have been made and provided in "good faith" as the term is used in section 364(e) of the Bankruptcy Code, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the DIP Orders or DIP Loan or any provisions are hereafter modified, vacated, amended or stayed by subsequent order of this Court or any other court without the express consent of XSI.

**F.      The Section 506(c) Waiver Should be Approved**

43.     The Court should approve the Debtor's waiver of any right to surcharge the Postpetition Collateral.  Such waivers and provisions are standard and customary under financings between sophisticated parties such as the Debtor and XSI.  As one court noted in discussing the later enforceability of such waivers, "the Trustee and Debtors-in-Possession in this case had significant interests in asserting claims under § 506(c) and have made use of their rights against XSI under § 506(c) by waiving them in exchange for concessions to the estates (including a substantial carve-out for the benefit of administrative creditors)." *In re Molten Metal Technology, Inc.*, 244 B.R. 515, 527 (Bankr. D. Mass. 2000); *See also In re Nutri/System of Florida Assocs.*, 178 B.R. 645, 650 (E.D. Pa. 1995) (noting that debtor had waived § 506(c) rights in obtaining debtor-in-possession financing); *cf. In re Telesphere Communications, Inc.*, 179 B.R. 544, 549 (Bank. N.D. Ill. 1994) (approving settlement between debtor and certain lenders wherein debtor waived certain rights (including 506(c) rights) against the lenders in exchange for valuable consideration).

44.     The waiver of surcharge rights is particularly appropriate where, as here, it is tied to the benefit to be received from a carve-out.  Under the DIP Loan, the Debtor agrees to waive

any rights to charge costs and expenses against XSI's collateral *except* for the Carve-Out. In other words, the Debtor has waived the uncertainty of surcharge rights in exchange for the valuable and predictable rights granted to the Debtor's other estate professionals under a carve-out. *Cf. In re Lunan Family Restaurants Ltd. P'ship*, 192 B.R. 173, 178 (N.D. Ill. 1996) ("The burden of proof is on any proponent of § 506(c) treatment, who must show by a preponderance of evidence that [(1) the expenditure was necessary, (2) the amounts were reasonable, and (3) the secured creditor was the party primarily benefited by the expenditure]."), *citing In re Flagstaff*, 739 F.2d 73, 77 (2d Cir. 1984) and *New Orleans Public Service Inc. v. Delta Towers, Ltd. (In re Delta Towers)*, 112 B.R. 811, 815 (E.D. La. 1990), *rev'd on other grounds sub nom., In re Delta Towers*, 924 F.2d 74 (5th Cir. 1991).

## G. Modification of Automatic Stay

45. The DIP Loan contemplates a modification of the automatic stay to the extent applicable and necessary to permit XSI to implement the terms of the DIP Orders and, upon the occurrence and during the continuance of an Event of Default, to exercise all rights and remedies in the Pre-Petition Financing Agreements as set forth in the Interim Order. Provisions of this kind are standard in debtor-in-possession financing and are reasonable under the circumstances.

## H. Establishing Notice Procedures and Request for Final Hearing

46. Pursuant to Bankruptcy Rule 4001(b)(2), the Court may commence a final hearing fifteen (15) days after service of this Motion. Local Rule 4001-2(c) further specifies that the Final Order may only be entered after notice and a hearing and that ordinarily a final hearing shall be held at least ten (10) days after the organizational meeting of a creditors committee, if any. The Debtors shall, within three (3) business days of the entry of the Interim Order by the Court, serve by overnight mail, a copy of the Interim Order and a notice of the Final Hearing

("Final Hearing Notice") to consider entry of the Final Order on the date established by the Court.

47. Any party in interest objecting to the relief sought at the Final Hearing shall serve and file objections, which objections shall: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; and (iii) be filed with the Clerk of the United States Bankruptcy Court for the District of Delaware no later than three (3) business days before the Final Hearing and served upon the following parties so as to be received not less than three (3) business days before the Final Hearing: (a) counsel to the Debtor, Gersten Savage, LLP, Attn: Paul Rachmuth, Esq, 600 Lexington Avenue, New York, New York 10017 and Bayard, P.A., Attn: Jamie L. Edmonson, Esq., 222 Delaware Avenue, Suite 900, Wilmington, Delaware 19899 (b) the United States Trustee for the District of Delaware; (c) counsel to XSI, Robinson & Cole, LLP, Attn: Patrick M. Birney 280 Trumbull Street, Hartford, Connecticut 06103-3597 and (d) counsel to any statutory committee appointed in these chapter 11 cases.

48. The Debtor requests that the Court schedule the Final Hearing and approve the proposed notice and objection procedures for the Final Hearing set forth herein.

## NOTICE AND PRIOR MOTIONS

49. The Debtor shall, as soon as reasonably possible after the Court schedules the interim hearing on this Motion to consider entry of the proposed Interim Order, serve by electronic mail, facsimile or overnight mail, a notice of such interim hearing on (a) the U.S. Trustee, (b) the creditors listed on the Debtor's List of Creditors Holding 20 Largest Unsecured Claims, (c) counsel to XSI, and (d) all parties with liens of record on the Debtor's assets as of the Petition Date.

50. In light of the nature of the relief requested herein, the Debtor submits that no other and further notice of the Motion is necessary or required.

51. No previous request for the relief sought has been made to this or any other court.

WHEREFORE, the Debtor requests that the Court (i) immediately enter the Interim Order, (ii) schedule the Final Hearing, and (iii) grant the Debtor such other and further relief as it deems may be just and proper under the circumstances.

April 11, 2011
Wilmington, Delaware

BAYARD, P.A.

*/s/ Jamie L. Edmonson*
Jamie L. Edmonson (No. 4247)
Daniel A. O'Brien (No. 4897)
222 Delaware Avenue, Suite 900
Wilmington, DE 19801
Phone: (302) 655-5000
Fax: (302) 658-6395

-and-

GERSTEN SAVAGE, LLP
Paul Rachmuth
600 Lexington Avenue
New York, New York 10022
Telephone: (212) 752-9700
Facsimile: (212) 980-5192

*Proposed Counsel for the Debtors and Debtors in Possession*