XSI, Inc.

April __, 2011

XStream Systems, Inc.
c/o Gersten Savage, LLP
Attn: Paul Rachmuth
600 Lexington Avenue
New York, New York 10022


Attn: Kim Hetzel Salbello, CRO


Re:    Amended Credit Facility

Ms. Salbello:

On March 1, 2011, XSI, Inc. ("XSI") made available to XStream Systems, Inc. (the "Company") a senior, secured credit facility (the "Credit Facility") pursuant to which XSI agreed to provide the Company loans in the aggregate principal amount of up to Two Hundred Thousand Dollars ($200,000) payable in such tranches and in such amounts (each, an "Advance").

On April 8, 2011 (the "Filing Date"), the Company filed a petition pursuant to Chapter 11 of Title 11, U.S. Code (the "Chapter 11 Case"). From March 1, 2011 to April 7, 2011, XSI made Advances to the Company in the aggregate principal amount of One Hundred Thirty Three Thousand Three Hundred Fifty Dollars ($133,350) (the "Pre-petition Indebtedness"), plus interest, costs and fees incurred or accruing thereafter, evidenced by (i) a senior secured demand note, dated March 1, 2011 (the "Note"), (ii) a security agreement, dated March 1, 2011 (the "Security Agreement"), and (iii) a control agreement, dated March 1, 2011 (the "Control Agreement"). The Pre-petition Indebtedness is secured by a first lien senior security interest in all of the assets of the Company.

The Company wishes to continue to borrow money from XSI in an amount not to exceed Fifty Thousand Dollars ($50,000) in original principal amount over and above the Pre-petition Indebtedness subject to the terms of this amended and restated letter agreement (the "Amended Letter Agreement"), the amended and restated Note of even date herewith, attached hereto as Exhibit A (the "Amended Note") and the amended and restated Security Agreement of even date herewith, attached hereto as Exhibit B (the "Amended Security Agreement") to provide for such continued borrowing.

XSI agrees to provide for such continued borrowing subject to the conditions specified in this Amended Letter Agreement. Upon request of the Company, additional Advances shall be made available by XSI to the Company, on an as needed basis in such amounts and at such times as determined solely by XSI and only in accordance with the limitations imposed by debtor-in-possession financing orders approved by the bankruptcy court in the Company's Chapter 11 case (the "Amended Credit Facility"). Such advances may be made to or on behalf of the Company as authorized and directed by XSI in its sole discretion.

For every Advance provided to the Company by XSI, XSI shall amend Exhibit A to the Amended Note, to reflect the amount of such Advance plus an origination fee equal to five percent (5%) of the amount of such Advance. The Amended Note shall bear interest at the rate of twelve percent (12%) per annum; provided, however, that during the continuance of an Event of Default (as defined in the Amended Note), the interest rate shall be increased to sixteen percent (16%).

The Company covenants to use the proceeds of each Advance solely for funding the Company's ongoing business operations and any other purpose XSI agrees to in writing.

Notwithstanding anything to the contrary provided herein or elsewhere, each Advance shall be conditioned upon XSI's receipt from the Company of a written certification that none of the following conditions exist as of the date of such Advance (a) an Event of Default, (b) a material adverse change in the business, assets, financial condition, income or prospects of the Company, (c) any material misstatements in or omissions from the materials that the Company has furnished as of such date to XSI for review, including but not limited to the Schedules to the Amended Note, and (d) a material disruption or material adverse change in the financial or capital markets since the date hereof.

The Company agrees to indemnify and hold harmless XSI, and its respective directors, officers, employees, affiliates, agents, attorneys, accountants, consultants and each other entity, if any, who controls XSI, and to hold XSI and such other persons and entities harmless from and against all losses, claims, damages, liabilities and expenses, joint or several, to which any such person or entity may become subject arising our of or in connection with this Amended Letter Agreement, the Amended Security Agreement, the Control Agreement and the Amended Note or any related transaction or any claim, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any of such indemnified parties is a party thereto, and to reimburse each of such indemnified parties upon demand for any legal or other expenses incurred in connection with investigating or defending any of the foregoing; provided, however, that the foregoing indemnity will not, as to any indemnified party, apply to losses, claims, damages, liabilities or related expenses to the extent they have resulted from the willful misconduct or gross

negligence of the proposed indemnitee. No indemnified person shall be liable for any indirect or consequential damages in connection this Amended Letter Agreement, the Amended Security Agreement, the Control Agreement, the Credit Facility or any related transactions.

This Amended Letter Agreement and XSI's commitment hereunder shall not be assignable by the Company without XSI's prior written consent. This Amended Letter Agreement may not be amended, and no provision hereof shall be waived or modified, except by an instrument in writing signed by the Company and XSI.

This Amended Letter Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without regard to the conflicts of laws principles thereof. The parties hereto hereby agree that any suit or proceeding arising directly and/or indirectly pursuant to or under this instrument or the consummation of the transactions contemplated hereby, shall be brought solely in a federal or state court located in the City, County and State of New York. By the execution hereof, the parties hereby covenant and irrevocably submit to the in personam jurisdiction of the federal and state courts located in the City, County and State of New York and agree that any process in any such action may be served upon any of them personally, or by certified mail or registered mail upon them or their agent, return receipt requested, with the same force and effect as if personally served upon them in New York City. The parties hereto waive any claim that any such jurisdiction is not a convenient forum for any such suit or proceeding and any defense or lack of in personam jurisdiction with respect thereto. In the event of any such action or proceeding, the party prevailing therein shall be entitled to payment from the other party hereto of its reasonable counsel fees and disbursements in an amount judicially determined. The parties hereto hereby knowingly, voluntarily and intentionally waive any rights they may have to a trial by jury in respect of any litigation based hereon, or arising out of, under, or in connection with this Amended Letter Agreement, the Amended Note, the Control Agreement, the Amended Security Agreement or any other document or instrument executed and delivered in connection herewith or any course of conduct, course of dealing, statements (whether verbal or written) or actions of the parties hereto.

Any notice, consent, request, or other communication given hereunder shall be deemed sufficient if in writing and sent by registered or certified mail, return receipt requested addressed to the Company, Attention: Kim Hetzel Salbello, CRO, C/O Gersten Savage, LLP, Attn: Paul Rachmuth, 600 Lexington Avenue, New York, New York 10022; and to XSI Attention: Simon Irish, C/O Robinson & Cole LLP, Attn: Paula Pescaru, 885 Third Avenue, Suite 2800, New York, NY 10022 (or to such other address as either the Company and/or XSI shall provide in writing to the other party). Notices shall be deemed to have been given on the date of receipt by the other party.

[Signature Page Follows]

Very truly yours,

XSI, INC.

