## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| XStream Systems, Inc.,[1] | Case No. 11-11086-CSS |
| Debtor. | |

## DECLARATION OF KIM HETZEL SALBELLO IN SUPPORT OF THE DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY PLEADINGS

I, Kim Hetzel Salbello, hereby state and declare as follows:

1.      I am the Chief Restructuring Officer ("CRO") of XStream Systems, Inc. ("XStream" or "Debtor"), a corporation duly organized under and existing pursuant to the laws of the State of Delaware.  I have been employed in this capacity since March 16, 2011.

2.      In my capacity as CRO, I have been responsible for, and I am familiar with, its operations, management and financial records.

3.      On April 8, 2011 (the "Petition Date") , the Debtor has filed in this Court a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

4.      To enable the Debtor to operate effectively and minimize certain of the potential adverse effects of the commencement of its reorganization case, the Debtor has requested certain relief in "first day" applications and motions filed with the Court (the "First Day Pleadings").  The First Day Pleadings, described in detail below, seek, among other things, to ensure the continuation of the Debtor's cash management system and other business operations without interruption, maintain employee morale and confidence

---

[1]      The last four digits of the Debtor's federal tax identification number are: 0466.  The Debtor's mailing address for purpose of this case is 10305 102nd Terrace, Suite 101, Sebastian, FL 32958.

and establish certain other administrative procedures to promote a seamless transition in Chapter 11. This relief will be critical to the Debtor's restructuring efforts.

5.     This declaration (the "<u>Declaration</u>") is submitted to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of the Chapter 11 case and in support of the petitions for relief under the Bankruptcy Code and the First Day Pleadings.  Any capitalized term used but not defined herein shall have the meaning ascribed to that term in the relevant First Day Pleading. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtor's management, my review of relevant documents, or my opinion based upon my experience, knowledge and information concerning the Debtor's operations and financial affairs.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.

6.     I am authorized to submit this Declaration on behalf of the Debtor.

7.     This Declaration is intended to provide a summary overview of the Debtor and the commencement of this Chapter 11 case.  Parts I through III of this Declaration provide an overview of XStream's background, business and capital structure, and the circumstances giving rise to the commencement of the Chapter 11 case.  Part IV summarizes the First Day Pleadings filed concurrently herewith.

## I.     The Debtor's Business[2]

8.     XStream was formed in 2004 under the laws of the state of Delaware. From its inception until 2010, it was primarily engaged in the sale of hardware and software products and services in relation to x-ray systems for material authentication and

---

[2]     Information herein with respect to the Debtor's business is based on my review of the Debtor's records and publicly filed documents.

detection solutions that allow molecular screening (i.e. molecular structure analysis on hidden material).

9.      XStream is headquartered in Sebastian, Florida and currently holds leasehold interests in approximately 5,600 square feet and shares a 40,000 square foot facility with three other companies in an industrial park in Florida.

10.     XStream's primary assets consist of licensed patented technology and other intellectual property based on energy-dispersive X-ray diffraction. XStream's products combine penetrating x-rays, forensic analysis, and automated software algorithms that allow non-technical personnel to authenticate products, such as pharmaceuticals, even when sealed within their original packaging.

11.     XStream's historic long-term corporate strategy was to become the primary source for technology, products, and services for applications requiring material analysis of hidden objects. XStream first generated its revenues through a contract in 2005 with the Transportation Security Administration, an agency under the Department of Homeland Security. In 2006, XStream entered into distributor agreements and in 2008 it entered into sales agreements with the first authorized sales agents and field service representatives (Remetronix and Compass Engineering) to sell and service its products. In 2008, XStream focused exclusively on the pharmaceutical industry by means of the XT250$^{tm}$ Material Identification System, hired an experienced sales force from that industry, and added Eastern Applied Research as an additional authorized sales agent and field service representative.

12.     XStream and Rutgers, the State University of New Jersey ("Rutgers") are parties to a License Agreement, dated September 13, 2004, as amended (the "Rutgers

License"). Pursuant to the Rutgers License Agreement, XStream is permitted to use, for a fee, certain patents of Rutgers pertaining to the analysis of X-ray diffraction. However, XStream contends that Rutgers' patents are not infringed by the technology contained in its XT250[tm] Material Identification System. Thus, XStream does not believe its system implicates the Rutgers Licenses.

