## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| XSTREAM SYSTEMS, INC.[1] | Case No. 11-11086 (CSS) |
| Debtor. | **Objections Due: June 7, 2011 at 4:00 p.m.**<br>**Hearing Date: July 5, 2011 at 10:00 a.m.**<br><br>**Re: Docket No. 55** |

## AMENDED MOTION OF THE DEBTOR FOR AN ORDER (I) APPROVING BIDDING PROCEDURES FOR THE SALE OF THE DEBTOR'S ASSETS, AND (II) SCHEDULING AN AUCTION IN CONNECTION WITH THE SALE

XStream Systems, Inc., the above-captioned debtor and debtor in possession (the "Debtor") hereby moves (the "Motion") the Court, pursuant to sections 105 and 363 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") for entry of an order (i) approving proposed bid procedures (the "Bid Procedures"), in connection with the Sale (herein so called) of the Assets (as defined below) as set forth below and in that certain Asset Purchase Agreement (the "APA") by and between the Debtor and XSI, Inc. ("XSI"), and (ii) scheduling an Auction (herein so called) in connection with the Sale.

---

[1] The last four digits of the Debtor's federal tax identification number are: 0466. The Debtor's mailing address for purposes of this case is 10305 102nd Terrace, Suite 101, Sebastian, FL 32958.

## JURISDICTION AND VENUE

1.     This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157(a) and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     The statutory basis for the relief requested herein is sections 105(a) and 363 of the Bankruptcy Code and Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

3.     On April 8, 2011 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

4.     The Debtor is authorized to operate its business and manage its property as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.     On May 10, 2011, the Office of the United States Trustee (the "UST") appointed the Official Committee of Unsecured Creditors (the "Committee") in this case.

### A.   The Debtor's Business

6.     As more fully explained in the Declaration of Kim Hetzel Salbello in Support of the Debtor's Chapter 11 Petition and First Day Pleadings (the "Salbello Declaration"), which is incorporated herein by reference, the Debtor is in the business of producing and marketing x-ray diffraction machines for use in pharmaceutical counterfeit detection (the "Devices"). It had been funded by several debt and equity raises over the past three years. However, because of its current financial status, it is unable to raise either debt or equity. And because it does not generate any appreciable cash flow from its current business, it is in a state of an acute liquidity crisis, without sufficient available funds to make payroll, pay rent, utilities or other necessary and essential operating expenses.

7.     Currently, the Debtor's assets consist primarily of intellectual property relating to the design and manufacture of the Devices, along with several Devices and inconsequential office equipment (collectively, the "Assets"). A schedule of the Assets is annexed hereto as Schedule 1.

8.     Prior to the Bankruptcy filing, the Debtor attempted an initial public offering to raise capital. This effort proved unsuccessful.

9.     When it became apparent that the Debtor was unable to obtain any further financing from either public or private sources, two individuals who were insiders of the Debtor formed a company, XSI for the purpose of providing financing to the Debtor to allow it to file for bankruptcy protection and to provide the Debtor with postpetition Debtor-in-Possession financing.

10.     Thereafter, on March 16, 2011, the Debtor retained the consulting firm K-Sal Group LLC ("K-Sal") and Kim Hetzel Salibello to act as Chief Restructuring Officer ("Ms. Sailbello" or "CRO"). On June 6, 2011, the Court entered an order authorizing the retention and employment of K-Sal and Ms. Salibello as CRO of the Debtor *nunc pro tunc* to the Petition Date.

11.     Ms. Salibello commenced a search for an investment banking firm to market and sell the Debtor and/or the Assets. Among the entities Ms. Salibello interviewed (and eventually selected) was Streambank, LLC ("Streambank"). On May 5, 2011, the Debtor filed the Motion to Authorize and Approve an Order for (i) the Debtor's Employment and Retention of Streambank, LLC as Investment Banker; (ii) Streambank LLC's Compensation Terms; (iii) a Waiver of Local Rule 2016-2(d); and (iv) Sale Procedures for the Debtor's Property (the "Streambank Retention Motion") seeking, *inter alia,* to retain and employ Streambank to act as investment banker to the Debtor as more fully described in the Streambank Retention Motion

and pursuant to the agreement between the Debtor and Streambank (the "IB Agreement"), a copy of which is attached as Exhibit C to the Streambank Retention Motion.[2]

12.     As set forth in more detail in the Streambank Retention Motion, Ms. Salibello selected Streambank to act as investment banker for the Debtor because of its extensive experience in the marketing and sale of intellectual property assets in distressed situations as well as its broad understanding of intellectual property assets as a result of their intellectual property appraisal practice.  Additionally, Streambank has been involved in numerous bankruptcy court sale processes before this and other bankruptcy courts and is therefore quite familiar and comfortable running a 363 sale process.  Further, Streambank was willing to be retained on financial terms Ms. Salibello believed to be reasonable under the circumstances.

