# EXHIBIT A

## [XSI APA]

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**") is made and entered into as of June 21, 2011, 2011, by and between **XStream Systems, Inc.** (the "**Seller**"), and **XSI, Inc.** (the "**Buyer**").

**WHEREAS**, Seller is engaged in the business of developing material authentication and verification solutions (the "**Business**"); and

**WHEREAS**, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller the Purchased Assets (as defined below) as of the Closing (as defined below), and Buyer desires to assume from the Seller the Assumed Liabilities (as defined below) as of the Closing, in each case, on the terms and subject to the conditions set forth herein; and

**WHEREAS**, Seller filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") on April 8, 2011 (the "**Petition Date**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") and such bankruptcy case is hereinafter referred to as the "**Chapter 11 Case**"; and

**WHEREAS**, Buyer acknowledges that to satisfy itself as to the title and condition of the Purchased Assets it is acquiring, and certain other matters, the Buyer will rely on (i) an order to be entered by the Bankruptcy Court, approving this Agreement and authorizing the transactions contemplated hereby pursuant to Sections 363 and 365 of the Bankruptcy Code, including that Buyer's acquisition of the Purchased Assets shall be free and clear of all liens, claims and encumbrances, except for the Permitted Exceptions (as defined below), including claims of successor liability (the "**Approval Order**"), and (ii) the representations and warranties of the Seller contained in this Agreement.

**NOW, THEREFORE**, the Seller and the Buyer hereby agree as follows:

## ARTICLE I
## PURCHASE OF ASSETS

1.1     Purchased Assets.  On the terms and subject to the conditions set forth herein, including the entry by the Bankruptcy Court of the Approval Order, the terms of which are acceptable to the Buyer, on the Closing Date (defined below), the Seller shall sell, transfer, assign, convey and deliver to the Buyer, and the Buyer shall purchase and accept from the Seller:

(a)     The entire right, title and interest of the Seller in and to the tangible and intangible personal property and assets of the Seller listed and/or described on **Schedule 1.1(a)(i)** to this Agreement (the "**Purchased Assets**") free and clear of all liens, claims and encumbrances, but subject only to those items reflected on **Schedule 1.1(a)(ii)** (the "**Permitted Exceptions**").

(b)     In the event and to the extent the sale, lease, conveyance, assignment, license or transfer of any of the authorizations, approvals, consents, licenses or permits ("**Permits**") listed on **Schedule 1.1(b)** (collectively referred to herein as the "**Assigned Permits**") is unlawful or is not permissible or requires the consent of any governmental entity under any agreement or under any applicable federal, state or local law (including common law), statute, treaty, rule, directive,

regulation, ordinance and similar provisions having the force or effect of law or an order of any governmental entity, (i) Seller shall relinquish all of its right, title, benefit and interest in and to and authority under, such Assigned Permits as of the Closing and shall fully cooperate to effectuate any such sale, lease, conveyance, assignment, license or transfer and (ii) Buyer shall have issued and granted to it by the appropriate governmental entity or other third party a Permit conferring upon Buyer, as of the Closing, all right, title, benefit, interest and authority at least equal to that relinquished by Seller, including the right, authority and approval for Buyer to own and operate the Purchased Assets from and after the Closing.

The sale, transfer, assignment and conveyance shall be evidenced by appropriate bills of sale and assignment with respect to the Purchased Assets in the form annexed hereto as **Exhibit A**, the Approval Order, the terms of which are acceptable to the Buyer, and such other instruments or documents of transfer, assignment and conveyance as are set forth herein and such others as may be reasonably necessary or appropriate to consummate the transactions contemplated by this Agreement and to comply with applicable law.

1.2     Excluded Assets. The Purchased Assets shall not include (a) cash on hand of Seller as of the Closing Date, (b) avoidance claims and causes of action under chapter 5 of Bankruptcy Code against non-insiders (the "**Avoidance Actions**"), (c) the corporate minute books of Seller, (d) any leases and executory contracts which are not Assigned Contracts (as such term is defined below), (e) those certain litigation claims by and of Seller described on **Schedule 1.2(e)** to this Agreement, (f) any assets associated with any Employee Benefit Plan (as such term is defined below) of the Seller, (g) any Permits which are not Assigned Permits, (h) any right to refunds or reimbursement of expenses prepaid by Seller to any third party service provider and/or insurer, and (i) any security deposits paid to lessors by Seller under any lease, sublease or similar agreement.   For the avoidance of doubt, any Avoidance Actions against Seller's current or former insiders (as the term insider is defined in section 101(31) of the Bankruptcy Code) shall be included in the Purchased Assets.

## ARTICLE II
## CONTRACTS TO WHICH SELLER IS A PARTY

2.1     Contracts. To the to the Seller's knowledge, Schedule 2.1 to this Agreement contains a list and/or a description of the contracts, personal and real property leases, licenses, and agreements to which the Seller is a party or by which it is bound (the "**Contracts**") and of which the Seller has knowledge as of the date of this Agreement.

2.2     Contracts Buyer Desires to Assume. **Schedule 2.2** hereto, as may be amended in accordance with Section 2.3 of this Agreement, identifies the Contracts that the Buyer shall assume on the Closing Date (collectively, the "**Assigned Contracts**"), along with identification of any cure amounts required for the assumption of each of the Assigned Contracts, and any other defaults thereunder known to the Seller.  The Seller shall obtain approval from the Bankruptcy Court for the assignment of the Assigned Contracts in accordance with the Approval Order.  The Buyer shall be responsible for any cure amounts as determined by the Bankruptcy Court as a condition to assumption and assignment of any Assigned Contract in the Approval Order. The Approval Order shall include a provision which specifies that the Assigned Contracts will be transferred to, and remain in full force and effect for the benefit of, the Buyer,

notwithstanding any provision in such Assigned Contract that prohibits such assignment or transfer.

2.3     Additional Contracts.  Seller agrees that if, after the date of this Agreement and before the Closing of the transactions contemplated hereby, it becomes aware of any additional contracts or agreements concerning the Seller or by which they are bound it will immediately notify the Buyer in writing and these additional contracts and agreements will be added to **Schedule 2.1**.  If, at that time and in Buyer's sole discretion, the Buyer desires to assume any Contracts that are not at such time listed on **Schedule 2.2** hereof, such Contracts will be added to the list of Assigned Contracts on **Schedule 2.2**.  Not less than ten (10) business days prior to the Closing Date, the Buyer may notify the Seller of any Contracts that are not at such time listed on **Schedule 2.2** hereof which Buyer, in its sole discretion, desires to assume on the Closing Date, in which case such additional Contracts shall be deemed to be Assigned Contracts and the same shall be added to **Schedule 2.2**, including identification of any cure amount, and the Seller will obtain Bankruptcy Court approval of the assumption and assignment of such additional Contracts prior to the Closing Date.  Payment of any cure amount shall be subject to the terms of Section 2.2 hereof.

### ARTICLE III
### ASSUMED AND EXCLUDED LIABILITIES

3.1     Assumed Liabilities.  On the terms and subject to the conditions contained in this Agreement, simultaneously with the sale, lease, conveyance, assignment, license, transfer and delivery of the Purchased Assets at the Closing, Buyer shall assume only the following liabilities of Seller (collectively, the "**Assumed Liabilities**"): the performance obligations remaining to be performed or accruing after the Closing under the Assigned Contracts, except to the extent that any such obligations result from, arise out of, relate to, or are caused by, any one or more of the following: (i) a breach of any of the Assigned Contracts occurring prior to the Closing Date; (ii) a breach of warranty, infringement or violation of law occurring prior to the Closing Date; or (iii) an event or condition occurring or existing prior to the Closing Date which, through the passage of time or the giving of notice or both, would constitute a breach or default by Seller under any of the Assigned Contracts.

3.2     Excluded Liabilities.  EXCEPT AS AND ONLY TO THE EXTENT EXPRESSLY SET FORTH IN THIS AGREEMENT, BUYER DOES NOT ASSUME AND SHALL NOT BE LIABLE FOR ANY OF THE DEBTS, OBLIGATIONS OR LIABILITIES OF SELLER, SELLER'S BUSINESS OR ANY AFFILIATE OF SELLER, WHENEVER ARISING AND OF WHATEVER TYPE OR NATURE.  In particular and notwithstanding anything to the contrary elsewhere in this Agreement, the Buyer shall not assume or be required to pay, satisfy, discharge or perform, or take or agree to take, any of the Purchased Assets subject to, and shall not be deemed by virtue of the execution and delivery of this Agreement or any document delivered to or by the Buyer at the Closing pursuant hereto, or as a result of the consummation of the transaction which is the subject of this Agreement, to have successor liability for, or to have assumed, or to have agreed to assume, or to take, or to have agreed to take, or to pay, satisfy, discharge or perform, any liabilities of the Seller, whether accrued or contingent or known or unknown, whether arising in tort, contract, or otherwise, attributable to or arising from the operations of the Seller.  Without limitation of the foregoing, the "**Excluded Liabilities**" shall

include debts, liabilities and obligations: (a) under any real estate lease or any contract or agreement to which any Seller is a party or by which the Seller or Seller's business is bound that has not been listed as an Assigned Contract on **Schedule 2.2** hereof; (b) with respect to any Assigned Contract, arising from the period prior to the Closing Date; (c) arising prior to the Closing Date out of any collective bargaining agreement to which the Seller is a party; (d) for any Employee Benefit Plan of the Seller; (e) for any obligation for real estate and personal property taxes arising prior to the Closing Date and other taxes; (f) for any liability for local or state sales, use or transfer tax and taxes that may be imposed upon the sale or assignment of the Purchased Assets pursuant to this Agreement and the Assignment and Assumption and Bill of Sale, regardless of when such obligations may become known and due; (g) for any damages or injuries to persons or property or for any tort or strict liability arising from conditions, circumstances, events, actions or inactions in Seller's business or the operation of such business or condition of such property prior to the Closing Date; (h) arising out of any litigation with respect to the period prior to the Closing Date, whether or not threatened or pending on or prior to the Closing Date; (i) incurred by Seller or by Seller's business for borrowed money; (j) for any accounts payable of Seller; and (k) any liability related to or arising under any Environmental Law (as defined hereunder) arising prior to the Closing Date. The intent and objective of Buyer and Seller is that, except for liabilities explicitly assumed by Buyer hereunder, Buyer does not assume, and no transferee liability shall attach to Buyer pertaining to, any of the Excluded Liabilities.