By:_____
     Name:  Simon Irish
     Title:  Secretary

Accepted and agreed as of the
date first appearing above

XStream Systems, Inc.

By:_____
     Name:  Kim Hetzel Salbello
     Title: CRO

# EXHIBIT A
## AMENDED NOTE

**EXHIBIT B**
**AMENDED SECURITY AGREEMENT**

**EXHIBIT C**
**CONTROL AGREEMENT**

# XSTREAM SYSTEMS, INC.

## Amended and Restated

## Senior Secured Demand Note

**Up to $183,350**                                                                 **April ___, 2011**

FOR VALUE RECEIVED, XStream Systems, Inc., a Delaware corporation (the "Company"), promises to pay on the Maturity Date to the order of XSI, Inc., a Delaware corporation (together with any, any successors or assigns, the "Payee") the principal sum of $183,350 or such lesser amount as shall equal the outstanding principal amount of all sums advanced to the Company (the "Principal Amount") plus all accrued and unpaid interest and all other amounts due hereunder, pursuant to the amended and restated letter agreement, dated as of even date herewith, between the Company and the Payee (the "Letter Agreement"). Capitalized terms used, and not defined, herein shall have the meanings ascribed thereto in the Letter Agreement.

Each advance will be available to the Company pursuant to the conditions of the Letter Agreement.

The Company hereby authorizes the Payee to endorse on the Schedule of Advances annexed to this Amended and Restated Senior Secured Demand Note (this "Note") as Exhibit A all advances made to the Company and all payments of principal amounts in respect of such advances, which endorsements shall, in the absence of manifest error, be conclusive as to the outstanding principal amount of all advances; provided, however, that the failure to make such notation with respect to any advance or payment shall not limit or otherwise affect the obligations of the Company under the this Note, the Letter Agreement or the Security Documents (as defined below).

All then outstanding Principal Amounts plus accrued interest at the Interest Rate (defined below) shall be due and payable in full upon the earlier to occur of (i) the date on which an Event of Default (as defined herein) occurs, (ii) one year from the date of execution and delivery of this Note, or (iii) demand for payment is made hereunder (the "Maturity Date").

1.    Prepayments; Mandatory Prepayments. The Company may prepay all or any portion of the outstanding Principal Amount hereunder at any time after six months without penalty or premium; provided, however, that (i) any prepayment (whether voluntary or involuntary) shall be applied first to any accrued and unpaid interest hereunder up to the date of such prepayment, then to any other sums which may be payable to Payee hereunder, and then to the outstanding Principal Amount hereunder, and (ii) the acceptance of any such prepayment following the occurrence and during the continuance of any Event of Default hereunder shall not constitute a waiver, release or accord and satisfaction thereof or of any rights with respect thereto by Payee. A prepayment penalty shall be assessed for prepayments within the first six months following the date hereof equal to the difference between the accrued interest and six percent (6%) of the principal sum.

2.     Payment Date.   Whenever any payment to be made hereunder shall become due and payable on a day which is not a Business Day (as defined below), such payment may be made on the next succeeding Business Day without being deemed past due and, in the case of any payment of principal, such extension of time shall in such case be included in computing interest on such payment.  As used herein, "Business Day" shall mean any day which is not a Saturday, Sunday or a day on which banks in the State of New York are closed.

3.     Use of Proceeds.   The Company shall use the proceeds of each advance solely for funding the Company's ongoing business operations and any other purpose that Payee agrees to in writing.

4.     Computation of Interest; Payment of Interest.

A.  Base Interest Rate.  All computations of interest under this Note shall be based on a year of 360 days.  Subject to subsections 4B below, the outstanding Principal Amount shall bear interest at a rate per annum of twelve percent (12%); provided, however, that during the continuance of any Event of Default, the interest rate otherwise applicable hereunder shall be increased to sixteen percent (16%) (the "Interest Rate").  Interest on the outstanding Principal Amount and any other payment due hereunder shall be due and payable on the Maturity Date.

B.  Maximum Rate.  In the event that the interest, charges and fees payable by the Company in connection herewith or in connection with any other document or instrument executed and delivered in connection herewith cause the effective interest rate applicable to the indebtedness evidenced by this Note to exceed the maximum rate allowed by New York State law (the "Maximum Rate"), then such interest shall be recalculated for the period in question and any excess over the Maximum Rate paid with respect to such period shall be credited, without further agreement or notice, to the Principal Amount outstanding hereunder to reduce said balance by such amount with the same force and effect as though the Company had specifically designated such extra sums to be so applied to the Principal Amount and the Payee had agreed to accept such extra payment(s) as a premium-free prepayment.  All such deemed prepayments shall be applied to the Principal Amount payable at maturity.

5.     Collateral.   This Note is secured by certain collateral (the "Collateral") more specifically described in the Amended and Restated Security Agreement, dated as of the date hereof, by and between the Company and Payee (as amended, modified or supplemented from time to time, the "Security Agreement"), the Uniform Commercial Code financing statements in connection with the Security Agreement (the "UCC Statements"), and the Control Agreement, dated as of March 1, 2011, by and between the Company and the Payee (as amended modified or supplemented from time to time, the "Control Agreement", and together with the Security Agreement, the UCC Statements, and any and all other documents executed and delivered by the Company to the Payee under which the Payee is granted liens on assets of the Company, the "Security Documents") of the Company in favor of the Payee covering all assets and future assets of the Company therein described, and Payee is entitled to the benefits thereof.

6.     Covenants of Company.  The Company covenants and agrees with respect to the Company that on and after the date hereof, so long as this Note shall remain in effect, or the

Principal Amount of, or interest thereon, or any fee, expense or amount payable hereunder or with respect to this Note shall be unpaid, it will perform the following obligations:

A. <u>Maintenance of Existence</u>. The Company will do or cause to be done all things necessary to preserve and keep in full force and effect its corporate existence, rights (character and statutory) and franchises, except where the failure to comply would not have a material adverse effect on the business, assets (including intangible assets), liabilities, financial condition, property, prospects or results of operations of the Company (a "Material Adverse Effect").

B. <u>Compliance with Laws</u>. The Company will comply with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, any governmental agency, in respect of the conduct of its business and the ownership of its properties (including without limitation applicable statutes, regulations and orders relating to equal employment opportunities or environmental standards or controls), except such as are being contested in good faith by appropriate proceedings, except where failure to comply would not have a Material Adverse Effect.

C. <u>Books and Records</u>. The Company will at all times keep true and correct books, records and accounts reflecting all of its business affairs and transactions in accordance with Generally Accepted Accounting Principles in the United States ("GAAP"). Such books and records shall be open at reasonable times and upon reasonable notice to the inspection of the Payee or its agents, subject to customary confidentiality restrictions but in no event more than once in each month absent a good-faith showing of need for such restrictions.