## II. Capital Structure

### A. Equity Issuances

13. XStream's common stock is not currently traded on any market or exchange. As of April 8, 2011 XStream had 111 stockholders of record.

14. XStream issued its first convertible promissory note on December 19, 2006 in the principal amount of $100,000, payable on demand at any time on or after February 28, 2007. In accordance with the terms of the note, on March 14, 2007, all of the principal and interest due on the note was converted into 26,867 shares of Series A Redeemable Convertible Preferred Stock, $.0001 par value per share (the "Series A Preferred Stock").

15. On various dates from August 31, 2005 to March 14, 2006, XStream sold debentures in the aggregate principal amount of $1,525,000 to accredited investors. In connection with such sale, each investor received a ten-year warrant to purchase 5,000 shares of common stock at a price of $2.34 per share for each $25,000 in principal amount of debentures. As a result, XStream issued warrants to purchase an aggregate of 305,000 shares of common stock.

16. On December 19, 2007, in connection with an amendment to two of the debentures in the aggregate amount of $250,000, the investors received additional ten-

year warrants to purchase an aggregate of 25,000 shares of common stock at a price of $3.00 per share. On December 21, 2007, an aggregate of $1,008,744 in principal amount and accrued but unpaid interest due on certain debentures was converted into an aggregate of 336,248 shares of Series B Redeemable Convertible Preferred Stock, $.0001 par value per share (the "Series B Preferred Stock").

17.     In connection with a secured, revolving, demand promissory note dated November 16, 2006, XStream issued the holder of the note a warrant to purchase an aggregate of 21,000 shares of common stock at an exercise price of $3.80 per share on January 25, 2008.

18.     On various dates from December 14, 2006 to December 4, 2007, XStream sold short-term convertible promissory notes to accredited investors in the aggregate principal amount of $1,356,000. On March 14, 2007, $330,955 in principal amount and accrued but unpaid interest due on the notes was subsequently converted into an aggregate of 87,094 shares of Series A Preferred Stock. On December 21, 2007, $894,348 in principal amount and accrued but unpaid interest due on the notes was converted into an aggregate of 298,116 shares of Series B Preferred Stock.

19.     By stock purchase agreement dated March 14, 2007, as amended from time to time, XStream issued an aggregate of 962,101 shares of Series A Preferred Stock to accredited investors. The shares of Series A Preferred Stock were issued at a purchase price of $3.80 per share, resulting in $3,655,955 of gross proceeds, part of which consisted of conversion of outstanding debt in the aggregate amount of $330,955 including accrued but unpaid interest.

20.     On various dates from December 2007 through June 2008, XStream issued an aggregate of 1,619,127 shares of Series B Preferred Stock to accredited investors. The shares of Series B Preferred Stock were issued at a purchase price of $3.00 per share, resulting in $4,857,381 of gross proceeds, part of which consisted of the conversion of outstanding debt in the aggregate amount of $1,903,092 including accrued but unpaid interest and services valued at approximately $100,000. In addition, each investor received for each share of Series B Preferred Stock purchased, one ten-year warrant to purchase five shares of XStream's common stock at an exercise price of $3.00 per share.

21.     On various dates from March 2009 through August 2009, XStream issued an aggregate of 365,996 shares of Series C Redeemable Convertible Preferred Stock, $.0001 par value per share (the "Series C Preferred Stock") to accredited investors. The shares of Series C Preferred Stock were issued at a purchase price of $3.00 per share, resulting in $1,097,988 of gross proceeds. In addition, each investor received for each share of Series C Preferred Stock purchased, one ten-year warrant to purchase five shares of XStream's common stock at an exercise price of $3.00 per share.

22.     During October 2009, XStream issued an aggregate of 563,414 shares of Series D Redeemable Convertible Preferred Stock, $.0001 par value per share (the "Series D Preferred Stock") to accredited investors. The shares of Series D Preferred Stock were issued at a price of $3.00 per share, resulting in $1,690,242 of gross proceeds. In addition, each investor received for each share of Series D Preferred Stock purchased, one ten-year warrant to purchase five shares of XStream's common stock at an exercise price of $3.00 per share.