**B.     XSI's Stalking Horse Bid**

13.     The material terms of the business deal between the Debtor and XSI (the "XSI Bid") are that XSI has agreed, if not outbid at the Auction, to purchase the Assets in the amounts set forth below, free and clear of liens (if any), claims, encumbrances, and interests except for the Permitted Exceptions (as defined in the APA), including claims of successor liability.

14.     This section summarizes the significant terms of APA, but are qualified in their entirety by reference to the actual APA, a copy of which is attached hereto as Exhibit A:

    (a)     Assumption of the Assumed Liabilities (as defined in the APA);

    (b)     A credit bid of the full amount of its prepetition and post petition secured loans to Debtor plus all amounts listed on the budget, dated as of June 21, 2011 and attached to the APA as Exhibit B, in an aggregate amount not to exceed Four Hundred Twenty Five Thousand Nine Hundred Eighty Five Dollars ($425,985.00), plus

---

[2] The Streambank Retention Motion, solely as it relates to the retention of Streambank as investment banker for the Debtor, is scheduled for hearing on July 5, 2011 at 1:00 p.m.  This Motion amends that portion of the Streambank Retention Motion that relates to Bid Procedures.

accrued interest, such credit to reduce the aggregate balance owed to zero;

    (c)    Seventy Five Thousand Dollars ($75,000) in cash (the aggregate of Subsection 4.1(a), 4.1(b), and 4.1(c) of the Agreement the "<u>Cash Consideration</u>"); and

    (d)    The transfer of 20,000 shares of XSI's common stock, representing approximately 7.4% of the outstanding equity to Debtor (the "<u>Equity Consideration</u>" and with the Cash Consideration, collectively, the "<u>Purchase Price</u>"), which common stock shall have the rights set forth in the Buyer's Certificate of Incorporation filed with the State of Delaware and the Buyer's Stockholders' Agreement, dated as of March 16, 2011 (the "<u>Stockholders' Agreement</u>").

15.    The Debtor evaluated the terms of the XSI Bid with the assistance of its professionals and, in its reasoned business judgment, concluded that XSI's proposal offered the best opportunity to initiate a sale process that will maximize creditor recoveries. The Debtor has marketed and will continue marketing their assets in an effort to solicit further interest from both strategic acquirers and financial buyers and investors. The APA is subject to higher or better offers.

## **<u>RELIEF REQUESTED</u>**

16.    The Debtor respectfully seeks entry of the proposed order attached hereto (the "<u>Order</u>") approving the Bid Procedures, substantially in the form attached hereto as Exhibit B, and scheduling an Auction in connection with the Sale of the Debtors' Assets.

17.    Local Rule 6004-1, which addresses "Sale and Sale Procedures Motions," requires that this Motion highlight select provisions in the Order. Accordingly, to the extent not

otherwise disclosed herein, the Debtor notes the following with respect to deadlines contained in the Bid Procedures in connection with the proposed Auction and Sale of the Assets:[3]

  (a) A bidding deadline of July 19, 2011 (the "Bid Deadline");

  (b) The scheduling of an Auction of the Assets, on or before July 21, 2011 to be held if a Qualified Bidder (as defined in the Bid Procedures) other than the XSI Bid is received by the Debtor;

  (c) The scheduling of a hearing on or about July 25, 2011 for the Court to consider confirming the results of the Auction, or sale to XSI if no Qualified Bid is received; and

  (d) Allowing the Debtor and the successful bidder, or XSI if no other Qualified Bid is received, to close on the sale transaction immediately after the Auction.