3.3   Post-Closing Liabilities. The Buyer shall be responsible for all Assumed Liabilities and all liabilities and obligations of any type attributable to or arising from the Buyer's ownership and/or its use of the Purchased Assets and its business first accruing after the Closing, whether arising in tort, contract, or otherwise.

## ARTICLE IV
## CONSIDERATION; ALLOCATION

4.1   Consideration. In consideration of the conveyance to the Buyer of the Purchased Assets, and in reliance on Seller's representations, warranties and covenants but subject to the conditions and terms hereof, Buyer shall consist of the following:

(a)   Assumption of the Assumed Liabilities;

(b)   A credit bid of the full amount of its prepetition and post petition secured loans to Debtor, plus all amounts obligated under such loans but not yet paid pursuant to the Budget, dated as of June 21, 2011 and attached to the APA as **Exhibit B**, in an aggregate amount not to exceed Four Hundred Twenty Five Thousand Nine Hundred Eighty Five Dollars ($425,985.00), plus accrued interest, such credit to reduce the aggregate balance owed to zero;

(c)   Seventy Five Thousand Dollars ($75,000) in cash (the aggregate of Subsection 4.1(a), 4.1(b), and 4.1(c) the "**Cash Consideration**"), and

(d)   The transfer of 20,000 shares of Buyer's common stock, representing approximately 7.4% of the outstanding equity to Seller (the "**Equity Consideration**" and with the Cash Consideration, collectively, the "**Purchase Price**"), which common stock shall have the

rights set forth in the Buyer's Certificate of Incorporation filed with the State of Delaware and the Buyer's Stockholders' Agreement, dated as of March 16, 2011 (the "**Stockholders' Agreement**").

4.2    Prorations/Apportionments.    As a general principle it is agreed that Seller shall be responsible for all expenses, and shall receive all income from the Purchased Assets, attributable to the period prior to and including the Proration Time (as defined below); and that Buyer shall be responsible for all expenses, and shall receive all income from the Purchased Assets, attributable to the period after the Proration Time. To this end, Buyer and Seller shall jointly prepare proposed proration schedules no later than seven (7) business days prior to the Closing Date including the items listed below and any other items the parties mutually determine to be necessary or proper. Seller and Buyer shall use commercially reasonable efforts to finalize and agree on the final proration schedule (the "**Proration Schedule**") at least two business days prior to the Closing. All items shall be prorated on a daily basis as of 11:59 p.m. on the day prior to the Closing Date (the "**Proration Time**"). The pro rated items shall, without limitation, consist of:

(a)    current payments under any Assigned Contracts;

(b)    non-delinquent personal property taxes on the Purchased Assets;

(c)    any amounts held in escrow or under deposit by third parties under any of the Assigned Contracts;

(d)    any other item subject to proration or adjustment pursuant to the terms of this Agreement; and

(e)    any other items customarily apportioned for similar transactions or referenced in this Agreement.

4.3    Post-Closing Receipts.    Seller shall pay to Buyer all cash received on and subsequent to the Closing Date from any source relating to the Purchased Assets or the business operated with the Purchased Assets. Such payments shall be made within thirty (30) days after receipt of such payments by Seller, and a copy of the remittance advice shall accompany such payments.

4.4    Allocation of Purchase Price.    Buyer and Seller agree that Thirty Thousand Dollars ($30,000.000) of the Purchase Price shall be allocated to the tangible personal property located within the state of Florida included in the Purchased Assets being purchased by the Buyer, with the remainder of the Purchase Price being allocated to the intangible personal property, including the Intellectual Property (as such term is defined in Section 10.7 below) and the tangible personal property located outside the state of Florida (the "**Agreed Allocation**"). Such value (and all other capitalized costs) shall be allocated among the Purchased Assets in accordance with Section 1060 of the Internal Revenue Code of 1986 (the "**Code**") and the Treasury regulations thereunder (and any similar provisions of state, local or foreign law, as appropriate) pursuant to the Agreed Allocation. Neither the Buyer nor the Seller shall take any action or position inconsistent for tax or accounting purposes with this allocation.

4.5    Transfer Taxes.    All Transfer Taxes (as defined below) incurred solely in connection with the sale of the Purchased Assets and the assumption of the Assumed Liabilities at the Closing

pursuant to this Agreement shall be the obligation of the Seller. Buyer and Seller shall cooperate in providing each other with any appropriate resale exemption certifications and other similar documentation. The party that is required by applicable law to make the filings, reports or returns with respect to any applicable Transfer Taxes shall do so, and the other party shall cooperate with respect thereto as necessary. For purposes of this Agreement, the term "**Transfer Taxes**" means all excise, sales, use, value added, registration, stamp, recording, documentary, conveyancing, transfer, and similar taxes, levies, charges and fees.

## ARTICLE V
## EFFECTIVENESS AND CLOSING

5.1    Effectiveness. The parties acknowledge that the consummation of the transaction that is the subject of this Agreement is subject to the approval of the Bankruptcy Court, including the issuance of the Approval Order, and to the conditions to closing set forth in Article VIII below for the benefit of Buyer and in Article IX below for the benefit of Seller.

5.2    Closing.    On the terms and subject to the conditions of this Agreement, the consummation of the transaction that is the subject of this Agreement (the "**Closing**") shall take place at the offices of Robinson & Cole LLP, 885 Third Avenue, 28th Floor, New York, NY 10022-4834, at 10:00 a.m., on August 1, 2011 or at such other place and on such other date as the parties hereto shall mutually agree to in writing (the actual date of the Closing shall be referred to herein as the "**Closing Date**").

5.3    Seller's Deliveries at Closing. At or prior to the Closing, the Seller shall deliver to the Buyer each of the following items:

(a)    Bill of Sale, Assignment and Assumption Agreement substantially in the form attached hereto as **Exhibit A** hereto (the "**Assignment Agreement**"), executed by the Seller, pursuant to which the Buyer shall be assigned and shall assume the Assigned Contracts and the Assumed Liabilities from the Seller;

(b)    Any other documents and instruments of transfer necessary to consummate the transactions contemplated by this Agreement;

(c)    The Final Order (as defined in Section 8.3 hereof);

(d)    Joinder agreement to the Stockholders' Agreement;

(e)    Physical possession and control of the Purchased Assets;

(f)    Seller will endeavor to provide Buyer with copies of all third-party consents which are required for Seller to transfer the Purchased Assets to Buyer and for Buyer to assume the Assumed Liabilities;

(g)    A certificate executed by Seller which certifies that all representations and warranties made by Seller in this Agreement are true and accurate through the Closing Date;

(h)     Seller will endeavor to provide Buyer with evidence satisfactory to the Buyer that all liens, claims and encumbrances on the Purchased Assets (except for the liens, claims and encumbrances shown on **Schedule 5.3(g)**) have been released of record or that such liens, claims and encumbrances have been deemed released in the Approval Order in a manner which is satisfactory to the Buyer, in its reasonable discretion;

(i)     Originals of all Assigned Contracts (to the extent the same are in the possession of or are located with the Seller);

(j)     All books, records and files with respect to the Seller, other than those items which are Excluded Assets (the delivery requirement thereof may be satisfied by leaving the same at the Seller's facilities after the Closing);

(k)     All keys in respect of the Seller (the delivery requirement thereof may be satisfied by leaving the same at the Seller's facilities after the Closing);

(l)     Properly completed and executed state and municipal conveyance tax statements and all other statements required for the payment of Transfer Taxes incurred in connection with the sale of the Purchased Assets and the assumption of the Assumed Liabilities;

(m)     Any other documents and instruments reasonably requested or deemed to be necessary or appropriate by the Buyer to consummate the transactions contemplated by this Agreement.

5.4     Buyer's Deliveries at Closing.  The Buyer shall deliver to the Seller each of the following items:

(a)     The Cash Consideration, payable by wire transfer or other delivery of immediately available funds to an account designated by the Seller;

(b)     A stock certificate of the Buyer representing the Equity Consideration;

(c)     The Assignment Agreement executed by the Buyer;

(d)     Evidence satisfactory to the Seller that Buyer has assumed certain indebtedness of the Seller pursuant to Section 3.1 of this Agreement; and

(e)     Any other documents and instruments reasonably requested by the Seller necessary or appropriate to consummate the transactions contemplated by this Agreement.

## ARTICLE VI
## EMPLOYEES AND EMPLOYMENT MATTERS

6.1     Seller's Employees.  **Schedule 6.1** lists all employees of the Seller (the "**Employees**"), their positions and their rates of pay as of the date of this Agreement.  Seller shall provide updated versions of Schedule 6.1 on the Closing Date.

6.2    Certain Unemployment Claims.  Seller shall be responsible for all unemployment claims made by employees of the Seller which are not subsequently employed by Buyer.  Buyer shall be responsible for all unemployment claims made by former employees of Seller who are terminated by Seller and hired by Buyer and which employees are thereafter subsequently terminated by Buyer, for periods beginning on or after the Closing Date.

6.3    COBRA.  Effective as of the Closing Date, the Seller shall cease to maintain any employee benefit plan which is a "group health plan" for purposes of Section 4980B of the Code, to the extent such plans exist. On and after the Closing Date, the Buyer will be responsible and liable for providing any required notices under Section 4980B of the Code with respect to any Employee Benefit Plan which is subject to the provisions of Section 4980B of the Code and for providing "COBRA continuation coverage" (as defined in the regulations issued under Section 4980B of the Code) to all individuals who are "M&A qualified beneficiaries" (as defined in the regulations issued under Section 4980B of the Code) with respect to such plan and who have a "qualifying event" (as defined in the regulations issued under Section 4980B of the Code, and including those events resulting from the transactions contemplated by this Agreement) prior to or as a result of the transactions contemplated by this Agreement.