D. <u>Notice of Certain Events</u>. The Company will give prompt written notice (with a description in reasonable detail) to the Payee of:

(i) the occurrence of any Event of Default or any event which, with the giving of notice or the lapse of time, would constitute an Event of Default; and

(ii) any material development materially and adversely affecting the business, properties, liabilities, obligations, financial condition, prospects, operations or results of operations of the Company taken as a whole.

E. <u>Financial Statements and Information</u>. The Company shall furnish or cause to be furnished to the Payee:

(i) within 90 days after the end of each fiscal year, a copy of the balance sheet of the Company, together with the related statement of income, change in stockholder's equity, and change in cash flows as of the end of and for such fiscal year, together with a report from the Company's accountants that such financial statements fairly present in all material respects the financial condition and results of operations of the Company in accordance with GAAP consistently applied; and

(ii) promptly following any request therefore, such other information regarding the business, financial condition or operations of the Company or compliance with the terms of this Note, the Security Documents or the Letter Agreement as the Payee may request.

7. Events of Default.

A. The term "Event of Default" shall mean any of the events set forth in this Section 7A; provided, however, that the pendency of the Chapter 11 Case (as defined in the Letter Agreement) shall not be deemed an Event of Default:

(i) Non-Payment of Obligations. The Company shall fail to pay any outstanding Principal Amount when due or any interest or other amount payable under this Note.

(ii) Cross-Default. The Company shall fail to pay when due any amount payable under any other obligation owed to Payee; or

(iii) Orders, Judgments or Decrees. Except for the orders, judgments or decrees set forth Schedule 7A(iii) hereof, if any order, judgment, or decree is or shall be entered in any proceeding against the Company requiring it divest itself of a substantial part of its assets, or awarding a money judgment or judgments aggregating more than $10,000, and if, within thirty (30) days after entry thereof, such order, judgment or decree shall not have been discharged or execution thereof stayed pending appeal, or if, within thirty (30) days after the expiration of any such stay, such judgment, order or decree shall not have been discharged; or

(iv) Invalidity of Note or Security Documents. This Note or any other Security Document shall for any reason cease to be, or shall be asserted by the Company not to be, a legal, valid and binding obligation of the Company, enforceable in accordance with its terms, or the security interest or lien purported to be created by any of the Security Documents shall for any reason cease to be, or be asserted by the Company not to be, a valid, first priority perfected security interest in any Collateral (except to the extent otherwise permitted under any of the Security Documents); or

(v) Impairment of Collateral. Payee deems any collateral to be insufficient or impaired (including all property in which the Payee has been granted a lien or security interest by the Company); or

(vi) Other Breaches, Defaults. The Company shall default and/or be in breach of any representation, warranty or covenant made by the Company to the Payee provided under this Note, the Security Documents, the Letter Agreement or any other agreement between the Company and the Payee related to the subject matter contained in such agreements or documents.

B. Rights of Payee Upon Event of Default. Upon the occurrence of an Event of Default hereunder, Payee may, at its option, exercise any and all rights and remedies available to it under applicable law, including, without limitation, the right to collect from the Company all sums due under this Note and exercise any and all rights available to it under the Security Documents. The Company (i) waives presentment, demand, protest or notice of any kind in connection with this Note and (ii) agrees, in the event of an Event of Default, to pay the Payee of this Note, on demand, all reasonable out-of-pocket costs and expenses (including reasonable attorneys' and other legal fees) incurred in connection with the enforcement and collection of this Note.

C. Rights and Remedies Cumulative. No right or remedy herein conferred upon the Payee is intended to be exclusive of any other right or remedy contained herein or in any instrument or document delivered in connection with or pursuant to this Note or the Security Documents, and every such right or remedy shall be cumulative and shall be in addition to every other such right or remedy contained herein and therein or now or hereafter existing at law or in equity or by statute, or otherwise.

D. Rights and Remedies Not Waived. No course of dealing between the Company and the Payee or any failure or delay on the part of the Payee in exercising any rights or remedies of the Payee and no single or partial exercise of any rights or remedies hereunder or under the Security Documents shall operate as a waiver or preclude the exercise of any other rights or remedies hereunder.

8. Representations of the Company. The Company represents and warrants to the Payee that:

A. Corporate Organization; Etc. The Company is duly organized, validly existing and in good standing under the laws of the jurisdiction in which it is incorporated, and has the full corporate power and authority to carry on its business as it is now being conducted.

B. Title. Except as otherwise set forth on Schedule 8B hereto, the Company has good and marketable title to all material properties and assets owned by it, free and clear of all liens, charges, encumbrances or restrictions, except as otherwise disclosed in this Note or such as are not significant or important in relation to the Company's business.

C. Intellectual Property Rights. The Company owns or possesses adequate rights or licenses to use all trademarks, trade names, service marks, service mark registrations, service names, patents, patent rights, copyrights, inventions, licenses, approvals, governmental authorizations, trade secrets and rights necessary to conduct its business as now conducted.

D. Taxes. Except as otherwise set forth on Schedule 8D hereto, the Company has filed all Federal, state, local and foreign tax returns which are required to be filed by it or otherwise met its disclosure obligations to the relevant agencies and all such returns are true and correct in all material respects.

E. Compliance With Laws; Licenses; Etc. The business of the Company is not being conducted in violation of any law, ordinance or regulation of any governmental entity except for such violations the sanctions for which either individually or in the aggregate would not reasonably be expected to have a Material Adverse Effect, and the Company has not received notice of any violation of or noncompliance with any Federal, state, local or foreign, laws, ordinances, regulations and orders applicable to its business which has not been cured, the violation of, or noncompliance with which, would be reasonably likely to have a Material Adverse Effect.

F. Existing Indebtedness. Schedule 8F hereto sets forth a complete and correct list of all indebtedness for borrowed money of the Company in an unpaid principal amount exceeding $10,000, showing as to each item of such indebtedness the obligor, the aggregate

principal amount outstanding and a brief description of any security thereof (after giving effect to the application of the proceeds of the sale of this Note).

G. Security Interest. The Security Documents create and grant to the Payee a legal, valid and perfected first priority security interest in the Collateral. The Collateral is not subject to any other lien or security interest whatsoever except the liens or security interests set forth on Schedule 8G hereto.

H. Subsidiaries. As of the date hereof, the Company has no active subsidiaries.

I. Authorization; No Violation.

(i) The Company has full corporate power and authority necessary to enter into this Note, the Letter Agreement and the Security Documents and to carry out the transactions contemplated thereby. The Board of Directors of the Company has taken such necessary action to authorize the execution and delivery of this Note, the Letter Agreement and the Security Documents and the consummation of the transactions contemplated thereby. This Note, the Letter Agreement and the Security Documents have been duly executed and delivered by the Company and are legal, valid and binding obligations of the Company enforceable against it in accordance with their terms except that (a) such enforcement may be subject to bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights and (b) the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefore may be brought.