**B. Options and Warrants**

23.    As a result of a 2004 Stock Option Plan, there exist outstanding stock options to purchase an aggregate of 1,879,386 shares of common stock at a weighted average exercise price of $2.13 per share and outstanding warrants to purchase 13,078,685 shares of common stock at a weighted average exercise price of $2.99 per share.

**C. Debt Issuances**

Unsecured Subordinated Debentures

24.    Pursuant to two Unsecured Subordinated Debentures, as amended from time to time (the "Debentures"), XStream issued a total of $250,000 of 8% Debentures due on December 31, 2009 (t. As of the Petition Date, the full amount of principal amount plus accrued interest was outstanding.

25.    In connection with the Debentures, for every $25,000 in aggregate face principal amount of Debentures, the subscribers received a warrant to purchase 2,500 shares of XStream's common stock, $0.0001 par value per share, with a strike price of $3.00 per share and to be exercisable for a period of ten years from issuance.

Unsecured Promissory Notes

26.    As of the Petition Date, XStream has several outstanding unsecured promissory notes with a principal amount totaling $480,226.29.

### D.    Other Indebtedness

Kimball Obligation

27.    Pursuant to a, XStream is a party to a $2.0 million loan agreement dated September 6, 2006 with Kimball International, Inc. and Kimball Electronics, Inc. (collectively, "Kimball").

28.    On February 8, 2010, Kimball, docketed a confession of judgment from XStream in the amount of $3,200,000 in the District Court for the Southern District of Indiana.  That confession of judgment was subsequently filed in the Southern District of Florida.

Rutgers License

29.    Rutgers alleges that XStream owes it $1,301,703.15 under the Rutgers License.  On March 11, 2011, Rutgers sent XStream a letter (the "License Termination Letter"), informing XStream that it intends to terminate the Rutgers License on 30 days notice based on the nonpayment of the amounts alleged due.

Prepetition Financing

30.    As described more fully below, when it became apparent that XStream was unable to otherwise raise capital, two of its Directors and Officers formed XSI, Inc. ("XSI") for the purpose of providing financing to XStream to allow it to file for bankruptcy protection and to provide postpetition Debtor-in-Possession ("DIP") financing.

31.    Prior to the commencement of the Case, XSI made loans and advances (the "XSI Loans") to Borrower pursuant to (1) Letter Agreement, Senior Secured Demand Note, Security Agreement, and Control Agreement, dated March 1, 2011, by

and between Lender and Borrower (as the same has heretofore been amended, supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date), and (2) all other agreements, documents, and instruments executed and/or delivered with, to, or in favor of XSI, including, without limitation, the security agreements, notes and Uniform Commercial Code ("UCC") financing statements and all other related agreements, documents, and instruments executed and/or delivered in connection therewith or related thereto, (collectively, the "Pre-Petition Financing Agreements"). Copies of the operative Pre-Petition Financing Agreements are annexed as Exhibit A to the Motion For Order (A) Authorizing Debtor To Obtain Interim Post-Petition Financing And Grant Security Interests And Superpriority Administrative Expense Status Pursuant To 11 U.S.C. §§ 105, 364(c) And 364(d); (B) Modifying The Automatic Stay Pursuant To 11 U.S.C. § 362; (C) Authorizing Debtor To Enter Into Agreements With XSI LLC; And (D) Scheduling A Final Hearing Pursuant To Bankruptcy Rule 4001 (the "DIP Motion").

32.     As of the Petition Date, the principal amount of the XSI Loans owed by the Debtor to XSI under and in connection with the Pre-Petition Financing Agreements was an amount not less than $122,000, plus all interest accruing thereon, and all fees, costs, expenses, and other charges accrued, accruing, or chargeable with respect thereto, totaling $133,350 (the "Pre-Petition Obligations").

33.     As of the Petition Date, the Pre-Petition Obligations were fully secured pursuant to the Pre-Petition Financing Agreements by valid, perfected, enforceable and non-avoidable security interests and liens granted by the Debtor to XSI upon all of the Assets existing as of the Petition Date and all rents, issues, profits, proceeds, and products

thereof (the "Prepetition Collateral", and collectively, together with any other property of the Debtor's bankruptcy estate (as defined under section 541 of the Bankruptcy Code, the "Estate").