18. Further, and in accordance with Local Rule 6004-1, this section summarizes additional key provisions of the Bid Procedures:

  (a) Streambank will market the Assets and contact prospective purchasers;

  (b) Any party interested in conducting due diligence on the Debtor or Assets must execute a nondisclosure and confidentiality agreement (a "NDA") substantially in the form annexed to the Bid Procedures;

  (c) Once an interested party executes a NDA, it will be allowed access to the Debtor's books, records and all relevant documents;

  (d) All competing bids must be for all of the Debtor's Assets;

  (e) All competing bids must be submitted by the Bid Deadline and include a mark-up of the XSI APA;

  (f) Competing bids must be at least $50,000 greater than the XSI Bid Value;

  (g) Bidders providing competing bids provide a good faith deposit of 10% of the bid amount, to be held in escrow;

  (h) All bids will be considered valid, enforceable contracts;

  (i) Bidding will start at the highest Qualifying Bid (as defined in the Bid Procedures), plus $50,000 and will continue in increments of at least

---

[3] All provisions of the Bid Procedures referenced in this Motion are qualified in their entirety by reference to the Bid Procedures attached hereto.

$50,000 in cash (or such lower amount as the Debtor sets during the Auction; and

(j)    Potential Bidders (as defined in the Bid Procedures) or Qualified Bidders (as defined in the Bid Procedures), including XSI, shall not be allowed any break-up, termination, or similar fee.

## BASIS FOR RELIEF REQUESTED

A. *The Sale of the Assets Pursuant to the Bid Procedures Represents an* *Exercise of the Debtor's Business Judgment*

19.    The Debtor desires to receive the greatest value for the Assets. Although the Debtor believes the APA with XSI is fair and reasonable and reflects the highest and best value for the Assets as of the date of this Motion, and although it marketed the Assets prepetition, the Debtor nevertheless desires to place the APA to the test of the broader public marketplace in the hope that higher and better offers are generated for the Assets.

20.    If the proposed Bid Procedures are approved, the Debtor will solicit competing bids for the Assets. The Bid Procedures describe, among other things, the assets available for sale, the manner in which bidders and bids become "qualified," the coordination of diligence efforts among bidders and the Debtor, the receipt, negotiation and qualification of bids received, the conduct of any auction, and the selection and approval of any ultimately successful bidders.

21.    The Bid Procedures were developed consistent with the Debtor's competing needs to expedite the sale process and promote participation and active bidding. Moreover, the Bid Procedures reflect the Debtor's objective of conducting the Auction in a controlled, but fair and open, fashion.

22.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 363 of the

Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's property prior to confirmation of a plan. However, courts in this Circuit and others have required that the decision to sell property outside the ordinary course of business be based upon the sound business judgment of the debtor. In re Abbotts Dairies of Penn., Inc., 788 F.2d 143 (3d Cir. 1986); see also Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D.D.C. 1991).

23.     The "sound business judgment" test requires a debtor to establish four elements in order to justify the sale or lease of property outside the ordinary course of business, namely, (a) that a "sound business purpose" justifies the sale of property outside the ordinary course of business, (b) that adequate and reasonable notice has been provided to interested persons, (c) that the debtor has obtained a fair and reasonable price, and (d) good faith. See Abbotts Dairies, 788 F.2d 143; Titusville Country Club v. Pennbank (In re Titusville Country Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); In re Sovereign Estates, Ltd., 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989). A debtor's showing of a sound business purpose need not be unduly exhaustive; rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." In re Baldwin United Corp., 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. Lionel, 722 F.2d at 1071; Montgomery Ward, 242 B.R. at 155 (approving funding of employee incentive and severance program; business purpose requirement fulfilled because stabilizing turnover rate and increasing morale were necessary to successful reorganization).

24.     Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper. In re Fesco Plastics Corp., 996 F.2d 152, 154 (7th Cir. 1993); Pincus v. Graduate Loan Ctr. (In re Pincus), 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's property. See, e.g., Chinichian v. Campolongo (In re Chinichian), 784 F.2d 1440, 1443 (9th Cir. 1986) ("[s]ection 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); In re Cooper Props. Liquidating Trust, Inc., 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that the bankruptcy court is "one of equity and as such it *has* a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws."). Bankruptcy Rule 6004 authorizes "sales not in the ordinary course of business . . . by private sale or by public auction." Fed. R. Bankr. P. 6004(f)(1).

25.     There is more than ample business justification for the approval of the Bid Procedures and the Sale of the Assets in accordance with the Bid Procedures. The proposed Bid Procedures provide an appropriate framework for selling the Assets and will enable the Debtor to review, analyze, and compare all bids received to determine which bid is in the best interests of the Debtor's estate and creditors. Moreover, the Debtor believes that the Sale of the Assets will

inure to the benefit of the Debtor's estates and creditors and, therefore, represents the exercise of the Debtor's sound business judgment.