6.4    Payroll and Benefit Obligations.  Buyer and Seller agree that the Seller shall terminate the employment of all employees of the Seller effective immediately prior to the Closing Date. Seller will be responsible for all accrued wages and benefits and related obligations, including the issuance of all Form W-2s, for the Employees of the Seller up to and including the Closing Date.

6.5    Benefit Plans.  To the extent any such plans exist, Seller agrees that it will terminate, effective no later than the Closing Date, any and all "employee pension benefit plans" (as defined in Section 3(2) of ERISA), "employee welfare benefit plans" (as defined in Section 3(1) of ERISA), and any other written or oral plans, agreements or arrangements involving direct or indirect compensation, including insurance coverage, cafeteria plan benefits, severance benefits, paid time off, vacation, holiday, sick leave, disability benefits, deferred compensation, bonuses, stock options, stock purchase, phantom stock, stock appreciation or other forms of incentive compensation or post-retirement compensation (any of the foregoing, an "**Employee Benefit Plan**"). As set forth in Section 3.2(d) of this Agreement, Buyer shall not be liable for any debts, liabilities or obligations related to the Employee Benefit Plans.

## ARTICLE VII
## CONDITION OF PURCHASED ASSETS

Buyer acknowledges and agrees that it has previously inspected the Purchased Assets and the Assumed Liabilities to the extent Buyer deems necessary in connection with the contemplated transaction.  Subject to the terms and conditions of this Agreement, Buyer acknowledges that the Seller is selling, and Buyer is buying and occupying, as applicable, the Purchased Assets, as is, where is, and with all faults on the date hereof, subject to ordinary wear and tear and natural deterioration between the date hereof and the Closing Date, and subject to the terms of this Agreement (including the express representations and warranties of the Seller set forth in this Agreement).

# ARTICLE VIII
## CONDITIONS PRECEDENT TO THE OBLIGATIONS OF THE BUYER

The obligations of the Buyer to consummate the transaction shall be subject to the satisfaction, at or prior to the Closing, of all of the following conditions, any one or more of which may be waived in writing at the discretion of the Buyer:

8.1    Consents.  The Seller will endeavor to obtain the written consent of all necessary third parties, with respect to Buyer's assumption of the Assigned Contracts as contemplated in Section 2.2 hereof, or, if such consent is not forthcoming, entry by the Bankruptcy Court of an order approving the assignment and assumption of any of the Assigned Contracts over the objection of the other parties to such Assigned Contracts.

8.2    Absence of Injunction.  No temporary restraining order, preliminary or permanent injunction or other order issued by any governmental agency or authority of competent jurisdiction or other legal restraint or prohibition preventing the consummation of the transaction (collectively, an "**Injunction**") shall be in effect.

8.3    Issuance of Approval Order and Bidding Procedures Order.  The Bankruptcy Court having jurisdiction over the Seller shall have entered the Approval Order, which shall have become a "Final Order" and a judgment of the Bankruptcy Court. The term "**Final Order**" shall mean an order or judgment of the Bankruptcy Court which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari*, or other reargument, or rehearing has expired and as to which no appeal, petition for *certiorari*, new trial, reargument, or rehearing thereof has been sought, or (b) such order or judgment of the Bankruptcy Court shall have been affirmed by the highest Court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired. In addition, the Bankruptcy Court shall have entered an order regarding certain bidding procedures to govern the conduct of the sale and the solicitation and handling of any and all competing bids for the Purchased Assets (the "**Bidding Procedures Order**"), by no later than July 8, 2011.

8.4    Representations, Warranties and Covenants of Seller.  Each of the representations and warranties of the Seller in this Agreement shall be true and correct in all material respects, on and as of the Closing Date (except for those representations and warranties which by their own express terms are limited in time to the date of entry of the Approval Order, as hereinafter defined) with the same force and effect as though made on and as of the Closing Date except for changes to such representations or warranties arising or relating to any matter occurring during the period from the date hereof to the Closing Date that (a) are approved in writing by Buyer, or (b) are otherwise permitted pursuant to the express terms of this Agreement and each of the covenants of the Seller shall have been performed and complied with in all material respects prior to or as of the Closing Date.

8.5    Closing Deliveries.  The Seller shall have executed and delivered to the Buyer the documents and instruments that the Seller is required to deliver under Section 5.3 above, and taken all other actions required of the Seller under this Agreement.

8.6     Material Adverse Change.  There shall not have been a Material Adverse Change (as defined below) in the business or financial conditions or prospects of the Seller since the date of this Agreement, other than any Material Adverse Change caused solely by an act or omission of Buyer which is not explicitly approved or authorized by Seller.  "**Material Adverse Change**" shall mean any effect, event, condition, circumstance, development or change that, individually or in the aggregate with all other effects, events, conditions , circumstances, developments or changes (a) has had or would reasonably be expected to have or result in a material adverse effect on the condition (financial or otherwise), Liabilities, operating results or operations of the Business or on the Purchased Assets and the Assumed Liabilities taken as a whole; provided, however, that no effects, events, conditions, circumstances, developments or changes arising or related to any of the following shall be deemed to constitute, a Material Adverse Change: (i) general business or economic conditions affecting the industry or markets in which Seller operates; (ii) national or international political or social conditions; (iii) financial, banking or securities markets; (iv) the taking of any action by Buyer or by Seller at Buyer's request; (v) changes as a result of the announcement or pendency of this Agreement; or (vi) reasonably anticipated actions, omissions, events and changes in the business or operations of Seller arising after the filing of the Chapter 11 Case; provided, further, however, that in the case of clauses (i) through (iv) above, except to the extent such effect, event, condition, circumstance, development or change has a disproportionate adverse effect on the Business or on the Purchased Assets and the Assumed Liabilities, taken as a whole, as compared to other similarly situated businesses; or (b) would reasonably be expected to materially adversely affect the ability of Sellers to consummate the transactions contemplated by this Agreement or any ancillary agreements on a timely basis.

**ARTICLE IX**
**CONDITIONS PRECEDENT TO THE OBLIGATIONS OF THE SELLER**

The obligations of the Seller to consummate the transaction that is the subject of this Agreement shall be subject to the satisfaction, at or prior to the Closing, of all the following conditions, any one or more of which may be waived in writing at the discretion of the Seller:

9.1     Absence of Injunction.  No Injunction shall be in effect.

9.2     Issuance of Approval Order and Bidding Procedures Order.  The Bankruptcy Court having jurisdiction over the Seller and the Seller shall have entered (a) the Bidding Procedures Order, by no later than July 8, 2011; and (b) the Approval Order, which shall have become a Final Order and a judgment of the Bankruptcy Court by July 19, 2011.

9.3     Representations, Warranties and Covenants of Buyer.  Each of the representations and warranties of the Buyer in this Agreement shall be true and correct in all material respects, on and as of the Closing Date with the same force and effect as though made on and as of the Closing Date except for changes to such representations or warranties arising or relating to any matter occurring during the period from the date hereof to the Closing Date that (a) are approved by Seller or acceptable to Seller in Seller's reasonable discretion, (b) are otherwise permitted pursuant to the express terms of this Agreement or (c) do not adversely affect Seller other than to an immaterial extent as determined by Seller in its sole but good faith discretion (it being understood, however, that for the purposes of this sentence the accuracy of any particular

representation or warranty that expressly speaks as of a particular date shall be determined as of the date of this Agreement and the Closing Date solely with reference to such particular date), each of the covenants of the Buyer shall have been performed and complied with in all material respects prior to or as of the Closing Date.

9.4    Closing Deliveries.    The Buyer shall have executed and delivered to the Seller the documents and instruments that the Buyer is required to deliver under Section 5.4 above, and taken all other actions required of the Buyer under this Agreement.

## ARTICLE X
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

Except as may be otherwise limited below, Seller hereby makes the following representations and warranties to the Buyer, each of which shall be true and correct to the best of the Seller's actual knowledge as of the date of this Agreement and as of the Closing Date.

10.1    Organization of Seller.    Seller is an entity duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate company power and authority to own, lease and operate its assets and to carry on the Business as a debtor in possession.

10.2    Power, Authority, Binding Nature.    Pursuant to the entry of the Approval Order, (a) Seller has and will have the requisite power and authority to deliver this Agreement and the other agreements, forms, deeds and documents to be executed and/or delivered by the Seller in conjunction herewith (the "**Seller Ancillary Agreements**") and to execute and to perform Seller's obligations hereunder and under the Seller Ancillary Agreements, including, without limitation, to sell, assign and transfer title to the Purchased Assets free and clear of all liens, pledges, claims, charges and encumbrances, except for the Permitted Exceptions and the Assumed Liabilities; and (b) this Agreement has been duly and validly executed and delivered by the Seller and constitutes, and each of the Seller Ancillary Agreements (when executed and delivered by the Seller) shall constitute, a valid and binding agreement of the Seller enforceable in accordance with its (or their) terms (and assuming that this Agreement and each of the Seller Ancillary Agreements constitute the valid and binding agreements of the Buyer).

10.3    Rights to Purchased Assets and Related Matters.    As of the entry of the Approval Order, Seller has not granted any rights, options, agreements or other commitments giving any person or entity any current or future right to require Seller or, following the Closing Date, Buyer, to sell or transfer to such person or entity or to any third person or entity any interest in any of the Purchased Assets, and to Seller's knowledge there are no such rights, options, agreements or other commitments outstanding.