(ii) Neither the execution and delivery of this Note, the Letter Agreement or the Security Documents nor the consummation of the transactions contemplated thereby will violate any provision of the certificate of incorporation or by-laws or other organizational documents of the Company or violate any statute or law applicable to the Company.

J. Litigation. Except as set forth on Schedule 8J hereto, no action has been brought or is threatened, which would interfere with the right of the Company to execute and perform all of the Company's obligations contained in this Note, the Letter Agreement or the Security Documents.

9. Miscellaneous.

A. Parties in Interest. All covenants, agreements and undertakings in this Note binding upon the Company or the Payee shall bind and inure to the benefit of the successors and permitted assigns of the Company and the Payee, respectively. Prior to the occurrence of an Event of Default, Payee may at any time sell, assign, or otherwise transfer to any of its affiliates all or part of its rights and obligations under this Note. After the occurrence of an Event of Default, Payee may at any time sell, assign, or otherwise transfer to any other person or entity all or part of its rights and obligations under this Note.

B. Governing Law. This Note shall be governed by and construed in accordance with the laws of the State of New York without regard to the conflicts of laws or principles

thereof. The parties hereto hereby agree that any suit or proceeding arising directly and/or indirectly pursuant to or under this instrument or the consummation of the transactions contemplated hereby, shall be brought solely in a federal or state court located in the City, County and State of New York. By its execution hereof, the parties hereby covenant and irrevocably submit to the in personam jurisdiction of the federal and state courts located in the City, County and State of New York and agree that any process in any such action may be served upon any of them personally, or by certified mail or registered mail upon them or their agent, return receipt requested, with the same full force and effect as if personally served upon them in New York City. The parties hereto waive any claim that any such jurisdiction is not a convenient forum for any such suit or proceeding and any defense or lack of in personam jurisdiction with respect thereto. In the event of any such action or proceeding, the party prevailing therein shall be entitled to payment from the other party hereto of its reasonable counsel fees and disbursements in an amount judicially determined.

C. Waiver of Jury Trial. THE PAYEE AND THE COMPANY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH THIS NOTE OR ANY OTHER DOCUMENT OR INSTRUMENT EXECUTED AND DELIVERED IN CONNECTION HEREWITH OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF THE PAYEE OR THE COMPANY. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PAYEE'S PURCHASING THIS NOTE.

D. Expenses and Fees. The Company and the Payee shall each bear their own fees, costs and expenses with respect to the preparation, negotiation, execution and delivery of this Note, the Security Documents and the Letter Agreement.

E. Entire Agreement. This Note (including the Schedules hereto), the Security Documents and the Letter Agreement set forth the entire agreement of the parties with respect to the subject matter hereof and thereof, superseding and replacing any agreement or understanding that may have existed between the parties prior to the date hereof in respect to such subject matter.

IN WITNESS WHEREOF, this Note has been executed and delivered on the date first specified above by the duly authorized representative of the Company.

XSTREAM SYSTEMS, INC.


By: _____
      Name:
      Title:

## Schedule of Advances

| Date of Advance | Amount | Origination Fee | Total Principal Amount |
|---|---|---|---|
| February 22, 2011 | $15,000 | $750 | $15,750 |
| March 21, 2011 | $10,000 | $500 | $10,500 |
| April 7, 2011 | $102,000 | $5,100 | $107,100 |
| | | | |
| | | | |
| | | | |
| **Total:** | $127,000 | $6,350 | $133,350 |

# AMENDED AND RESTATED

# SECURITY AGREEMENT

**THIS AMENDED AND RESTATED SECURITY AGREEMENT** (this *"Agreement"*) is dated as of April __, 2011, by XSTREAM SYSTEMS, INC., a Delaware corporation (the *"Grantor"*), in favor of XSI, INC., a Delaware corporation (the *"Lender"*).

## Recitals

**WHEREAS,** pursuant to that certain Amended and Restated Letter Agreement (the *"Letter Agreement"*) of even date herewith between the Grantor and Lender, Lender has made available a senior, secured credit facility in the aggregate principal amount of up to One Hundred Eighty-Three Thousand Three Hundred Fifty Dollars ($183,350);

**WHEREAS,** pursuant to that certain Amended and Restated Promissory Note of even date herewith, issued by the Grantor in favor of the Lender (as the same may from time to time be amended, modified, supplemented or restated, the *"Note"*), Grantor has promised to pay the Obligations (as defined herein) to the Lender; and

**WHEREAS,** the obligations of the Lender under the Letter Agreement are subject to the condition, among others, that Grantor shall have executed and delivered to Lender this Agreement.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Grantor, Grantor hereby represents, covenants and agrees with Lender as follows:

1.    **Definitions.**

   a.    When used in this Agreement the following terms shall have the following meanings (such meanings being equally applicable to both the singular and plural forms of the terms defined):

   *"Collateral"* has the meaning assigned to such term in Section 2 of this Agreement.

   *"Contracts"* means all contracts (including any customer, vendor, supplier, service or maintenance contract), leases, licenses, undertakings, purchase orders, permits, franchise agreements or other agreements (other than any right evidenced by Chattel Paper, Documents or Instruments), whether in written or electronic form, in or under which Grantor now holds or hereafter acquires any right, title or interest, including, without limitation, with respect to an Account, any agreement relating to the terms of payment or the terms of performance thereof.

   *"Copyrights"* means all of the following now owned or hereafter acquired or created (as a work for hire for the benefit of Grantor) by Grantor or in which Grantor now holds or

hereafter acquires or receives any right or interest, in whole or in part: (a) all copyrights, whether registered or unregistered, held pursuant to the laws of the United States, any State thereof or any other country; (b) registrations, applications, recordings and proceedings in the United States Copyright Office or in any similar office or agency of the United States, any State thereof or any other country; (c) any continuations, renewals or extensions thereof; (d) any registrations to be issued in any pending applications, and shall include any right or interest in and to work protectable by any of the foregoing which are presently or in the future owned, created or authorized (as a work for hire for the benefit of Grantor) or acquired by Grantor, in whole or in part; (e) prior versions of works covered by copyright and all works based upon, derived from or incorporating such works; (f) income, royalties, damages, claims and payments now and hereafter due and/or payable with respect to copyrights, including, without limitation, damages, claims and recoveries for past, present or future infringement; (g) rights to sue for past, present and future infringements of any copyright; and (h) any other rights corresponding to any of the foregoing rights throughout the world.

*"Obligations"* has the meaning set forth in Section 3 of this Agreement.