Prepetition Total Indebtedness

34.     XStream's records reflect that as of April 8, 2011, its total indebtedness is approximately $8 million, consisting of approximately (i) $2.6 million, owed to Kimball; (ii) $ 250 thousand under the Unsecured Subordinated Debentures; (iii) $ 480 thousand under the Unsecured Promissory Notes; (v) $895 thousand in deferred compensation to former employees, (vi) $133 thousand to XSI under the Pre-petition Obligations, and (vii) $1.3 million claimed by Rutgers under the Rutgers License.

35.     In contrast, the only assets of XStream are (a) minimal cash; (b) a security deposit; (c) an immaterial amount of furniture, fixtures and equipment, and (d) the Rutgers License and other intellectual property necessary for the production of the XT250<sup>tm</sup> Material Identification System.

### III.     Events Leading to the Debtor's Chapter 11 Case

36.     XStream is in a severe liquidity crisis attributable to a host of factors, including, among others, overall exposure to the recent tightening and volatile credit and financing markets and uncertainty regarding the market acceptance of XStream's main products and technology.

37.     XStream's Form S-1 prepared in connection with the company's attempted IPO indicates that XStream incurred a net loss of $2.7 million for the year ended December 31, 2008 and a net loss of $827 thousand for the six months ended June 30, 2009.

38.     As of April 8, 2011, XStream's current liabilities exceeded its current assets by approximately $8 million.

39.     Historically, XStream's primary sources of liquidity have been cash provided by debt and equity offerings and borrowings. In the past, these sources have been sufficient to meet XStream's business needs. However, the adverse developments in financial and credit markets have made it extremely difficult to access capital and credit markets.

40.     In the summer of 2010, XStream attempted to commence an initial public offering, which included it preparing and filing with the Securities and Exchange Commission, Form S-1 Statements on August 20, 2010 and September 12, 2010. Unfortunately, XStream's attempt at an initial public offering was unsuccessful and no money was raised.

41.     When it became apparent that XStream was unable to obtain any further financing either public or private including further investments from the Officers and Directors of XStream itself, two individuals, Anthony Chidoni, XStream's Co-CEO, and Simon Irish, an XStream Board member, formed XSI.

42.     Shortly thereafter, Messrs. Chidoni, and Irish stated their intention to resign from XStream.

43.     Such resignations, once effective, would leave XStream completely without management.  Accordingly, existing management, with the assistance of their counsel, commenced a search for a chief restructuring officer.

44.     After interviewing several candidates, XStream selected K-Sal and the CRO to be engaged to fill their roles.  Neither K-Sal, nor the CRO had been known to XStream or any of its Officers or Directors.

45.     XStream retained K-Sal and the CRO's on March 16, 2011.

46.     On March 21, 2011, Messrs. Chidoni and Irish resigned from their positions with XStream.

47.     On March 29, 2011, Joseph Melone, an XStream Director resigned from his position as a Director of XStream.   On information and belief, Mr. Melone has since become an investor in XSI.

48.     On or about April 1, 2011, Mr. John Lowrey, XStream's Co-CEO and a Director resigned from his positions of XStream.

49.     On April 5, 2011, Dr. Edwin Darracott Vaughan, an XStream Director resigned from his position as a Director of XStream.

50.     Due to these resignations, the CRO remains the only management of XStream.

51.     As stated above, Rutgers sent XStream the License Termination Letter on March 11, 2011.  It purports to allow Rutgers to terminate the Rutgers License after 30 days after the Termination Letter was received.  Accordingly, if the assertions in the Termination Letter are correct, Rutgers would be have been able to terminate the Rutgers License on or after April 10, 2011.

52.     XStream disputes that the Rutgers can terminate the License Agreement on April 10, 2011 and it also believes that the  XT250$^{tm}$ Material Identification System

does not infringe on Rutgers' patent and is, therefore, independent of the Rutgers License. However, XStream realizes that the Rutgers License may be a valuable asset. It, therefore, will seek to preserve the Rutgers License to be sold in its asset sale. Accordingly, XStream chose to file for chapter 11 bankruptcy protection prior to the expiration of the period Rutgers' stated cure period.