26. The proposed Sale of the Assets pursuant to the Bid Procedures is in "good faith" within the meaning of the Abbotts Dairies analysis. The Debtor represents that no insider will gain an unfair advantage from the Sale pursuant to the Bid Procedures.

27. In fact, every effort has been taken to insure that the former insider status of XSI's principals in no way affords XSI an unfair advantage; all Board decisions regarding the Sale of the Assets and the retention of the CRO and the CRO's decision to retain Streambank have been made without such parties, who are no longer directors. Indeed, the retention of the CRO and Streambank are designed to provide independent, disinterested and fair analysis and actions with respect to the Sale of the Assets. Further, the prepetition loan, debtor-in-possession financing and XSI Bid are all commercially reasonable transactions and are not the product of undue influence.

28. Accordingly, the Court should approve the Bid Procedures and schedule an Auction in connection with the Sale of the Debtor's Assets.

B. *The Sale of the Property Should Be Approved Under 11 U.S.C § 363(f)*

29. Pursuant to section 363(f) of the Bankruptcy Code, a debtor in possession may sell all or any part of its property free and clear of any and all liens, claims or interests in such property if (i) such a sale is permitted under applicable non-bankruptcy law, (ii) the party asserting such a lien, claim or interest consents to such sale, (iii) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property, (iv) the interest is the subject of a *bona fide* dispute, or (v) the party asserting the lien, claim or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for

such interest. <u>See</u> 11 U.S.C. § 363(f); <u>In re Elliot</u>, 94 B.R. 343, 345 (E.D. Pa. 1988) (section 363(f) written in disjunctive; court may approve sale "free and clear" provided at least one of the subsections is met).

30.     Kimball International, Inc. ("<u>Kimball</u>") asserts a lien on certain of the Assets – those physical assets located in the State of Florida (the "<u>Florida Physical Assets</u>"). To the extent Kimball holds such a lien, it shall attach to that portion of the sale proceeds attributable to Florida Physical Assets.[4]

31.     Accordingly, the requirements of section 363(f) of the Bankruptcy Code are met, and the proposed disposition of the Assets should be approved "free and clear" of any such liens, claims or interests, with any such liens to attach to the proceeds of the Sale.

## NOTICE

32.     No trustee, of examiner has been appointed in this chapter 11 cases. Notice of this Motion has been provided to: (a) the UST; (b) counsel for the Committee; (c) counsel for XSI; (d) Counsel for Kimball; and (d) those parties who have requested notice in these cases pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested herein, the Debtor submits that no other or further notice is required.

## CONCLUSION

33.     No previous request for the relief sought herein has been made to this or any other Court.

---

[4] Substantially contemporaneous with filing this Motion, the Debtor is filing an adversary complaint against Kimball seeking, *inter alia,* a determination of the validity, extent and priority of Kimball's asserted lien.

WHEREFORE, the Debtors respectfully request that the Court enter the Order granting (i) the relief requested herein, and (ii) such other and further relief as the Court may deem proper.

BAYARD, P.A.

June 21, 2011
Wilmington, Delaware

/s/ Daniel A. O'Brien,
Jamie L. Edmonson (No. 4247)
Daniel A. O'Brien (No. 4897)
222 Delaware Avenue, Suite 900
Wilmington, DE 19801
Phone: (302) 655-5000
Fax: (302) 658-6395

-and-

GERSTEN SAVAGE, LLP
Paul Rachmuth
600 Lexington Avenue
New York, New York 10022
Telephone: (212) 752-9700
Facsimile: (212) 980-5192

*Proposed Co-Counsel for the Debtors and
Debtors in Possession*

# SCHEDULE 1

Debtor's Assets:

Cash
Parts inventory
Office equipment
2 XTS250 machines located in Sebastian, Florida facility
1 XTS250 machine located at Quality Control Products' facility in New Holland, Ohio
1 XTS250 machine located at Drogueria de la Villa, Ponce, PR
All executory contracts including:
      Licensing agreement with the State University of New Jersey- Rutgers division to utilize
      Energy Dispersive X-ray diffraction (EDXRD) technology.
      Contract rights with various XST250 machine owners
Intellectual property including: trademarks; trade secrets and know-how; copyright rights, including in proprietary computer algorithms and business processes; all relating to the design, manufacture and marketing of the Debtor's x-ray diffraction detection system.