10.4    No Bar.    Except as set forth on **Schedule 10.4** and pursuant to the entry of the Approval Order, neither the execution nor delivery of this Agreement or the Seller Ancillary Agreements nor the consummation of the transactions contemplated hereby will violate any order, judgment, injunction, award or decree of any court, arbiter or governmental or regulatory body against or binding upon the Seller; or (b) result in the creation of any lien or encumbrance on any of the

Purchased Assets. No consents or approvals are required to enable the Seller to perform its obligations hereunder other than the Approval Order.

10.5   Insurance. Set forth on **Schedule 10.5** is a correct and complete list of all insurance policies (including the scope and amount of the coverage provided thereunder) maintained by Sellers, which policies are in full force and effect and all premiums have been paid. Such policies provide insurance in such amounts and against such risks as is sufficient to comply with the legal requirements applicable to the Purchased Assets and the Assumed Liabilities, and the Seller is not in breach or default, and has not taken any action or failed to take an action which with notice or lapse of time, or both, would constitute such a breach or default, or permit a termination or adverse modification of, any such insurance policies. There are no pending notices or cancellation or non-renewal of any such insurance policy nor has the termination of any such insurance policy been threatened, and, there exists no event, occurrence, condition or act (including the purchase of the Purchased Assets hereunder) that with notice or lapse of time, or both, would entitle any insurer to terminate or cancel any such insurance policies.

10.6   Environmental Matters. To the Seller's knowledge, the operations of the Business related to the Purchased Assets and the Assumed Liabilities materially comply with all applicable environmental laws and requirements, which compliance includes obtaining, maintaining and complying with all environmental permits necessary to operate the Business related to the Purchased Assets and Assumed Liabilities, and no action or proceeding is pending or threatened to revoke, modify or terminate any such permits. There are no circumstances or conditions that currently exist that would reasonably be expected to result in material noncompliance with any environmental requirements or permits.

10.7   Intellectual Property.

(a)     As used herein, "**Intellectual Property**" shall mean all intellectual property and proprietary rights of any kind and related priority rights, whether protected, created or arising under any federal, state, provincial, local, municipal, foreign, international, multinational, or other law, ordinance, principle of common law, regulation, statute or treaty, including but not limited to all: (i) patents, patent applications and patent disclosures together with all reissues, continuations, continuations-in-part, divisionals, revisions, substitutions, extensions or re-examinations thereof and all patents issuing on any of the foregoing, (ii) trademarks, service marks, trade dress, trade names, brands, slogans, logos, Internet domain names, corporate names and all other indicia of origin, together with all translations, adaptations, derivations and combinations of any of the foregoing, and all applications, registrations, renewals and extensions in connection with any of the foregoing, together with all of the goodwill associated with any of the foregoing, (iii) copyrights, works of authorship and moral rights and all applications, registrations, renewals, extensions and reversions in connection with any of the foregoing, and (iv) trade secrets, know-how  and other confidential or proprietary information (including discoveries, concepts, ideas, research and developments, compositions, processes, techniques, technical data and information, databases and compilations of data, procedures, methods, designs, drawings, specifications, software, algorithms, technology, formulas, customer lists, supplier lists and business and marketing plans. All Intellectual Property used in the operation of Seller's Business whether by virtue of ownership by Seller or license by Seller and included in the Purchased Assets shall be referred to as the "**Acquired Intellectual Property**". Schedule

1.1(a)(i) sets forth an accurate and correct list of each of the following included in the Acquired Intellectual Property: (i) all issued patents, patent applications and invention disclosures; (ii) all trademark and service mark registrations and applications for registration and unregistered trademark and service marks; (iii) all copyright registration and applications for registration; and (iv) all domain names, indicating for items (i) – (iv), as applicable, the registered owner thereof, applicable jurisdiction, registration number (or application number) and date issued (or date filed).

(b)     Except as set forth on **Schedule 10.7(b)**, the Seller is the sole owner, free and clear of all liens and encumbrances, of all Acquired Intellectual Property and all Acquired Intellectual Property is in effect, valid and subsisting. Except as set forth on **Schedule 10.7(b)**, there are no royalties, honoraria, annuities, payments, fees, responses to office actions or other filings required to be made or paid in connection with the ownership or license of any Acquired Intellectual Property by Seller.

(c)     Seller has a valid and continuing right to use all Acquired Intellectual Property in connection with the Business as now conducted and in the manner such Acquired Intellectual Property is now used or contemplated to be used by Seller. The Acquired Intellectual Property together includes all Intellectual Property rights necessary and sufficient to enable Seller to conduct the Business as now conducted. The Acquired Intellectual Property is valid and enforceable.

(d)     Except as set forth on **Schedule 10.7(d)**, neither the conduct of the Business by Sellers as currently conducted (including the products and services sold or provided by Sellers or the making, having made, use, practice, offer for sale, sale or other disposition or exploitation of any such products or services) nor any of the Acquired Intellectual Property (or the use, practice or exploitation thereof) infringes, constitutes or results from a misappropriation of or otherwise violates any other person's or entity's Intellectual Property. No claims are pending or to the Seller's knowledge, threatened in writing against Seller alleging that Seller is infringing, misappropriating or violating any person's or entity's Intellectual Property rights or challenging the ownership, use, validity or enforceability of any Acquired Intellectual Property. To Sellers' knowledge, no person or entity is infringing, misappropriating or otherwise violating any of the Acquired Intellectual Property owned by or exclusively licensed to any Seller. No claims are pending or threatened in writing against any person or entity by Seller alleging that any person or entity is infringing, misappropriating or violating any Acquired Intellectual Property owned by or exclusively licensed to any Seller.

(e)     Seller has taken commercially reasonable measures to protect the confidentiality of all material trade secrets, know-how and confidential information of Seller and any confidential information of any person or entity to whom Seller has a confidentiality obligation. Seller has established privacy compliance policies and is in compliance in all material respects with, and in the year prior to the date hereof has been in compliance in all material respects with, its privacy policies.

(f)     **Schedule 1.1(a)(i)** sets forth a complete and accurate list of (1) all software owned by Seller ("**Seller Software**") and (2) all software not exclusively owned by Seller and incorporated, embedded or bundled with any Seller Software and (3) all other software licensed

by Seller and used in the Business (excluding any generally available software licensed to Seller under a shrink wrap or similar license on reasonable terms for a one time license fee of no more than $50,000). The Seller (X) has not licensed or provided to any person or entity, or otherwise permitted any person or entity (in each case, other than an employee, contractor or agent of Seller) to access or use, any source code or related materials for any Seller Software and (Y) is not a party to any source code escrow contract or any other contract (or a party to any contract obligating any Seller to enter into a source code escrow contract or other contract) requiring the deposit of any source code or related materials for any Seller Software.

(g)     Seller believes that no software code subject to the provisions of any license for software made generally available to the public without requiring the payment of fees or royalties such as "open source" or "free source" license (referred to herein as "**Open Source**") (1) forms part of any Seller Software, (2) was or is incorporated in whole or in part in, or has been or is distributed in whole or in part with, any Seller Software or (3) was or is used in the development, maintenance or operation of any Seller Software, in the case of each of the foregoing clauses (1), (2) and (3), in a manner that requires or obligates Seller to make available, disclose, contribute, distribute or license any source code or related materials for any Seller Software (or any portion thereof) to any person or entity or otherwise impose any limitation, restriction or condition on the rights or ability of Seller to use or distribute the Seller Software.

(h)     Neither this Agreement nor the consummation of the transactions contemplated by this Agreement will result in (1) the loss or impairment of the right of Buyer to own, use, practice or exploit any Acquired Intellectual Property or (2) the grant to any person or entity any ownership interest, license, right or protection from any litigation with respect to any Acquired Intellectual Property.

(i)     All communications systems, computer systems, servers, network equipment and other hardware owned, licensed or leased by Seller and included in the Purchased Assets are adequate (with respect to working condition, capacity and absence of damage or defects) for use in the continued operation of the Business. Seller has taken commercially reasonable security measures to protect the confidentiality, integrity and security of such systems and any software, data or information stored thereon. During the two-year period prior to the date hereof, to Sellers' Knowledge, there has been no unauthorized use of or access to any of such systems (or any software, data or information stored thereon).

(j)     Seller shall record all assignments and other documents with the appropriate governmental entities and take all other actions necessary, including any payment of associated fees, to reflect Seller as the record owner (in a manner such that there is no break in the chain of title) of all Acquired Intellectual Property no later than five (5) business days prior to the Closing Date and provide evidence of same.

(k)     No funding, facilities, resources or personnel of any educational institution or governmental entity were used, directly or indirectly, to develop or create, in whole or in part, any Acquired Intellectual Property. All Acquired Intellectual Property that is licensed by Seller is set forth on **Schedule 1.1(a)(i)** and identified as such. All other Acquired Intellectual Property was either (i) developed on behalf of Seller by a third party and all ownership and other rights therein irrevocably assigned or otherwise transferred to or vested in Seller pursuant to written

agreement; or (ii) developed by an employee of Seller acting within the scope of their employment and subject to an inventions and developments assignment agreement.

10.8    Brokers.  Except for Streambank, LLC, no agent, broker, investment banker or other person or firm acting on behalf of or under the authority of Seller is or will be entitled to any broker's or finder's fee or any other commission or similar fee, directly or indirectly, in connection with the transactions contemplated by this Agreement.  Seller agrees to indemnify and hold Buyer harmless against any liability by reason of the claim of any broker or agent claiming to have represented Seller, or otherwise to be entitled to a commission on account of the transactions described herein, said indemnity to include all costs of defending against any such claim, including reasonable attorneys' fees.  Notwithstanding any provision to the contrary, Seller's indemnity shall survive Closing.

10.9    Litigation, Etc.  Other than as set forth on **Schedule 10.9**, the Seller is not subject to any order arising out of, in connection with, relating to or otherwise affecting the Seller which would constitute a lien on the Purchased Assets or would have a material adverse effect on the Purchased Assets or the business or operations of Seller. As used herein the term "order" means any judgment, writ, decree, award, compliance agreement, injunction or judicial or administrative order or determination of any governmental agency or entity or arbitrator.