*"Patents"* means all of the following in which Grantor now holds or hereafter acquires any interest: (a) all letters patent of the United States or any other country, all registrations and recordings thereof and all applications for letters patent of the United States or any other country, including, without limitation, registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country; (b) all reissues, divisions, continuations, renewals, continuations-in-part or extensions thereof; (c) all petty patents, divisionals and patents of addition; (d) all patents to issue in any such applications; (e) income, royalties, damages, claims and payments now and hereafter due and/or payable with respect to patents, including, without limitation, damages, claims and recoveries for past, present or future infringement; and (f) rights to sue for past, present and future infringements of any patent.

*"Trademarks"* means all of the following in which Grantor now holds or hereafter acquires any interest: (a) all trademarks, whether registered or unregistered, held pursuant to the laws of the United States, and State thereof, or any country (b) registrations, applications, recordings and proceedings in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country; (c) any continuations, renewals or extensions thereof; (d) any registrations to be issued in any pending applications; (e) income, royalties, damages, claims and payments now and hereafter due and/or payable with respect to trademarks, including, without limitation, damages, claims and recoveries for past, present or future infringement; (f) rights to sue for past, present and future infringements of any trademark; and (g) any other rights corresponding to any of the foregoing rights throughout the world.

*"UCC"* means the Uniform Commercial Code as the same may from time to time be in effect in the State of New York; *provided, however,* in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of

Lender's security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, the term *"UCC"* shall mean the Uniform Commercial Code (including the Articles thereof) as in effect at such time in such other jurisdiction for purposes of the provisions hereof relating to such attachment, perfection or priority and for purposes of definitions related to such provisions. In addition, the following terms shall have the meanings set forth for such terms in the UCC: *"Account," "Account Debtor," "Chattel Paper"* (including tangible and electronic chattel paper), *"Commercial Tort Claims," "Commodity Account," "Deposit Account," "Documents," "Equipment," "Fixtures," "Fixture Filing," "General Intangible"* (including, without limitation, Payment Intangibles, Copyrights, Patents, Trademarks, designs, drawings, technical information, marketing plans, customer lists, trade secrets, proprietary or confidential information, inventions (whether or not patentable), procedures, know-how, models and data), *"Instrument," "Intellectual Property," "Inventory"* (including all goods held for sale or lease or to be furnished under a contract of service, and including returns and repossessions), *"Investment Property"* (including Securities, Securities Accounts and Securities entitlements), *"Letter-of-Credit Right"* (whether or not the letter of credit is evidenced by a writing), *"Payment Intangibles," "Proceeds," "Promissory Notes," "Securities," "Securities Account," "Securities Entitlement"* and *"Supporting Obligations."* Each of the foregoing terms shall include all of such items now owned, or hereafter acquired, by Grantor.

b.    Except as otherwise defined herein, all capitalized terms used in this Agreement have the meanings stated in the Note.

2.    **Grant of Security.** As collateral security for the full, prompt, complete and final payment and performance when due (whether at stated maturity, by acceleration or otherwise) of all the Obligations, Grantor hereby grants to Lender a lien on and continuing security interest in, all of Grantor's right, title and interest in, to and under the following, whether now owned or hereafter acquired (all of which being collectively referred to herein as the *"Collateral"*):

a.    All Accounts of Grantor (including, but not limited to, and notwithstanding anything in this Agreement to the contrary, any and all proceeds, money or accounts under all Contracts (without exception).

b.    All Chattel Paper of Grantor;

c.    All Contracts of Grantor;

d.    All Deposit Accounts of Grantor;

e.    All Licenses of Grantor;

f.    All Documents of Grantor;

g.    All Equipment of Grantor;

h.    All Fixtures of Grantor;

i.     All General Intangibles of Grantor;

j.     All Instruments of Grantor, including, without limitation, Promissory Notes;

k.     All Inventory of Grantor;

l.     All Investment Property of Grantor;

m.     All Letter-of Credit Rights of Grantor;

n.     All Supporting Obligations of Grantor;

o.     All property of Grantor held by Lender, including, without limitation, all property of every description now or hereafter in the possession or custody of or in transit to Lender for any purpose, including, without limitation, safekeeping, collection or pledge, for the account of Grantor, or as to which Grantor may have any right or power;

p.     All other goods and personal property of Grantor wherever located, whether tangible or intangible, and whether now owned or hereafter acquired, existing, leased or consigned by or to Grantor, except those goods and personal property which are excluded pursuant to Section 2(c) or 2(h) hereunder; and

q.     To the extent not otherwise included, all Proceeds of each of the foregoing and all accessions to, substitutions and replacements for and rents, profits and products of each of the foregoing.

If Grantor shall at any time acquire a Commercial Tort Claim, Grantor shall promptly notify the Lender in a writing signed by Grantor of the brief details thereof and grant to Lender in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance reasonably satisfactory to the Lender.

Grantor hereby authorizes the Lender to file, without Grantor's signature thereon and at Grantor's expense, financing statements, continuation statements (including "in lieu" continuation statements) and amendments thereto, that describe the Collateral and which contain any other information required by Part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement, continuation statement or amendment, including if Grantor is an organization, the type of organization and any organization identification number issued to Grantor.

3.     **Security for Obligations.**  This Agreement secures the payment of (i) all of the unpaid Principal Amount of, and accrued interest on (including any interest that accrues after the commencement of any bankruptcy proceeding) and any other payment due in connection with the Note, (ii) the obligation of Grantor to pay any fees, costs and expenses of Lender under the Note or under this Agreement, and (iii) all other obligations, liabilities and indebtedness owed by Grantor to the Lender under the Note, this Agreement, the Control

Agreement or the Letter Agreement, in each case, whether now existing or hereafter incurred (collectively, the "***Obligations***").