## IV. The First Day Pleadings

53. The Debtor has filed the First Day Pleadings listed on **Exhibit A**. I submit this Declaration in support of the First Day Pleadings. I have reviewed each of the First Day Pleadings (including the exhibits and schedules attached thereto) and, to the best of my knowledge, believe that the facts set forth therein are true and correct. Such representation is based upon information and belief, through my review of various materials and other information. If called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Pleadings.

54. Through my review of various materials and other information, discussions with the other Debtor's personnel, and discussions with outside advisors, I have formed opinions as to (a) the necessity of obtaining the relief sought in the First Day Pleadings, (b) the importance of the relief sought in the First Day Pleadings for the Debtor to continue to operate effectively; and (c) the negative impact upon the Debtor of not obtaining the relief sought in the First Day Pleadings.

55. As described more fully below, the relief sought in the First Day Pleadings will minimize the adverse effects of the Chapter 11 case on the Debtor and ensure that the Debtor's reorganization efforts proceed as efficiently as possible and result in a maximum recovery for creditors, and I believe that the relief sought in each of the First

Day Pleadings is necessary to enable the Debtor to operate as a debtor-in-possession. A description of the relief requested and the facts supporting each of the First Day Pleadings is set forth below.

**MOTION FOR AN ORDER AUTHORIZING DEBTORS TO EMPLOY K-SAL GROUP, LLC *NUNC PRO TUNC* TO THE PETITION DATE AND DESIGNATING KIM HETZEL SALBELLO AS CHIEF RESTRUCTURING OFFICER TO THE DEBTOR PURSUANT TO 11 U.S.C. §§ 105 AND 363 AND <u>GRANTING RELATED RELIEF</u>**

56.     The Debtor has moved (the "<u>CRO Retention Motion</u>") the Court for an Order authorizing the Debtor to employ and retain K-Sal Group, LLC ("<u>K-Sal</u>") *nunc pro tunc* to the Petition Date, designating myself as Chief Restructuring Officer ("CRO") to the Debtor and granting related relief.  The Debtor seeks to employ and retain K-Sal and designate me as CRO pursuant to the terms of the Engagement Letter dated March 16, 2011 between K-Sal and the Debtor, a copy of which is attached to the CRO Retention Motion as Exhibit "B" (the "<u>Engagement Letter</u>").

57.     I will serve as CRO of the Debtor and, pursuant to the Engagement Letter, will perform all of the duties and obligations usually associated with the position of CRO of a Delaware corporation.  These duties include, but are not limited to:

- Overseeing the Debtor's banking relationships and dealings with secured and unsecured creditors;
- Overseeing ongoing business operations;
- Overseeing the Debtor's bankruptcy process, including the preparation of all relevant reports and schedules;
- Retaining an investment banking firm to market and sell the Debtor or its assets;
- Evaluating any bids received with respect to the sale of the Debtor or its assets;
- Assisting in the formulation of any plan of reorganization or liquidation and the associated disclosure statement; and
- Perform any necessary claim review and resolution process.

- Coordinate all activities necessary for the expeditious and efficient resolution of this Chapter 11 Case.

## A. K-SAL AND MS. SALBELLO'S QUALIFICATIONS

58. The Debtor Chose to engage K-Sal because of my extensive experience and knowledge in the fields of business management, debtors' and creditors' rights, operational systems, financial and strategic planning and implementation and business reorganizations under chapter 11 of the Bankruptcy Code.

59. I have been involved in the turnaround consulting business for 10 years and have been involved in dozens of engagements (both on the debtor and creditor sides). Most recently I assisted the CRO of the Innovative Stone Companies in their Chapter 11 proceedings in the Eastern District of NY. The Innovative Companies was a key supplier of high quality tile and stone to commercial and residential customers. As part of this team, I was involved in executing a transaction whereby an investment banker was retained, a replacement lender located who then credit bid their loan to purchase the core assets through a 363 sale process.

60. On March 15, 2011, XStream's Board unanimously authorized the retention K-Sal and me as CRO.

## B. K-SAL'S DISINTERESTEDNESS

61. Although not required for K-Sal' retention under section 363 in this case to the best of my knowledge, K-Sal (a) is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b), and (b) does not hold or represent an interest adverse to the Debtor's estate.