10.10   Intentionally Omitted.

10.11   Labor Relations; Employees; Employee Benefits.  As of entry of the Approval Order, **Schedule 6.1** sets forth a true, correct and complete list of all Employees, together with their current compensation (including salary, wages, bonuses and commissions) and all Employee Benefit Plans maintained by Seller.  All Employees are employees at-will and the Seller does not have any written employment agreement (including executive compensation, severance or retention agreements) or oral employment arrangements with any such Employees or with any other persons relating to the Seller.  There is and has been no collective bargaining agreements, labor controversy, strike, dispute, disturbance, grievance, slowdown, charge, proceeding or stoppage actually pending, anticipated by, threatened against or involving the Seller.   No Employee Benefit Plan provides health care coverage after termination of the employment except as required pursuant to Section 4980B of the Code or applicable state law.  The Seller has never been obligated to contribute to a multiemployer pension plan (as defined in Section 4001(a)(3) of the Employee Retirement Income Security Act of 1974, as amended) or any defined benefit plan subject to the provisions of Section 412 of the Code.

10.12   Contracts.

As of the entry of the Approval Order:

(a)    **Schedule 2.1** sets forth a true and complete description of all Contracts of which the Seller has knowledge as of the date of this Agreement.

(b)    Each of the Assigned Contracts is a valid and binding obligation of the Seller, and of the third parties thereto, has not been modified or amended, and is enforceable in accordance with its terms and conditions.

10.13    Accuracy as of the Closing Date.  Each representation and warranty of Seller, including all information set forth in the schedules attached hereto, shall be true, accurate and correct in accordance with the terms thereof as of the Closing Date, with the same force and effect as though such representations and warranties were to be made on the Closing Date, except insofar as any of the following representations and warranties expressly provide a limitation on their effectiveness to the date of entry of the Approval Order.

As used in these representations and warranties the term "knowledge" with respect to any specific representation and/or warranty means the actual knowledge of the Seller at the time the representation and/or warranty is made, it being understood and acknowledged that Seller shall make a good faith investigation, including an inquiry of the officers, directors, partners, key employees and professional advisers of Seller who could reasonably be expected to have actual knowledge of the matters in question. The representations and warranties of the Seller set forth in this Article X or elsewhere in this Agreement shall not survive the Closing.

## ARTICLE XI
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer hereby makes the following representations and warranties to the Seller, each of which shall be true and correct as of the date of this Agreement and as of the Closing Date in accordance with this Agreement.

11.1    Business Organization.  The Buyer is a corporation duly organized, validly existing and in good standing under the laws of the state of Delaware and has the requisite legal power and authority to own, lease or otherwise hold its properties and assets and to carry on its business as presently conducted.

11.2    Authorization and Effect of Agreement and Buyer Ancillary Agreements.  (a) The Buyer has the requisite power and authority to deliver this Agreement and the other agreements, forms, deeds and documents to be executed and/or delivered by the Buyer in conjunction herewith (the "**Buyer Ancillary Agreements**"; the Seller Ancillary Agreements and the Buyer Ancillary Agreements, collectively, the "**Ancillary Agreements**") and to execute and to perform Buyer's obligations hereunder and under the Buyer Ancillary Agreements; and (b) this Agreement has been duly and validly executed and delivered by the Buyer and constitutes, and each of the Buyer Ancillary Agreements (when executed and delivered by the Buyer) shall constitute, a valid and binding agreement of the Buyer enforceable against the Buyer in accordance with its and their terms, subject (in each case) to applicable bankruptcy, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally and as to enforceability, to general principles of equity (and assuming that this Agreement and each of the ancillary agreements constitute the valid and binding agreements of the Seller).

11.3    Due Authorization by Buyer.  The execution and delivery by the Buyer of this Agreement and the Buyer Ancillary Agreements and the performance by it of the transactions contemplated hereunder and thereunder have been duly authorized by all necessary action on the part of the Buyer.

11.4   No Conflicts; Consents and Approvals.  The execution and delivery by the Buyer of this Agreement and the Buyer Ancillary Agreements do not and will not, and the performance by the Buyer of the transactions contemplated by this Agreement and the Buyer Ancillary Agreements will not, conflict with, or result in any violation of, or constitute a default under (a) any provision of the certificate of incorporation or bylaws of the Buyer, (b) any of the terms, conditions or provisions or any material agreement or other material document by which the Buyer is bound, or (c) any state, federal or local law or order applicable to or binding on the Buyer. The execution and delivery by the Buyer of this Agreement and the Buyer Ancillary Agreements do not and will not require any consent of any person or government or governmental agency other than the consent of the Bankruptcy Court, including the entry of the Approval Order.

## ARTICLE XII
## COVENANTS OF THE PARTIES

12.1   Conduct of Business.  Except as expressly provided for in this Agreement and subject to any restrictions, rulings and obligations imposed by the Bankruptcy Court, during the period from the date of this Agreement and continuing until the earlier of the termination of this Agreement, the Closing or the date of entry by the Bankruptcy Court of the Approval Order if specifically set forth below, (a) the Seller shall (i) until the entry of the Approval Order, maintain, and from the entry of the Approval Order through the Closing Date, cooperate with the Buyer in maintaining, the existing property and liability insurance policies through the Closing Date; and (ii) until the entry of the Approval Order, maintain, and from the entry of the Approval Order through the Closing Date, cooperate with Buyer in maintaining, appropriate levels of supplies and other consumables which are necessary for the operation of the business of the Seller; and (b) the Seller shall not (unless the Buyer has consented in writing thereto, which consent shall not be unreasonably withheld): (i) by action or inaction, abandon, terminate, cancel, forfeit, waive or release any of Seller's material rights, in whole or in part, with respect to the Purchased Assets, or sell, lease, license, transfer or otherwise dispose of or mortgage, pledge or otherwise suffer to exist any encumbrance on any of the Purchased Assets; (ii) modify, amend or terminate any Assigned Contract that is included in the Purchased Assets or waive, release or assign any material rights or claims thereunder or permit any of the foregoing to occur; (iii) effect any merger, business combination or similar transaction or take any other action, corporate or otherwise, which might affect Seller's ability to perform in accordance with this Agreement; (iv) cancel or permit the cancellation or lapse of any insurance coverage on the Purchased Assets unless replaced with comparable coverage; (v) take any action or enter into any agreement with any governmental entity, whether or not related to any Permits which would be binding on or would materially adversely affect the Purchased Assets or which would materially adversely affect the business or operations of the Seller or the cost and expense of operating the business of the Seller prior to or after Closing; (vi) use the Purchased Assets, or any portion thereof, to settle any dispute or threatened dispute with any governmental agency or authority or party to any Assigned Contract; (vii) except in the ordinary course of business, grant any increase in salary or benefits of any officer, director, manager, or employee or pay any special bonus to any person, enter into or modify any employment offer, employment loss, employment status or severance agreement or grant any severance or termination pay (other than pursuant to severance arrangements or policies as in effect on the date of this Agreement), or make any loan or advance to, or enter into any contract with, any director, manager, officer, employee or consultant of Seller; (viii) change its practices, policies or procedures with respect to the timing of the payment

17

of accounts payable or the collection of accounts receivable; (ix) enter into any tolling agreement to extend the statute of limitations with respect to any liabilities of Seller; (x) except in the ordinary course of business, take any other action which might affect an Assumed Liability; (xi) other than as may be performed by or with the prior consent of Buyer, make any alterations or improvements to the facilities of the Seller or make any capital expenditure with respect to the Seller except for emergency repairs; (xiii) enter into any lease or agreements outside the ordinary course of business; or (xiv) agree or otherwise commit to take any of the actions set forth above. During the period from the date of this Agreement through the Closing Date, Seller shall promptly provide to Buyer any documents which shall be reasonably necessary or appropriate to allow Buyer to ascertain Seller's compliance with the obligations set forth in this Section 12.1, including, without limitation, copies of new or renewed agreements entered into by the Seller, notice of any investigations or litigation being pursued by third parties against the Seller and any correspondence dealing with the Purchased Assets or the Assumed Liabilities.

12.2    Buyer's Access to Records and Properties.  At all reasonable times during the period commencing on the date of this Agreement and expiring on the Closing Date, Buyer, its agents, and its representatives shall be entitled, at Buyer's sole cost and expense, to review all books and records of the Seller, and have access to the Seller's facilities.

12.3    Cooperation to Satisfy the Conditions to Closing.  During the period commencing on the date of this Agreement and expiring on the Closing Date, Buyer and the Seller shall each use their best efforts to satisfy the conditions to Closing set forth in Articles VIII and IX.

12.4    Rights to Purchased Assets.  Except as otherwise permitted in the Bidding Procedures Order, during the period from the date of this Agreement through the Closing Date, Seller shall not grant any rights, options, agreements or other commitments giving any person or entity any current or future right to sell or transfer to such person or entity or to any third person or entity any interest in any of the Purchased Assets.

12.5    Litigation.  During the period from the date of this Agreement through the Closing Date, Seller shall notify Buyer of any order, or pending litigation which could reasonably be expected to result in such an order, which would cause a violation of the representation set forth in Section 10.9 hereof.

12.6    Seller's Access to Records and Information.  Buyer acknowledges and agrees that, during the period following entry of the Approval Order through the Closing Date, Buyer shall make available to Seller representatives the business records of Seller for review and inspection, after reasonable notice, for reasonable purposes which include, without limitation, preparing monthly operating reports for bankruptcy proceedings, reviewing and objecting to claims, prosecuting and defending causes of action and litigation and compliance with applicable laws.  Notwithstanding the foregoing, Seller representatives shall be responsible for any copying or other charges incurred by Buyer related to such access.