4. **Rights of Lender; Collection of Accounts.**

   a. Grantor expressly agrees that Grantor shall remain liable under each of its Contracts to observe and perform all the conditions and obligations to be observed and performed by it thereunder and that Grantor shall perform all of its duties and obligations thereunder such that the Grantor shall not be deemed to be in breach of each such Contract. The Lender shall not have any obligation or liability under any Contract by reason of or arising out of this Agreement or the granting to the Lender of a lien therein or the receipt by the Lender of any payment relating to any Contract pursuant hereto, nor shall the Lender be required or obligated in any manner to perform or fulfill any of the obligations of Grantor under or pursuant to any Contract, or to make any payment, or to make any inquiry as to the nature or the sufficiency of any payment received by them or the sufficiency of any performance by any party under any Contract, or to present or file any claim, or to take any action to collect or enforce any performance or the payment of any amounts which may have been assigned to them or to which they may be entitled at any time or times.

   b. The Lender authorizes Grantor to collect its accounts, provided that such collection is performed in a prudent and businesslike manner, and the Lender may, upon the occurrence and during the continuation of any Event of Default and without notice, limit or terminate said authority at any time. Upon the occurrence and during the continuance of any Event of Default, at the request of the Lender, Grantor shall deliver to Lender all original and other documents which created and/or relate to such accounts, including, without limitation, all original orders, invoices and shipping receipts.

   c. The Lender may at any time, upon the occurrence and during the continuance of any Event of Default, without notifying Grantor of its intention to do so, notify Account Debtors of Grantor, parties to the Contracts of Grantor, obligors in respect of Instruments of Grantor and obligors in respect of Chattel Paper of Grantor that the Accounts and the right, title and interest of Grantor in, to and under such Contracts, Instruments and Chattel Paper have been assigned to Lender and that payments thereunder or with respect thereto are to be made directly to the Lender. Upon the request of the Lender, Grantor shall promptly so notify such Account Debtors, parties to such Contracts, obligors in respect of such Instruments and obligors in respect of such Chattel Paper. Upon the occurrence and during the continuance of any Event of Default, the Lender may, in Lender's name or in the name of others, communicate with such Account Debtors, parties to such Contracts, obligors in respect of such Instruments and obligors in respect of such Chattel Paper to verify with such parties, to the Lender's satisfaction, the existence, amount and terms of any such Accounts, Contracts, Instruments or Chattel Paper. Notwithstanding the foregoing, Lender shall not notify or

otherwise communicate with any parties to Contracts or Account Debtors of Grantor except upon the occurrence of any Event of Default.

d. Without limiting the foregoing and Lender's rights as set forth in the foregoing, any action by the Lender pursuant to or as described in Section 4(b) or Section 4(c) hereof shall be in compliance with the provisions set forth in Section 12(b)(v) hereof.

5. **Representations and Warranties of Grantor**. Grantor represents and warrants as follows:

a. Grantor is a corporation duly organized, existing and in good standing under the laws of the State of Delaware, (b) has the legal power to own its property and to carry on its business as now being conducted, and (c) is duly qualified to do business and is in good standing in each jurisdiction in which the character of the properties owned or leased by it therein or in which the transaction of its business makes such qualification necessary, except where the failure to so qualify or be in good standing would not have a Material Adverse Effect.

b. Except as otherwise set forth in the Note, Grantor is, and as to Collateral acquired by it from time to time after the date hereof Grantor will be, the owner of all Collateral free and clear of all liens, claims, encumbrances and interests.

c. This Agreement, together with the Control Agreement, creates, for the benefit and security of Lender in respect of the Obligations, a legally valid and binding lien on, pledge of, and security interest in the Collateral.

d. The execution and delivery of this Agreement, the Control Agreement, the Letter Agreement, and the Note and the performance of their terms, will not violate or constitute a default under the terms of any agreement, indenture or other instrument, license, judgment, decree, order, law, statute, ordinance or other governmental rule or regulation applicable to the Grantor or any of its property.

6. **As to the Collateral**.

a. Notwithstanding anything to the contrary contained herein, the assignment by Grantor herein stated is intended to be an assignment for security purposes and is not intended to divest Grantor of its ownership of the Collateral, except as otherwise provided herein.

b. So long as no Event of Default has occurred and is continuing, (i) Grantor shall retain title to and record ownership of the Collateral, and (ii) Grantor shall be entitled to receive any and all income or distributions made with respect to the Collateral, except as provided in Section 6(c) hereof.

c. Upon the occurrence and during the continuance of an Event of Default, all income and proceeds of the Collateral which are received by Grantor shall be (i)

received in trust for the benefit of the Lender, (ii) segregated from other funds of Grantor, and (iii) forthwith paid over by Grantor to the Lender (for application in accordance with this Agreement) in the same form as so received.

7.   **Covenants of Grantor**.  Grantor covenants and agrees with Lender that unless approved by Lender:

a.   Grantor shall not sell, assign (by operation of law or otherwise), or otherwise transfer any of the Collateral, or attempt or contract to do so, or grant any option with respect to any of the Collateral, except Inventory in the ordinary course of business.

b.   Grantor shall not change its name, identity or corporate structure in any manner, nor change its jurisdiction of organization, relocate its chief executive office, principal place of business or its principal records with respect to the Collateral, or allow the relocation of any Collateral, in each case without thirty (30) days' prior written notice to the Lender.

c.   Grantor shall keep and maintain at its own cost and expense satisfactory and reasonably complete records of the Collateral.  Grantor shall furnish the Lender with such information regarding the Collateral as the Lender may reasonably request from time to time and shall allow the Lender, upon reasonable notice, access during normal business hours to inspect the Collateral and Grantor's records, accounts and books pertaining to the Collateral, provided that no restriction as to normal business hours shall be required during the continuance of an Event of Default.

d.   Grantor shall not knowingly take or omit to take any action, the taking or omission of which might impair Lender's lien on the Collateral or adversely affect the value of the Collateral.

e.   Upon the occurrence and during the continuance of any Event of Default, Grantor shall not grant any extension of the time of payment of any of its Accounts, Chattel Paper, Instruments or amounts due under any of its Contracts or Documents, compromise, compound or settle the same for less than the full amount thereof, release, wholly or partly, any Person liable for the payment thereof, or allow any credit or discount whatsoever thereon other than trade discounts and rebates granted in the ordinary course of Grantor's business.

f.   Grantor shall (i) protect, defend and maintain the validity and enforceability of the Copyrights, Patents and Trademarks, (ii) use commercially reasonable efforts to detect infringements of the Copyrights, Patents and Trademarks and promptly advise the Lender in writing of material infringements detected, and (iii) not allow any material Copyrights, Patents or Trademarks to be abandoned, forfeited or dedicated to the public without the written consent of the Lender, unless any such abandonment is appropriate in accordance with reasonable and customary business practice.

7

g.     Grantor shall not execute or authorize to be filed in any public office any UCC financing statement (or similar statement or instrument of registration under the law of any jurisdiction) except UCC financing statements filed or to be filed in respect of and covering the lien created by this Agreement.

h.     Grantor shall not amend, modify, waive, take any action or fail to take any action with respect to all or a portion of any Contract which Grantor reasonably expects or should expect would adversely affect Lender's interest in the Collateral (including, but not limited to, the value of the Collateral) or which affect the timing, value or amount of any proceeds due under any Contract.

8.     **Further Assurances**. Grantor agrees, at any time and from time to time, upon request of the Lender, to promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or desirable, in order to perfect and protect any security interest granted or purported to be granted hereby or to enable the Lender to exercise and enforce Lender's rights and remedies hereunder with respect to any Collateral. If Grantor executes and delivers any document or instrument pursuant to this Section 8, such document or instrument shall be in form and substance reasonably satisfactory to the Lender and a copy thereof shall be provided by Grantor to the Lender.