62. Furthermore to the best of my knowledge, neither K-Sal nor I have any connection with the Debtor, its creditors, equity holders, or any other parties-in-interest,

their respective attorneys and accountants, the United States Trustee, or any person employed in the office of the United States Trustee. K-Sal will promptly disclose such information to this Court, creditors of the Debtors and the United States Trustee if it or I discover any information to the contrary.

### C. PROFESSIONAL COMPENSATION

63.     Since being retained, K-Sal has received $20,000 from the Debtor as an advance retainer. Of this amount, $10,000 has been invoiced for pre-petition services. The remaining $10,000 - with an additional $5,000 to be received during week 3 of the current approved budget - will be held as a retainer for postposition services and expenses during the pendency of this Chapter 11 Case. No other retainer or other funds have been received by K-Sal or me from or on behalf of the Debtor pre-petition.

64.     In consideration for the services rendered and to be rendered by me, the Debtor has agreed to pay K-Sal $250/hr. for my time spent in connection with the Debtor and this case, along with reimbursement of related reasonable and necessary expenses. The Debtor has further agreed to make such payments to K-Sal on a bi-weekly basis, subject to approval by this Court. The expenses to be charged include, among other things, regular and express mail charges, special or hand delivery charges, document processing, photocopying charges, travel expenses, meals, computerized research charges, and transportation costs. No profit margin will be included in these charges.

65.     The Debtor believes that the compensation is comparable or more favorable to those generally charged by Chief Restructuring Officers and other restructuring advisors of similar stature to me and K-Sal for comparable engagements.

66.     In light of the foregoing, the Debtor believes that the compensation is both fair and reasonable under the circumstances of this engagement.

67.     K-Sal is not being employed as a professional under section 327 of the Bankruptcy Code. It, therefore, does not intend to submit fee applications pursuant to sections 330 and 331 of the Bankruptcy Code, and the Debtor requests a waiver, to the extent necessary, that K-Sal submit fee applications.

## D. INDEMNIFICATION

68.     The Debtor will indemnify K-Sal and I to the fullest extent permitted by applicable law, including advancement of expenses, which indemnification and advance of expenses will continue after the termination of the Engagement Letter for such period as may be reasonably required to continue to fully indemnify K-Sal and me for their acts during the term of the Engagement Letter.

## MOTION OF DEBTOR FOR ORDER (I) AUTHORIZING CONTINUED USE OF EXISTING BUSINESS FORMS AND RECORDS; (II) AUTHORIZING MAINTENANCE OF EXISTING CORPORATE BANK ACCOUNT; (III) WAIVING (IF NECESSARY) THE REQUIREMENTS OF 11 U.S.C. § 345(B) AND (IV) GRANTING RELATED RELIEF

69.     The Debtor has moved for an Order (i) authorizing continued use of existing business forms and records; (ii) authorizing maintenance of existing corporate bank account; (iii) waiving (if necessary) the requirements of 11 U.S.C. § 345(b); and (iv) granting related relief.

70.     The Debtor's only bank account is held at Wachovia Bank (the "Bank Account"). The details for the Bank Account are as follows:

| Bank: | Wachovia Bank |
|---|---|
| Address: | 1524 US Highway 1<br>Sebastian, FL. 32958 |
| Account name: | XStream Systems Inc |
| Account #: | 2000041647378 |

71.     The Debtor is requesting the entry of an order authorizing it to continue using its existing business forms and records and authorizing it to maintain the Bank Account.

72.     The Debtor is also requesting the entry of an order waiving the requirements of 11 U.S.C. § 345(b) and granting related relief.  The Office of the United States Trustee's Operating Guidelines for Chapter 11 Cases (the "Guidelines") require Chapter 11 debtors-in-possession to, among other things, close all existing bank accounts and open new debtor-in-possession ("DIP") bank accounts, establish one DIP account for all estate monies required for the payment of taxes (including payroll taxes), maintain a separate DIP account for cash collateral, and obtain checks for all DIP accounts that bear the designation, "debtor-in-possession."  The Guidelines also require debtors to close their books and records as of the petition date and to open new books and records.  The Guidelines are designed to provide, among other things, a clear demarcation between prepetition and postpetition transactions and operations, which would, in theory, prevent the inadvertent postpetition payment of a prepetition claim.