12.7    Efforts to Consummate; Certain Actions.  Subject to the terms and conditions herein, each of the parties agrees to use commercially reasonable efforts to cause to be taken all action, and to do, or cause to be done as promptly as practicable, all things reasonably necessary under applicable laws and regulations to consummate and make effective as promptly as practicable the

transactions contemplated by this Agreement; and to cooperate with the other parties in obtaining all authorizations, consents, orders, licenses, and approvals of any governmental authority that may be or become necessary in connection with the consummation of the transaction and to take all reasonable actions to avoid the entry of any order or decree by any governmental authority prohibiting the consummation of the transaction; and shall furnish to the other all such information in its possession as may be necessary for the completion of the notifications to be filed by the others. TIME IS OF THE ESSENCE under the terms of this Agreement.

## ARTICLE XIII
## BANKRUPTCY COURT APPROVALS

13.1    Bidding Procedures Order. The Bidding Procedures Order shall provide for minimum overbid protection, and other bidder protections and procedures as provided in a form acceptable to the Buyer. The Bidding Procedures Order shall be entered, in a form acceptable to the Buyer.

13.2    Sale Motion. In accordance with the Bidding Procedures Order, the Seller shall file appropriate motions and/or orders (the "**Sale Motion**") seeking Bankruptcy Court approval of this Agreement and entry of the Approval Order, the terms of which are acceptable to the Buyer by July 8, 2011.

## ARTICLE XIV
## TERMINATION OF THIS AGREEMENT

14.1    Termination. This Agreement may be terminated as follows:

(a)    Mutual Agreement. By the mutual written consent of Seller, Buyer and the Creditors' Committee, in which case the parties shall thereafter have no obligations or liabilities of any type whatsoever to each other hereunder.

(b)    Casualty. By the Buyer, (i) in the event any of the conditions precedent to the obligations of Buyer set forth in Article VIII above are not satisfied on or prior to the Closing Date, or (ii) in the event of a fire, storm or other casualty as set forth in Section 16.2. In this case the Buyer shall thereafter have no obligations or liabilities of any type whatsoever to the Seller. In the event Seller disputes Buyer's right to terminate this Agreement pursuant to this Section 14.1(b), Buyer hereby agrees to shortened notice and a hearing before the Bankruptcy Court to determine such issue.

(c)    Breach by Seller. By the Buyer, if there has been a material breach by Seller of any representation or warranty, covenant or agreement set forth in this Agreement which is not cured by Seller within five (5) business days after notice to Seller.

(d)    Breach by Buyer. By the Seller, (i) if there has been a material breach by Buyer of any representation or warranty, or a material breach by Buyer of any covenant or agreement set forth in this Agreement which is not cured by Buyer within five (5) business days after notice thereof; or (ii) in the event any of the other conditions precedent to the obligations of Seller set forth in Article IX above are not satisfied on or prior to the Closing Date.

(e)     Final Order.  By the Buyer or Seller, if the Approval Order fails to become a Final Order prior to the Closing Date. In such event, neither party shall have any further obligations or liabilities to the other.

(f)     Injunction.  By the Buyer or the Seller, if any Injunction has not been dismissed and dissolved prior to the Closing Date. In such event, neither party shall have any further obligations or liabilities to the other.

14.2    Effect of Termination.  In the event of the termination of this Agreement, this Agreement shall be of no further force or effect, except for those provisions of this Agreement that expressly survive the termination hereof, the rights of the parties to seek remedies in the event of an alleged wrongful termination and the obligations set forth in this Section 14.2, which shall survive the termination of this Agreement.  Upon request therefor, each party shall destroy or redeliver all documents, work papers and other material of another party relating to the transactions contemplated hereby, whether obtained before or after the execution hereof, to the party furnishing the same.

## ARTICLE XV
## RELEASE

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Seller hereby completely remises, releases, and forever discharges the Buyer and its directors, officers, managers, members, employees, agents, consultants, attorneys, advisors, representatives, predecessors, successors, parent, subsidiary and affiliated entities (collectively, the "**Buyer Releasees**"), from any and all actions, causes of action, dues, sums of money, damages, judgments, charges, complaints, claims, liabilities, obligations, promises, suits, rights, demands, costs, losses, debts, accounts, reckonings, controversies, contracts, variances, trespasses, liens, costs and expenses (including attorneys' fees and costs actually incurred) whatsoever, in law or equity, known or unknown, against the Buyer Releasees, which the Seller, as applicable, ever had, now has or hereafter can, shall, or may have, from the beginning of time to the date of the Approval Order relating in any way to the transaction contemplated herein.

## ARTICLE XVI
## MISCELLANEOUS PROVISIONS

16.1    Publicity.  Except (a) as required by law, (b) as part of the action pending in the Bankruptcy Court or (c) to reasonably effectuate the transactions contemplated in this Agreement, any public announcements or statements made prior to the Closing by the Buyer or the Seller concerning the contemplated transactions shall require the prior written consent of the Seller or the Buyer, as applicable, which consent shall not be unreasonably withheld, and the parties will make reasonable efforts to coordinate press releases and other public dissemination of information regarding the transactions contemplated.

16.2    Risk of Loss.  The Seller assumes all risk of destruction, loss, or damage to the Purchased Assets due to fire, storm, or other casualty up to the Closing. In case of any material destruction, loss, or damage to Purchased Assets the Buyer shall have the right to (a) receive a purchase price reduction in accordance with the Agreed Allocation described in Section 4.4 above, or (b)

proceed to the Closing and accept from the Seller an assignment of all insurance proceeds payable in connection with such destruction, loss or damage. In the case of any immaterial destruction, loss, or damage to the Purchased Assets the Buyer shall proceed to the Closing and accept from the Seller an assignment of all insurance proceeds payable in connection with such destruction, loss or damage.

16.3    Further Assurances.

(a)    From time to time following the Closing Date, Seller and/or the Buyer shall at the other party's reasonable request, and subject to any necessary Bankruptcy Court approval, execute, acknowledge and deliver such additional documents, instruments of conveyance, transfer, assignment, assumption or assurances and take such other action as the Buyer or the Seller, as the case may be, may reasonably request to more effectively assign, convey and transfer the Purchased Assets to the Buyer and fully vest title to the Buyer in the Purchased Assets, or for the Buyer to more effectively assume the Assumed Liabilities, as the case may be.

(b)    Effective as of the Closing Date, Seller hereby appoints Buyer its agent and attorney-in-fact for the sole and specific purpose of taking actions under or with respect to those Purchased Assets and Assumed Liabilities for which a required document, instrument of conveyance, transfer, assignment, assumption or assurance is not obtained by Seller, with the intent that the Buyer realize the intended benefits of such Purchased Assets and Assumed Liabilities. If, notwithstanding the foregoing appointment, the consent of a third party proves necessary to enable the Buyer to realize the benefits under such Purchased Assets or Assumed Liabilities, Seller shall use its best efforts to obtain such required consents and shall cooperate with Buyer in any reasonable arrangement designed to provide for Buyer the benefits of such Purchased Assets and Assumed Liabilities.

(c)    All reasonable costs and expenses incurred by the non-requesting party shall be reimbursed by the requesting party. The obligations contained in this Section 16.3 shall survive the Closing.

16.4    Notices.  All notices and other communications required or permitted hereunder shall be in writing and, unless otherwise provided in this Agreement, shall be deemed to have been duly given when delivered in person or when dispatched by electronic facsimile transfer (if available) (confirmed in writing by mail simultaneously dispatched) or one business day after having been dispatched by a nationally recognized overnight courier service to the appropriate party at the address specified below:

(a)    If to the Seller by mail, to:

XStream Systems, Inc.
c/o K-Sal Group, LLC
1412 Park Ave.
Mamaroneck, NY  10543
Attention: Kim Salibello, CRO
Facsimile: (206) 203-2612

with a copy to:

Gersten Savage LLP
600 Lexington Avenue
9th Floor
New York, NY 10022
Attention: Jay M. Kaplowitz
Fax: (212) 980-5192

(b)    If to the Buyer, to:

XSI, Inc.
1 Union Square South
Apt. 14L
New York, NY 10003
Attention: Simon Irish, Secretary

with a copy to:

Robinson & Cole LLP
885 Third Avenue
Suite 2800
New York, NY 10022
Attention: Paula Pescaru, Esq.
Facsimile: (212) 451-2999

or to such other address or addresses or facsimile number as any such notice party may from time to time designate as to itself by like notice.

16.5    <u>Expenses</u>.   Each party hereto shall pay any expenses incurred by it incident to this Agreement and in preparing to consummate and consummating the contemplated transactions.

16.6    <u>Waiver</u>.   Either the Seller, on the one hand, or the Buyer, on the other hand, may by written notice to the other (a) extend the time for performance of any of the obligations of the other party under this Agreement, (b) waive any inaccuracies in the representations or warranties of the other party contained in this Agreement, (c) waive compliance with any of the conditions or covenants of the other party contained in this Agreement, or (d) waive or modify performance of any of the obligations of the other party under this Agreement; provided, however that no such party may, without the prior written consent of the other party, make or grant such extension of time, waiver of inaccuracies or compliance or waiver or modification of performance with respect to its representations, warranties, conditions or covenants hereunder. Except as provided in the immediately preceding sentence, no action taken pursuant to this Agreement shall be deemed to constitute a waiver of compliance with any representations, warranties, conditions or covenants contained in this Agreement or shall operate or be construed as a waiver of any subsequent breach, whether of a similar or dissimilar nature.

16.7    <u>Entire Agreement</u>.   This Agreement, which includes the Schedules and the Exhibit hereto, and all other documents, instruments or agreements delivered by the parties pursuant to

or in connection with this Agreement, supersedes any other agreement, whether written or oral, that may have been made or entered into by any party relating to the matters contemplated hereby.

16.8   Amendments, Supplements, Etc.   This Agreement may be amended or supplemented at any time by additional written agreements as may mutually be determined by the parties to be necessary, desirable or expedient to further the purposes of this Agreement or to clarify the intention of the parties.