9.     **Security Interest Absolute**. All rights of the Lender and the assignment and security interest hereunder, and all obligations of Grantor hereunder, shall remain in full force and effect and shall secure the Obligations, and shall be absolute and unconditional, irrespective of:

a.     any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations or any other amendment or waiver of or any consent to any departure from the Note; or

b.     any taking, exchange, release or non-perfection of any other collateral, or any release or amendment or waiver of or consent to departure from any guaranty, for all or any of the Obligations; or

c.     any manner of application of any Collateral, or proceeds thereof, to all or any of the Obligations or any manner of sale or other disposition of any Collateral; or

d.     any other circumstances other than releases, waivers and the like by the Lender that might otherwise constitute a defense available to, or a discharge of, Grantor's obligations hereunder or Lender's security interest hereunder.

10.    **Continuing Security Interest; Sale of Participations; Release of Collateral**. This Agreement shall create a continuing security interest in the Collateral and shall (i) remain in full force and effect until the payment in full of the Obligations (subject to Section 14 hereof), (ii) be binding upon Grantor, its successors and its permitted assigns under the Note, and (iii) inure to the benefit of, and be enforceable by (subject to the terms hereof), the Lender and its successors and assigns. No sales of participations in, and no other sales, assignments, transfers or other dispositions of, any agreement governing or instrument evidencing the Obligations or any portion thereof or interest therein by the

Lender shall in any manner affect the lien granted to the Lender hereunder. Subject to Section 14 hereof, upon the payment in full of the Obligations, the security interest granted hereby shall terminate and all rights to the Collateral shall revert to Grantor. Upon any such termination, the Lender will, at Grantor' expense, execute and deliver to Grantor such documents as Grantor shall reasonably request to evidence such termination. The Lender shall, at the request of Grantor, deliver any document reasonably necessary to release any lien granted hereunder with respect to any Collateral Grantor is transferring.

11. **Lender's Duties**. The powers conferred on the Lender hereunder are solely to protect Lender's interest in the Collateral as a secured party and shall not impose any duty upon the Lender to exercise any such powers. Except for the safe custody of any Collateral in Lender's possession and the accounting for money actually received by Lender hereunder, the Lender shall not have any duty as to any Collateral or as to the taking of any necessary steps to preserve any rights pertaining to any Collateral. The Lender shall not have any responsibility or liability for the collection of any proceeds of any Collateral or by reason of any invalidity, lack of value or uncollectability of any of the Collateral. The Lender shall be deemed to have exercised reasonable care in the custody and preservation of any Collateral in the Lender's possession if such Collateral is accorded treatment substantially equal to that which the Lender accords its own property.

12. **Events of Default; Remedies Upon Default; Actions by Lender**.

   a. The occurrence of an Event of Default under and as defined in the Note or the failure of Grantor to fulfill any of its obligation hereunder shall constitute an *"Event of Default"* hereunder.

   b. If any Event of Default shall have occurred:

      i. The Lender may exercise in respect of the Collateral, in addition to other rights and remedies provided for herein or otherwise available to Lender (or any of them), all the rights and remedies of a secured party on default under the UCC (whether or not the UCC applies to the affected Collateral), and may also, without notice of any kind or demand of performance or other demand (all and each of which demands and notices are hereby expressly waived to the maximum extent provided by the UCC and other applicable law) reclaim, take possession, recover, store, maintain, finish, repair, prepare for sale or lease, advertise for sale or lease and sell the Collateral or any part thereof in one or more parcels at public or private sale, at any exchange, broker's board or at the Lender's offices or elsewhere, for cash, on credit, or for future delivery, and upon such other terms as the Lender may deem commercially reasonable. In connection with the liquidation, sale or other disposition of the Collateral, the Lender is granted a non-exclusive, royalty-free license or other right to use, without charge, Grantor' labels, patents, copyrights, trade secrets, trade names, trademarks, service marks, or any similar property as it pertains to the Collateral, in completing a liquidation, sale or other

disposition of the Collateral. The Lender shall not be obligated to make any sale of Collateral regardless of notice of sale having been given. The Lender may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned. Grantor agrees that in any sale of any of the Collateral, whether at a foreclosure sale or otherwise, the Lender is hereby authorized to comply with any limitation or restriction in connection with such sale as it may be advised by counsel is necessary in order to avoid any violation of applicable law (including compliance with such procedures as may restrict the number of prospective bidders, require that such prospective bidders and the Lender have certain qualifications and restrict such prospective bidders and the Lender to Persons who will represent and agree that they are purchasing for their own account for investment and not with a view to the distribution or resale of such Collateral), and Grantor further agrees that such compliance shall not result in such sale being considered or deemed not to have been made in a commercially reasonable manner, nor shall the Lender be liable or accountable to Grantor for any discount allowed by reason of the fact that such Collateral is sold in compliance with any such limitation or restriction.

ii.    Grantor authorizes the Lender, on the terms set forth herein, to enter the premises where the Collateral (or any part of it) is located, to take possession of the Collateral (or any part of it), and to pay, purchase, contract, or compromise any encumbrance, charge or lien which, in the opinion of the Lender, appears to be prior or superior to its security interest. Grantor further agrees, at the Lender's request, to assemble the Collateral and make it available to the Lender at places which the Lender shall reasonably select. To the maximum extent permitted by applicable law, Grantor hereby waives all claims, damages, and demands against the Lender arising out of the repossession, retention or sale of the Collateral.

iii.   The Lender may sell Collateral without giving warranties as to such Collateral. The Lender may specifically disclaim any warranties of title or the like. The foregoing will not be considered adversely to affect the commercial reasonableness of any sale of Collateral.

iv.    If the Lender sells any of the Collateral upon credit, Grantor will be credited only with, and at the time of, payments actually made by the purchaser in such sale received by the purchaser and applied to the indebtedness of such purchaser. In the event the purchaser in such sale fails to pay for the Collateral, the Lender may resell the Collateral and Grantor shall be credited with the proceeds of the resale in accordance with the preceding sentence. In the event the Lender purchases any of the Collateral being sold, the Lender may pay for the Collateral by crediting some or all of the amounts described in clauses first and second of Section 12(b)(v) hereof.

v.   Any cash held by the Lender as Collateral and all cash proceeds received by the Lender in respect of any sale of, collection from, or other realization upon, all or any part of the Collateral or the exercise of any other remedies consequent upon an Event of Default shall be applied in whole or in part by the Lender against all or any part of the Obligations in the following order:

*First*, to the Lender in an amount sufficient to pay in full the Obligations, including all reasonable fees, costs, expenses, liabilities and advances incurred or made by the Lender in connection with the sale, disposition or other realization of the Collateral, including without limitation, reasonable attorneys' fees; and

*Second*, upon payment in full of all the Obligations, to Grantor or to whomsoever may be lawfully entitled to receive such surplus.

vi.   Grantor shall remain liable for any deficiency if the proceeds of any sale or disposition of the Collateral are insufficient to fully pay the Obligations, and Grantor also shall be liable for the reasonable costs and expenses (including reasonable attorneys' fees and expenses) incurred by Lender to collect such deficiency.

vii.   Grantor hereby waives presentment, demand, protest or any notice (to the maximum extent permitted by applicable law) of any kind in connection with this Agreement or any Collateral.