73.     The Debtor is seeking a waiver of certain of the Guidelines.  The Debtor's operations would be harmed by the disruption, confusion, delay, and cost that would most certainly result from rigid compliance with the Guidelines.  The Debtor is seeking a waiver of the Guidelines' requirement that it open a new set of books and records as of the Petition Date.  Opening a new set of books and records would create unnecessary

administrative burdens and hardship and would cause unnecessary expense, utilization of resources, and delay. In the ordinary course of its business, the Debtor use invoices, stationery, and other business forms. Printing new business forms would take an undue amount of time and expense. Fulfillment of the requirement would likely delay the payment of postpetition claims and negatively impact operations and the value of the estate. Accordingly, the Debtor is requesting that it be authorized to continue to use its existing business forms and to maintain its existing business records.

74.     In order to conduct its postpetition business, the Debtor needs to be able to issue checks to vendors, service providers and others. To open new accounts and obtain checks for those accounts will cause delay and disruption to the Debtor's business and a delay in receipt of funds needed for the Debtor's operation.

75.     The relief requested in the motion is vital to ensuring the Debtor's seamless transition into bankruptcy.

76.     Pursuant to § 105(a) of the Bankruptcy Code, the Debtor is seeking a waiver of the requirements of § 345(b) of the Bankruptcy Code. The Bank Account is maintained with a financial institution that is financially stable. The Debtor believes that its bank is authorized depositories in this and other jurisdictions. Out of an abundance of caution, however, the Debtor request a waiver of the requirement to comply with § 345(b)'s investment guidelines, if necessary, as the deposits in the Bank Account should not pose a substantial risk to the Debtor's estate or creditors.

**MOTION FOR ORDER (A) AUTHORIZING DEBTOR TO OBTAIN INTERIM POST-PETITION FINANCING AND GRANT SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS PURSUANT TO 11 U.S.C. §§ 105 AND 364(c); (B) MODIFYING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362; AND (C) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001**

77. The Debtor is seeking entry of seeks entry of interim and final orders pursuant to Bankruptcy Code Sections 105, 361, 362, 363, 364 and 507(b), Bankruptcy Rules 2002, 4001 and 9014 and Local Rule 4001-2 (a) authorizing the Debtor to use cash collateral; (b) authorizing the Debtor to obtain postpetition secured financing from XSI, based on a Budget (as defined in the DIP Motion) (i) on an interim basis up to an aggregate principal amount of $50,000.000, pursuant to an interim order, and (ii) on a final basis up to an amount that may be agreed upon by and between the Debtor and XSI and approved pursuant to a final order; (c) granting XSI postpetition liens and providing it superpriority administrative expense status; (d) providing XSI adequate protection; (e) modifying the automatic stay in certain respects; (f) scheduling a final hearing; and (g) approving certain notice procedures.

78. As of the Petition Date, the principal amount of the Loans owed by the Debtor to XSI under and in connection with the Pre-Petition Financing Agreements was an amount not less than $122,000.00, plus all interest accruing thereon, and all fees, costs, expenses, and other charges accrued, accruing, or chargeable with respect thereto totaling $133,350.00. The Debtor concludes that the Pre-Petition Obligations constitute allowed, legal, valid, binding, enforceable and non-avoidable obligations of the Debtor, and may not be subject to any offset, defense, counterclaim, avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or any other applicable law. The Debtor concludes that it does not possess and may not assert any claim, counterclaim,

setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of the Pre-Petition Obligations.

79.     As of the Petition Date, the Pre-Petition Obligations were fully secured pursuant to the Pre-Petition Financing Agreements by valid, perfected, enforceable and non-avoidable security interests and liens granted by the Debtor to XSI upon all of the Assets existing as of the Petition Date and all rents, issues, profits, proceeds, and products thereof (the "Prepetition Collateral", and collectively, together with any other property of the Debtor's bankruptcy estate (as defined under section 541 of the Bankruptcy Code, the "Estate").  Debtor does not possess and will not assert any claim, counterclaim, setoff or defense of any kind, nature or description, which would in any way affect the validity, enforceability and non-avoidability of any of XSI's liens, claims and/or security interests in the Pre-Petition Collateral.

A.      **Need for Access to DIP Financing**

80.     **T**he Estate will suffer immediate and irreparable harm if the Debtor does not obtain authorization to use cash collateral and immediate access to the proposed debtor-in-possession financing ("DIP Financing"), as the Debtor does not have sufficient available sources of working capital to operate its business in the ordinary course without the financing requested herein.  The ability of the Debtor to obtain sufficient liquidity through the proposed post-petition financing arrangements with XSI as set forth in this Motion is, therefore, vital to the preservation and maintenance of the Debtor's going concern value.  Accordingly, the Debtor has an immediate need to obtain the post-petition financing in order to permit, among other things, the orderly operation of its business and the continued marketing of itself and its assets, thereby allowing it to

engage in an orderly sale through an auction pursuant to Section 363 of the Bankruptcy Code; maximizing the potential recovery to all creditors.

81.     The Debtor believes that it would be futile, under the circumstances, to pursue alternative post-petition financing in the form of: (1) unsecured credit allowable as an administrative expense under Section 503(b)(1) of the Code; (2) unsecured credit allowable under Sections 364(a) and 364(b) of the Code; or (3) secured credit pursuant to Section 364(c) and/or Section 364(d) of the Code, on more favorable terms and conditions from sources other than XSI.   Accordingly, XSI has agreed to fund the Debtor's continued operations in chapter 11 in exchange for the reasonable protections proposed, including first-priority liens on all of the Assets in accordance with Section 364(d) of the Code.

**B.      Proposed Use of Cash Collateral and Proposed DIP Financing**

82.     XSI is willing to permit the Debtor to use cash collateral (as defined by Section 363(a) of the Code, including, any pre-petition proceeds and, subject to Section 552 of the Code, any and all post-petition proceeds of the Pre-Petition Collateral (the "Cash Collateral")) and to operate under the Pre-Petition Financing Agreements with the amendments described in the DIP Motion.

83.     In addition to permitting the use of Cash Collateral, XSI has agreed to provide the Debtor with access to additional postpetition credit (the "DIP Loan") on substantially the same terms and conditions of the Pre-Petition Financing Agreements prior to the Petition Date, pursuant to the Budget, with the amendments described in the DIP Motion.

84.     Given the Debtor's current debt obligations and lack of liquidity, the Debtor has had to rely for some time on protective advances from XSI made under the

Pre-Petition Financing Agreements to meet daily operating needs and remains unable to satisfy obligations as they come due. As indicated in the 13 week budget, which has been approved by XSI (as amended, modified or supplemented from time to time, the "DIP Budget", a copy of which is annexed to the DIP Motion as Exhibit "B"), the Debtor will need additional funds from XSI as well as the use of Cash Collateral to operate postpetition.

85. Prior to the commencement of the Chapter 11 case, XSI made loans and advances to the Debtor as described above.

## CONCLUSION

86. For the reasons stated herein and in each of the First Day Pleadings, I respectfully request that each of the First Day Pleadings be granted in its entirety, together with such further relief as the Court deems just and proper.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on April 10, 2011.

Kim Hetzel Salbello
Chief Restructuring Officer

**Exhibit A**

1.      Motion for an Order authorizing the Debtor to employ and retain K-Sal Group, LLC *nunc pro tunc* to the Petition Date, designating Kim Hetzel Salbello as Chief Restructuring Officer ("CRO") to the Debtor and granting related relief.

2.      The Debtor has moved for an Order (i) authorizing continued use of existing business forms and records; (ii) authorizing maintenance of existing corporate bank account; (iii) waiving (if necessary) the requirements of 11 U.S.C. § 345(b); and (iv) granting related relief.

3.      Motion For Order (A) Authorizing Debtor To Obtain Interim Post-Petition Financing And Grant Security Interests And Superpriority Administrative Expense Status Pursuant To 11 U.S.C. §§ 105 And 364(C); (B) Modifying The Automatic Stay Pursuant To 11 U.S.C. § 362; and (C) Scheduling A Final Hearing Pursuant To Bankruptcy Rule 4001.