16.9   Rights of the Parties.   This Agreement is an agreement solely for the benefit of the Buyer (and the Buyer's permitted successors and/or assigns) and the Seller. Nothing expressed or implied in this Agreement is intended or shall be construed to confer upon or give any other person or entity any rights or remedies under or by reason of this Agreement or any transactions contemplated hereby, nor shall any other person be entitled to rely upon the terms, covenants and provisions contained in this Agreement.

16.10   Inconsistencies.   In the event of any inconsistency between the terms and provisions of this Agreement and the terms and provisions of any of the Ancillary Agreements, the terms and provisions of this Agreement shall prevail.

16.11   Governing Law and Choice of Forum.   The validity and interpretation of this Agreement shall be construed in accordance with, and governed by the laws of the State of Delaware without regard to the choice-of-law provisions of this or any other jurisdiction and shall be subject to the jurisdiction of the Delaware Bankruptcy Court. Any suit, action, claim or proceeding seeking to enforce any provision of or based on any matter arising out of or in connection with this Agreement or the Ancillary Agreements shall be brought in the courts of the State of Delaware and the Seller and the Buyer hereby irrevocably submit and consent to the exclusive jurisdiction of such court (and of the appropriate appellate courts therefrom) in any such suit or proceeding and irrevocably waive, to the fullest extent permitted by law, any objection and defenses which he, she or it may now have or hereafter may have based on forum, venue, or personal or subject matter jurisdiction as they may relate to any suit, action or proceeding in any such court. Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without jurisdiction of said court. The Parties agree that the relief sought from the court as a result of any dispute brought in connection with this Agreement or the Ancillary Agreements may include, but is not necessarily limited to, injunctive relief, specific performance or monetary damages.

16.12   Waiver of Jury Trial.   EACH OF THE PARTIES WAIVES TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE ANCILLARY AGREEMENTS, OR THE TRANSACTION IN ANY COURT IN WHICH SUCH ACTION OR PROCEEDING MAY BE BROUGHT.

16.13   Execution in Counterparts.   This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement. Any counterpart may be executed by facsimile signature and such facsimile signature shall be deemed an original.

16.14  Invalid Provisions.  If any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future law, and if the rights or obligations under this Agreement of the Seller, on the one hand, and the Buyer, on the other hand, shall not be adversely affected thereby: (a) such provision shall be fully severable; (b) this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof; (c) the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Agreement; and (d) in lieu of such illegal, invalid or unenforceable provision, there shall be added automatically as a part of this Agreement a legal, valid and enforceable provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible.

16.15  Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the parties named herein and their respective successors and permitted assigns. No party may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of the other parties hereto and the approval of the Bankruptcy Court.

16.16  Attorney's Fees.  In the event of any litigation between the parties hereto to enforce any of the provisions of this Agreement or any right of either party hereto, the unsuccessful party to such litigation agrees to pay to the successful party all costs and expenses, including reasonable attorney's fees and disbursements, incurred herein by the successful party in and as part of the judgment rendered in such litigation.

16.17  No Waiver of Rights.  Nothing contained in this Agreement shall be construed as a waiver of any rights, remedies or standing any party or individual may have at law or in equity to enforce this Agreement.

*[Signature page follows]*

IN WITNESS WHEREOF, the parties hereto have executed this Asset Purchase Agreement as of the day and year first above written.

**SELLER:**

**XSTREAM SYSTEMS, INC.**

By: _____
Name:
Title:

**BUYER:**

**XSI, INC.**

By: _____
Name:
Title:

## BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT

**THIS BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT** (this *"Bill of Sale"*) is entered into as of the ___ day of _____, 2011 by and between XSI, Inc., a Delaware corporation (*"Purchaser"*), and XStream Systems, Inc., a Delaware corporation (the *"Seller"*).

**WHEREAS**, pursuant to that certain Asset Purchase Agreement between Seller and Purchaser of even date herewith (the *"Purchase Agreement"*), Seller has agreed to sell, convey, transfer, assign and deliver to Purchaser all of Seller's right title and interest in and to the Purchased Assets (as such term is defined in the Purchase Agreement);

**WHEREAS**, capitalized terms used but not otherwise defined herein shall have the meanings attributed to such terms in the Purchase Agreement; and

**WHEREAS**, Seller desires to deliver to Purchaser such instruments of sale, transfer, conveyance, assignment and delivery as are required to sell, convey, transfer, assign and deliver to Purchaser all of the Purchased Assets.

**NOW, THEREFORE**, pursuant to the Purchase Agreement and in consideration of mutual promises it contains, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. **Assignment.** For good and valuable consideration, the receipt, adequacy and legal sufficiency are hereby acknowledged, and as contemplated by Section 1.1 of the Purchase Agreement, Seller hereby sells, conveys, transfers, assigns and delivers to Purchaser (i) all of the Purchased Assets free and clear of all liens, claims and encumbrances, and (ii) all of the Assumed Liabilities; provided that no sale, transfer, assignment or delivery shall be made of any Transferred Contract if an attempted sale, assignment, transfer or delivery, without the consent of a third party, would constitute a breach or other contravention thereof or in any way adversely affect the rights of Purchaser or the Seller thereunder.

2. **Assumption.** Purchaser hereby purchases, accepts and acquires from Seller the Purchased Assets free and clear of all liens, claims and encumbrances. Purchaser hereby assumes and agrees to discharge, to be bound, and perform when due the Assumed Liabilities, subject to any terms, conditions and limitations set forth in the Purchase Agreement.

3. **No Additional Warranties or Obligations.** This Bill of Sale shall not be construed as creating warranties or obligations over and above those set forth in the Purchase Agreement or as superseding or releasing any of the rights, duties or obligations of any party to the Purchase Agreement, and the disclaimers and limitations contained in the Purchase Agreement are incorporated herein by reference.

4. **Governing Law**. This Bill of Sale shall be governed by and construed in accordance with the choice of law provisions set forth in the Purchase Agreement.

5. **Successors and Assigns**. This Bill of Sale shall be binding upon and inure to the benefit of the parties hereto and their permitted successors and assigns.

6. **Further Assurances**. Seller will execute, acknowledge and deliver any such other instruments of conveyance and transfer and take such other action as may reasonably be required to convey, transfer to and vest in Purchaser and to put Purchaser in, possession of the Purchased Assets conveyed, transferred and delivered under this Bill of Sale.

7. **Severability**. Should any term, provision or paragraph of this Bill of Sale be determined to be illegal or void or of no force and effect, the balance of the Bill of Sale shall survive.

8. **Counterparts**. This Bill of Sale may be executed in multiple counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument. The parties further agree that this Bill of Sale may be executed by the exchange of facsimile signature pages.

*[Signature Page Follows]*

**IN WITNESS WHEREOF**, the parties have caused this Bill of Sale, Assignment and Assumption Agreement to be executed by their duly authorized representatives as of the date and year first set forth above.

**PURCHASER:**

XSI, INC.

By: _____
      Name:
      Title:

**SELLER:**

XSTREAM SYSTEMS, INC.

By: _____
      Name:
      Title:

**Exhibit B**

**BUDGET**

**(See attachment)**

**Xstream Systems, Inc**
**Actual Cash Analysis**
**April 11 thru June 10, 2011**

| IR | | Actual Wk 1 15-Apr | Actual Wk 2 22-Apr | Actual Wk 3 29-Apr | Actual Wk 4 6-May | Actual Wk 5 13-May | Actual Wk 6 20-May | Actual Wk 7 27-May | Actual Wk 8 3-Jun | Actual Wk 1 10-Jun |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | |
| 2 | **CASH RECEIPTS & DISBURSEMENTS** | | | | | | | | | |
| 3 | | | | | | | | | | |
| 4 | RECEIPTS | | | | | | | | | |
| 6 | Loan Receipts- DIP | 5,000 | - | - | - | - | 10,050 | 2,650 | - | 26,000 |
| 7 | Total Receipts | 5,000 | - | - | - | - | 10,050 | 2,650 | - | 26,000 |
| 8 | | | | | | | | | | |
| 9 | Cumulative Advances under Interim Dip | | | | | | 10,050 | 12,700 | 12,700 | 38,700 |
| 10 | **DISBURSEMENTS** | | | | | | | | | |
| 11 | *Operating Disbursements* | | | | | | | | | |
| 12 | Vendor Payments | | | | | | | | | |
| 13 | Payroll & Related | | | 1,000 | | | 8,400 | 1,000 | - | 8,400 |
| 14 | Rent | | | - | | | | | | |
| 15 | Insurance- estimate for Gen'l Liability | 5,357 | | | | | | | | |
| 16 | Ordinary Course | | | | | - | - | - | | |
| 17 | Other | 308 | 184 | - | - | 581 | 1,016 | 1,675 | - | - |
| 18 | Total Operating Disbursements | 5,665 | 184 | 1,000 | - | 581 | 9,416 | 2,675 | - | 8,400 |
| 19 | | | | | | | | | | |
| 20 | Professional Fees | - | - | - | - | - | - | - | - | 16,691 |
| 21 | UST fees | | | | | | | | | |
| 22 | Interest | | | | | | | | | |
| 23 | Total Disbursements | 5,665 | 184 | 1,000 | - | 581 | 9,416 | 2,675 | - | 25,091 |
| 24 | | | | | | | | | | |
| 25 | **CASH BALANCE** | | | | | | | | | |
| 26 | | | | | | | | | | |
| 27 | Beginning Balance | 3,239 | 2,574 | 2,390 | 1,390 | 1,390 | 809 | 1,443 | 1,418 | 1,418 |
| 28 | Change in Cash | (665) | (184) | (1,000) | - | (581) | 634 | (25) | - | 909 |
| 29 | Ending Balance | 2,574 | 2,390 | 1,390 | 1,390 | 809 | 1,443 | 1,418 | 1,418 | 2,327 |
| 30 | | | | | | | | | | |
| 31 | | | | | | | | | | |

Xstream Systems, Inc
Actual Cash Analysis
April 11 thru June 10, 2011

| IR | | Actual Wk 1 15-Apr | Actual Wk 2 22-Apr | Actual Wk 3 29-Apr | Actual Wk 4 6-May | Actual Wk 5 13-May | Actual Wk 6 20-May | Actual Wk 7 27-May | Actual Wk 8 3-Jun | Actual Wk 1 10-Jun |
|---|---|---|---|---|---|---|---|---|---|---|
| 32 | | | | | | | | | | |
| 33 | **Employee consulting agreements** | | | | | | | | | |
| 34 | Alton Graf | | | | | 3,400 | | | - | 3,400 |
| 35 | Paul Miccichi | | | | | 5,000 | | | - | 5,000 |
| 36 | Alberto Rivera | | | | - | | | | - | |
| 37 | Charles | | | | - | | | | | - |
| 38 | Valery | | | 1,000 | | | - | 1,000 | | |
| 39 | | | - | 1,000 | - | 8,400 | - | 1,000 | - | 8,400 |
| 40 | | | | | | | | | | |
| 41 | **Professional Fees** | | | | | | | | | |
| 42 | K-Sal | 0 | | | | | | - | | 16,691 |
| 43 | Gerston Savage | | | | | | | | | |
| 44 | Bayard (Local counsel) | | | | | | | | | |
| 45 | StreamBank | 0 | | | | | | - | | |
| 46 | Committee Carve out | | | | | | | | | |
| 47 | | - | - | - | - | - | - | - | - | 16,691 |
| 63 | | | | | | | | | | |
| 64 | **LOANS OUTSTANDING** | | | | | | | | | |
| 65 | Opening Balance | 133,350 | 138,350 | 138,350 | 138,350 | 138,350 | 138,350 | 148,400 | 151,050 | 151,050 |
| 66 | + Advances | 5,000 | - | - | - | - | 10,050 | 2,650 | - | 26,000 |
| 67 | + Fees | | | | | | | | | |
| 68 | - Payments | | | | | | | | | |
| 69 | Closing Balance | 138,350 | 138,350 | 138,350 | 138,350 | 138,350 | 148,400 | 151,050 | 151,050 | 177,050 |

Assumptions

1. Revised budget assumes Auction date of early August
2. The only projected cash receipts are those proceeds from the DIP loan.
3. The Projected Payroll and related are Consulting Agreements with former employees.
4. Rent terms pursuant to a LOI from Sebastian landlord which represents significant reduction from current rent of $11k.
   Pmt in Wk 5 represents catch up payment for post petition rent. Timing of payment TBD.
5. Wk 6 inc. est. pmt to CPA for 2010 extensions/returns. Add'l $10K for 2011 tax rtns is incl at the end of the budget pd.
6. Mkting exp is incl in Other Exp and is related to sale of assets. Any single exp >$1K to be apprd by mgmt. Cap of $5K.
7. Other misc. expenses include phones, email, internet
8. Wk 7 incs $5K est newspaper advertising. If req by Court. This amt could be higher if natl advertising is req by court
9. Payments to K-SAL every 2 wks for prior 2 wk period. Pmt during wk 5 incl additional retainer as per agreement (5,170).
   Total Ksal fees reflect application of approx $7k of fees during the last 30 days of the projected period.
10. This budget does NOT include any post petition royalty payments towards accrual of minimum royalty payments due to Rutgers.

Xstream Systems, Inc
Actual Cash Analysis
April 11 thru June 10, 2011

## CASH RECEIPTS & DISBURSEME

| IB | | Projected Wk 2 17-Jun | Projected Wk 3 24-Jun | Projected Wk 4 1-Jul | Projected Wk 5 8-Jul | Projected Wk 6 15-Jul | Projected Wk 7 22-Jul | Projected Wk 8 29-Jul | Projected Wk 9 5-Aug | Projected Wk 10 12-Aug | Projected Wk 11 19-Aug | Projected Wk 12 26-Aug | Projected Wk 13 2-Sep | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | | | | | |
| 2 | **RECEIPTS** | | | | | | | | | | | | | |
| 3 | | | | | | | | | | | | | | |
| 6 | Loan Receipts- DIP | - | 11,300 | - | 42,736 | 11,500 | 25,625 | 1,500 | 11,500 | 1,500 | 3,000 | 500 | 196,125 | 348,986 |
| 7 | **Total Receipts** | - | 11,300 | - | 42,736 | 11,500 | 25,625 | 1,500 | 11,500 | 1,500 | 3,000 | 500 | 196,125 | 348,986 |
| 8 | | | | | | | | | | | | | | |
| 9 | Cumulative Advances under | 38,700 | 50,000 | 50,000 | | | | | | | | | | |
| 10 | **DISBURSEMENTS** | | | | | | | | | | | | | |
| 11 | *Operating Disbursements* | | | | | | | | | | | | | |
| 12 | Vendor Payments | | | | | | | | | | | | | 29,200 |
| 13 | Payroll & Related | | 1,000 | | 8,400 | | 1,000 | | | | | | | 23,666 |
| 14 | Rent | | | | | | | | | | | | | 5,357 |
| 15 | Insurance- estimate for Gen'l Liabilit | | | | | | | | 5,000 | | | | | |
| 16 | Ordinary Course | | | | 18,666 | 10,000 | | | | | | | 10,000 | 20,000 |
| 17 | Other | | - | - | 500 | 1,500 | 6,500 | 1,500 | 1,500 | 1,500 | 500 | 500 | 500 | 18,264 |
| 18 | Total Operating Disbursement | | 1,000 | - | 27,566 | 11,500 | 7,500 | 1,500 | 6,500 | 1,500 | 500 | 500 | 10,500 | 96,487 |
| 19 | | | | | | | | | | | | | | |
| 20 | Professional Fees | | 12,500 | | 14,170 | - | 17,500 | - | 5,000 | - | 2,500 | - | 185,000 | 253,361 |
| 21 | UST fees | | | | | | 625 | | | | | | 625 | 1,250 |
| 22 | Interest | | | | | | | | | | | | | |
| 23 | **Total Disbursements** | - | 13,500 | - | 41,736 | 11,500 | 25,625 | 1,500 | 11,500 | 1,500 | 3,000 | 500 | 196,125 | 351,098 |
| 24 | | | | | | | | | | | | | | |
| 25 | **CASH BALANCE** | | | | | | | | | | | | | |
| 26 | | | | | | | | | | | | | | |
| 27 | Beginning Balance | 2,327 | 2,327 | 127 | 127 | 1,127 | 1,127 | 1,127 | 1,127 | 1,127 | 1,127 | 1,127 | 1,127 | 3,239 |
| 28 | Change in Cash | | (2,200) | - | 1,000 | - | - | - | - | - | - | - | - | (2,112) |
| 29 | Ending Balance | 2,327 | 127 | 127 | 1,127 | 1,127 | 1,127 | 1,127 | 1,127 | 1,127 | 1,127 | 1,127 | 1,127 | 1,127 |
| 30 | | | | | | | | | | | | | | |
| 31 | | | | | | | | | | | | | | |

Prepared By: K-SAL Group LLC
Based on Information Provided by the Company

6/21/2011
Xstream13 week Revised 621.xlsx

Xstream Systems, Inc
Actual Cash Analysis
April 11 thru June 10, 2011

| ln | | Projected Wk 2 17-Jun | Projected Wk 3 24-Jun | Projected Wk 4 1-Jul | Projected Wk 5 8-Jul | Projected Wk 6 15-Jul | Projected Wk 7 22-Jul | Projected Wk 8 29-Jul | Projected Wk 9 5-Aug | Projected Wk 10 12-Aug | Projected Wk 11 19-Aug | Projected Wk 12 26-Aug | Projected Wk 13 2-Sep | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 32 | | | | | | | | | | | | | | |
| 33 | **Employee consulting agreem** | | | | | | | | | | | | | |
| 34 | Alton Graf | | | - | 3,400 | | | | | | | | | |
| 35 | Paul Miccichi | | | - | 5,000 | | | | - | | | | | |
| 36 | Alberto Rivera | | | - | | | | | - | - | | | | |
| 37 | Charles | | | - | | | | | | | | | | |
| 38 | Valley | | 1,000 | | | | 1,000 | | | | - | | | |
| 39 | | - | 1,000 | - | 8,400 | - | 1,000 | - | - | - | - | | | |
| 40 | | | | | | | | | | | | | | |
| 41 | **Professional Fees** | | | | | | | | | | | | | |
| 42 | K-Sal | - | - | | 14,170 | | 5,000 | | 5,000 | | 2,500 | | - | 43,361 |
| 43 | Gerston Savage | | | | | | | | | | | | 125,000 | 125,000 |
| 44 | Bayard (Local counsel) | | | | - | | | | | | | | 35,000 | 35,000 |
| 45 | StreamBank | | 12,500 | | - | - | 12,500 | - | | | | | | 25,000 |
| 46 | Committee Carve out | | | | | | | | | | | | 25,000 | 25,000 |
| 47 | | - | 12,500 | - | 14,170 | - | 17,500 | - | 5,000 | - | 2,500 | - | 185,000 | 253,361 |
| 63 | | | | | | | | | | | | | | |
| 64 | **LOANS OUTSTANDING** | | | | | | | | | | | | | |
| 65 | Opening Balance | 177,050 | 177,050 | 188,350 | 188,350 | 231,086 | 242,586 | 268,211 | 269,711 | 281,211 | 282,711 | 285,711 | 286,211 | 133,350 |
| 66 | + Advances | - | 11,300 | - | 42,736 | 11,500 | 25,625 | 1,500 | 11,500 | 1,500 | 3,000 | 500 | 196,125 | 346,986 |
| 67 | + Fees | | | | | | | | | | | | | |
| 68 | - Payments | - | - | - | | | | | | | | | | |
| 69 | Closing Balance | 177,050 | 188,350 | 188,350 | 231,086 | 242,586 | 268,211 | 269,711 | 281,211 | 282,711 | 285,711 | 286,211 | 482,336 | 482,336 |