13.   **Expenses.** The Grantor and Lender shall each bear their own fees, costs and expenses with respect to the preparation, negotiation, execution and delivery of this Agreement, the Note, the Control Agreement and the Letter Agreement.

14.   **Reinstatement.** This Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against Grantor for liquidation or reorganization, should Grantor become insolvent or make an assignment for the benefit of creditors or should a receiver or trustee be appointed for all or any significant part of Grantor's property and assets, and shall continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment or performance had not been made. In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

15.   **Amendments, Etc.** No amendment or waiver of any provision of this Agreement, nor consent to any departure by Grantor herefrom, shall in any event be effective unless the same shall be in writing and signed by the parties necessary to amend the Note, and then

such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

16. **Cumulative Remedies.** The rights and remedies hereunder provided are cumulative and may be exercised singly or concurrently, and are not exclusive of any rights and remedies provided by law. The Lender shall not by any act, delay, omission or otherwise be deemed to have waived any of its respective rights or remedies hereunder, nor shall any single or partial exercise of any right or remedy hereunder on any one occasion preclude the further exercise thereof or the exercise of any other right or remedy.

17. **Lender May Perform; Reimbursement; Power of Attorney.**

   a. If Grantor fails to perform any obligation of Grantor under this Agreement, the Lender may, but shall not have the obligation to, without prior notice to or obtaining the consent of Grantor, perform that obligation on behalf of Grantor, including, without limitation, obtaining insurance coverage for the Collateral and satisfying tax obligations or liens on the Collateral. Grantor shall reimburse the Lender on demand for all reasonable expenses and reasonable attorneys' fees incurred by the Lender in performing any such obligation, including interest at the interest rate specified in the Note.

   b. Grantor hereby absolutely and irrevocably constitutes and appoints the Lender as Grantor's true and lawful agent and attorney-in-fact, with full power of substitution, in the name of Grantor: (i) to take any and all such action as the Lender or any of its agents, nominees or attorneys may, in its or their sole and absolute discretion, reasonably determine as necessary or advisable for the purpose of maintaining, preserving or protecting the security constituted by this Agreement or any of the rights, remedies, powers or privileges of the Lender under this Agreement; and (ii) generally, in the name of Grantor to exercise all or any of the powers, authorities and discretions, conferred on or reserved to the Lender by or pursuant to this Agreement, and (without prejudice to the generality of any of the foregoing) to seal and deliver or otherwise perfect any deed, assurance, agreement, instrument or act as the Lender may deem proper in or for the purpose of exercising any of such powers, authorities or discretions, in each case. Grantor hereby ratifies and confirms, and hereby agrees to ratify and confirm, whatever lawful acts the Lender or any of its agents, nominees or attorneys shall do or purport to do in the exercise of the power of attorney granted to the Lender pursuant to this Section 17(b), which power of attorney, being given for security, is irrevocable.

18. **Addresses for Notices.** All notices and other communications to any party provided for hereunder shall be in writing and mailed by registered or certified mail, return receipt requested, or personally delivered to the addresses for the Grantor and the Lender set forth on the signature pages hereto, or, as to any party, to such other address as shall be designated by such party in a written notice to each other party complying as to delivery with the terms of this Section 18. All such notices and other communications shall be effective (i) upon personal delivery to the party to be notified; (ii) on the date of first

attempted delivery after having been sent by registered or certified mail, return receipt requested, postage prepaid; (iii) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt.

19. **Forbearance; Delay.** Any forbearance, failure or delay by the Lender in exercising any right, power or remedy hereunder shall not preclude the exercise thereof. Every right, power or remedy of the Lender shall continue in full force and effect until such right, power or remedy is specifically waived by an instrument in writing executed by the Lender.

20. **Severability.** Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

21. **Successors and Assigns.** This Agreement is for the benefit of the Lender and its successors and assigns, and in the event of an assignment of all or any of the Obligations, the rights hereunder, to the extent applicable to the indebtedness so assigned, may be transferred with such indebtedness. This Agreement shall be binding on the Grantor and its respective successors and assigns.

22. **Consent To Jurisdiction And Service Of Process.** ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF GRANTOR AND LENDER CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE NON-EXCLUSIVE JURISDICTION OF THOSE COURTS. EACH OF THE GRANTOR AND LENDER IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF THIS AGREEMENT OR ANY DOCUMENT RELATED HERETO. EACH OF GRANTOR AND LENDER WAIVES PERSONAL SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER PROCESS, WHICH MAY BE MADE BY ANY OTHER MEANS PERMITTED BY NEW YORK LAW.

23. **Waiver Of Jury Trial.** EACH OF GRANTOR AND LENDER WAIVES ITS RIGHT TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY PARTY AGAINST ANY OTHER PARTY, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE. EACH OF GRANTOR AND LENDER AGREES THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT TRIAL WITHOUT A JURY. WITHOUT LIMITING THE FOREGOING,

EACH OF GRANTOR AND LENDER FURTHER AGREES THAT ITS RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS SECTION AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS AGREEMENT OR ANY PROVISION HEREOF. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT.

24.    **Advice of Counsel; Construction.**  Each of Grantor and Lender represents and warrants that it has discussed this Agreement, including, without limitation, Section 22 and Section 23 hereof, with its counsel.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of the Agreement.

25.    **Headings.**  The various headings in this Agreement are inserted for convenience only and shall not affect the meanings or interpretation of this Agreement or any provision hereof.

26.    **Governing Law.**  This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York determined without reference to principles of conflicts of law, except to the extent that the validity or perfection of any security interest created hereunder, or remedies hereunder, in respect of any item of the Collateral is governed by the laws of a jurisdiction other than the State of New York.

27.    **Counterparts.**  This Agreement may be executed in counterparts, each of which shall constitute an original.

**[Signature Page Follows]**

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed and delivered as of the date first above written.

**XSTREAM SYSTEMS, INC.**

By:_____
        Name:
        Title:

**XSI, INC.**

By:_____
        Name:
        Title: