# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>XSTREAM SYSTEMS, INC.,<br><br>Debtor. | Chapter 11<br><br>Case No. 11-11086 (CSS)<br><br>**Objection Deadline: June 30, 2011 at 4:00 pm (by agreement)**<br><br>**Hearing Date: July 5, 2011 at 1:00 p.m.** |

**COMBINED OBJECTION OF THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS
(A) TO THE AMENDED MOTION OF THE DEBTORS FOR AN
ORDER (I) APPROVING BIDDING PROCEDURES FOR THE SALE
OF THE DEBTOR'S ASSETS, (II) SCHEDULING AN AUCTION IN
CONNECTION WITH THE SALE, AND (B) AUTHORIZING THE
DEBTOR TO OBTAIN POSTPETITION FINANCING ON A FINAL BASIS**

The Official Committee of Unsecured Creditors (the "Committee") of Xstream Systems, Inc. (the "Debtor") hereby files this combined objection[1] (the "Objection") (A) to the Amended Motion the ("Bidding Procedures Motion") of the Debtor for an Order (I) Approving Bidding Procedures for the Sale of the Debtor's Assets, (II) Scheduling an Auction in Connection with the Sale, and (B) the Motion of the Debtor Authorizing the Debtor to Obtain Postpetition Financing on a Final Basis (the "Final DIP Motion"). In support of the Objection, the Committee states as follows:

## PRELIMINARY STATEMENT

1. It has become routine for this Court to be presented with companies on the brink of shut down and liquidation and be asked to approve an emergency sale, with little to no

---

[1] The Committee is continuing its discussions with the Debtor and XSI with the hopes of consensually resolving some or all of the issues raised herein.

{00007280. }
LEGAL21235081.1

marketing, under extremely short time frames. Under such circumstances, it is not surprising the Court often approves those sales. This case, however, does not present those circumstances. To the contrary, there is no emergency and there is no "melting iceberg." The Debtor shut down its operations in 2010 and the only activity being conducted is the administration and support necessary to maintain this Chapter 11 case. In addition, no marketing efforts whatsoever have been conducted to date. The Debtor has now hired an investment banker, Streambank, to market its assets, but Streambank does not expect to have a draft of its proposed marketing materials ready until next week. While the Committee is supportive of the Debtor's marketing efforts, the bid procedures and timeline proposed by the Debtor – highlighted by a total of 16 days of marketing between the bid procedures hearing and the auction – are not appropriate and should not be approved.

2. Instead, the Court should permit the assets to be properly marketed over a reasonable time period. This is especially true in this case, where the Debtor's officers and directors abruptly resigned from the Debtor after starting their own company (the proposed stalking horse bidder, XSI, Inc.) with the sole intention of directing the Debtor to file bankruptcy, wipe out the debt and purchase the assets for nothing more than the minimum amounts necessary to create the impression that a sale process was undertaken.

## BACKGROUND

3. On April 8, 2011 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

4. The Debtor filed the Bidding Procedures Motion, which seeks, among other things, to approve bid procedures for the sale of substantially all of the Debtor's assets (the "Sale"). The Debtor also seeks authority to obtain post petition financing, pursuant to a final order of approximately $278,000.

5. The Debtor asserts that it has no ongoing business operations, no employees other than its Chief Restructuring Officer, and that its most valuable asset is its intellectual property.

6. Historically, the Debtor's primary source of liquidity has been debt and equity offerings and borrowings. However, this source of financing became more difficult to procure due to the nation's economic difficulties. Therefore, the Debtor attempted to conduct an inititial public offering in the summmer of 2010. In connection with its public offering effort, the Debtor prepared and filed Form S-1 Statements with the SEC on August 20, 2010 and September 12, 2010. However, this attempt to procure financing failed.

7. As explained in the CRO's First Day Declaration, the Debtor's struggle to obtain financing is traced to two factors: (1) the nation's economic climate and (2) the Debtor's financial condition. On the Petition Date the Debtor's liabilities exceeded its asets by approximately $8 million. Additionally, the Debtor does not have a significant revenue stream.

8. After the failed initial public offering, two directors of the Debtor, a Co-CEO Anthony Chidoni, and Board member Simon Irish formed XSI, Inc. ("XSI") for the purpose of acquiring the Debtor's assets under a bankruptcy sale.

9. After forming XSI with the sole purpose of purchasing the Debtor's assets, on March 21, 2011, Mr. Chidoni and Mr. Irish resigned from their positions with the Debtor.

10. Prior to their resignations, the Debtor retained consulting firm K-Sal Group LLC ("K-Sal") and Kim Hetzel Salibello to act as Chief Restructuring Officer ("CRO"), engaged bankruptcy counsel, and provided financing to the Debtor on a purportedly secured basis. This financing arrangment was executed pursuant to pursuant to a Letter Agreement, Senior Secured Demand Note, Security Agreement and Control Agreement, dated March 1, 2011, in an amount

not less than $122,000 plus other charges totaling $130,662 in exhange for, among other things, purported liens on all of the Debtor's assets (the "Pre Petition Secured Loan").

11. Shortly after Messrs. Chidoni and Irish resigned, the three remaining directors followed suit. By April 5, 2011, the CRO was the only member of management that remained with the Debtor.

12. In the bankruptcy case, XSI obtained interim approval to provide debtor-in-possession financing, in an amount not to exceed $50,000.00 (the "Interim DIP Loan").

13. XSI seeks to provide additional debtor-in-possession pursuant to a final order in an amount of approximately $278,000 (the "Final DIP Loan"). In exchange, XSI seeks numerous protections, including a first priority lien on all the Debtor's assets and a superpriority claim.

14. In its Bidding Procedures Motion, the Debtor seeks an order that allows XSI to act as the stalking horse bidder in connection with the Debtor's auction process. If not outbid at the auction, XSI agrees to purchase the Debtor pursuant to the terms set forth in an asset purchase agreement (the "APA"), attached to the Bid Procedures Motion.

15. As part of the proposed APA, XSI seeks to credit bid the entire amount of all the loans to be provided to the debtor, including the Pre Petition Secured Loan, the Interim DIP Loan and the Final Dip Loan, in an amount of $425,985.00 plus interest (the "Credit Bid"). As of this date, however, only $180,662 has been authorized.

16. In addition to the Credit Bid, XSI will transfer 20,000 shares of its common stock, representing 7.4% of its outstanding shares. XSI values these shares at approximately $150,000. XSI also agrees to provide $75,000 in cash to the Debtor.

{00007280. }
LEGAL21235081.1

17. In order for a competing bidder to participate in the auction, pursuant to the Bidding Procedures Motion, that bidder must submit a "Qualified Bid". One requirement is that a competing bidder offers at least $487,050 in cash, and offers consideration of a total value of at least $697,050. Any competing bid must be at least $50,000 more than the purported value of the XSI bid. Further, only bidders who agree to purchase substantially all of the Debtor's assets and on the same basis as XSI will be allowed to participate in the auction.

18. Under the APA, XSI seeks to purchase any claims arising under Chapter 5 of the Bankruptcy Code against current and former insiders of the Debtor. See Bidding Procedures Motion, Exhibit A, the XSI APA § 1.2 (stating that "any Avoidance Actions against [the Debtor's] current or former insiders (as the term insider is defined in section 101 (31) of the Bankruptcy Code) shall be included in the Purchased Assets").

19. On May 5, 2011 the Debtor filed a motion to employ Streambank, LLC ("Streambank") as its investment banker in order to market and sell the Debtor and/or its assets.

20. To date, neither the Debtor nor Streambank have engaged in substantial marketing efforts. In fact, the Debtor testified at the section 341 meeting, that no marketing whatsoever has been conducted. Nevertheless, the Debtor proposes to conduct an auction only 16-days after the hearing on the Bid Procedures Motion. The Debtor proposes the following schedule:

    (a) Bidding Procedures Hearing – July 5, 2011

    (b) Bid Submission Deadline – July 19, 2011

    (c) Auction – July 21, 2011

    (d) Sale Hearing – July 25, 2011

21. The Debtor seeks an order from the Court approving the Final DIP Loan because it claims that the "[e]state will suffer immediate and irreparable harm if the Debtor does not

-5-
{00007280. }
LEGAL21235081.1

obtain authorization to use cash collateral and immediate access to the proposed debtor-in-possession financing." See DIP Motion ¶ 13. XSI seeks, among other things, priming liens, replacement liens, and superpriority claims.

22. Under the Final DIP Loan, XSI seeks a first priority liens on all the avoidance claims arising under chapter 5 of the Bankruptcy Code. The Debtor states that it is appropriate to do that because "it likely is of little consequence given that XSI has funded the Debtor's operations for several months prior to the Petition Date." See DIP motion at ¶ 21(c).

23. The Final DIP Loan provides for a "carve out" for professional fees in connection with representation of the bankruptcy estate. The Debtor's carve out is $160,000; the Committee's carve out is $25,000.

24. The Final DIP Loan proposes an interest rate of 12% and includes a 5% origination fee for each advance made on the loan.

## ARGUMENT

**The Bidding Procedures Does Not Provide Adequate Time, Does Not Permit Marketing of the Assets and Should Not Be Approved**

25. Proposed sales of all of a debtor's assets, outside of a plan of reorganization requires careful review, particularly when selling to a possible insider. See In re Exaeris Inc., 380 B.R. 741, 744 (Bankr. D. Del. 2008) (denying emergency motion to expedite a sale of substantially all the debtor's assets to an insider because of, inter alia, the purchaser's insider status, the proposed releases in favor of the insider, the lack of evidence of marketing, and the lack of evidence of asset values).

26. Here, the Debtor argues that its proposed course of action satisfies the Abbotts Diaries "sound business judgment test", including that the debtor has obtained a fair and

reasonable price for the proposed Sale, and that the offer is made in good faith. In re Abbotts Diaries of Penn., Inc., 788 F.2d 143 (3d Cir. 1986) (discussing the "good faith" standard when considering a 363 sale). The Debtor asserts that good faith exists because "no insider will gain an unfair advantage from the Sale pursuant to the Bid Procedures." See Bid Procedures Motion ¶ 26. However, this assertion does not appear to be true, given the lack of marketing, lack of explanation of the value of assets, the locking up of assets pre petition by former insiders of the Debtor, and the details of XSI's stalking horse bid. Not to mention that the directors of XSI are seeking to obtain a release on any avoidance action liability that it may face.

27. The Debtor goes on to represent that "all Board decisions regarding the Sale of Assets and the retention of the CRO and the CRO's decision to retain Streambank have been without [the former directors]." Id. at ¶ 27. Again, this is not true. The former directors set in place the current plan before leaving the Debtor. Debtor's counsel was engaged by the former directors, prior to the hiring of the CRO. The former directors entered into the pre petition financing arrangement with XSI, they are the ones who hired the CRO, they are the ones funding the CRO and Streambank. Given the actions of the insiders, the Debtor must be required to show more in order to establish that the proposed sale fetches a "fair and reasonable price" and that it was made in "good faith." As expressed by the Third Circuit in Abbott Diaries, the bankruptcy court must be on guard against terms that are "designed to preclude any truly competitive bidding." 783 F.2d at 148.

28. Here, the Debtor seeks to rush a sale, despite there being no apparent reason to do so. There is no melting ice cube. There are few employees, in fact no full time employees and the APA states that all (two) employees are to be termininated upon the Sale. There are no ongoing business operations. The Debtor has not begun to market its assets and the Debtor's

investment banker, Streambank, has not even prepared marketing materials. There can be no question that under these circumstances the Debtor cannot satisfy its burden. In this regard, it bears note that because the XSI transacton is with insiders, the Debtor must satisfy the entire fairness doctrine. See Kahn v. Tremont Corp., 694 A.2d 422, 429 (Del. 1997) (stating that "where a controlling shareholder stands on both sides of the transaction the conduct of the parties will be viewed under the more exacting standard of entire fairness as opposed to the more deferential business judgment standard.")

**The Final DIP**

29. The Debtor has the burden of proof with respect to its Final DIP Motion. Section 364 governs the Debtor's request for the proposed financing arrangement. In order to be granting priming, adequate protections or other liens and super-priority claims under Sections 364(c) and (d) of the Bankruptcy Code, the Debtor must show that (i) the proposed financing is a sound exercise of their business judgment; (ii) no alternative financing is available on better terms; and (iii) the financing is in the best interests of the estate. See e.g., In re Farmland Indus., Inc., No. 02-50557, 2003 WL 1904557 (Bankr. W.D. Mo. April 17, 2003).

30. The Court has authority to reject a proposed financing arrangement that includes terms and conditions that serve no valid business purpose other than to benefit a prepetition lender. See In re Ames Dep't Stores, Inc., 115 B.R. 34, 39 (Bankr. S.D.N.Y. 1990) ("[A] proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate.").

{00007280. }
LEGAL21235081.1

## OBJECTIONS

**Summary of the Bidding Procedures Objections**

31. The Commmittee has numerous concerns and issues. The Committee suggests the following modifications to the Bidding Procedures

    (a)    All auction related deadlines should be extended by 60-days;

    (b)    XSI should not be allowed to credit bid the amount of any post-petition financing not yet approved by the Court;

    (c)    XSI should not be allowed to credit bid any portion of the Pre Petition Secured Loan;

    (d)    XSI should be required to provide back up for its assertion that 20,000 shares of its common stock is worth $150,000;

    (e)    Overbids and bid increments should be decreased to only $10,000;

    (f)    There is no reason bids for less than substantially all the Debtor's assets should not be considered;

    (g)    XSI should not be allowed to purchase claims against insiders that arise under Chapter 5 of the Bankruptcy Code;

    (h)    Because of the relationship between XSI and the Debtor, the Debtor and Streambank should be prohibited from sharing information about competing bids with XSI.

**A.    The Stalking Horse Bid**

32. The consideration offered to the Debtor pursuant to XSI's Stalking Horse Bid is primarily in the form of a credit bid. The credit bid amount ($425,985.00) represents the full amount of pre and post petition loans to be made to the Debtor. The post petition loans have not yet been approved, and thus a credit bid on that amount is premature. Moreover, the prepetition credit bid should be disallowed in its entirety. The circumstances surrounding the extension of

-9-

{00007280. }
LEGAL21235081.1

the prepetition loan are suspect. The loan was executed before Mr. Anthony Chidoni resigned from his position as Co - CEO of the Debtor; Mr. Chidoni was also the director of XSI, in effect making a deal with himself. The Debtor has not even attempted to demonstrate that it attempted to comport with sound corporate governance practices in making its decision to enter into the secured loan. This extension of credit was a classic case of self dealing, as XSI's directors were also the Debtor's directors. See Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 362 (Del. 1993) ("[C]lassic self-dealing transaction occurs where a director or officer stands on both sides of a transaction."). Further, the debtor or its former directors are not entitled to rely on any presumption running with the business judgment rule, but rather must defend their actions under the entire fairness standard. Tremont Corp., 694 A.2d at 429. The secured loan was designed solely to wipe out unsecured creditors. If allowed to credit bid that amount, XSI will have further chilled the market for competing bids, once again at the expense of unsecured creditors. A creditor's right to credit bid is not absolute; the Court may deny the right to credit bid "for cause." See 11 U.S.C. § 363(k). See In rePhiladelphia Newspapers 599 F.3d 298, 315 (3d Cir.2010) (stating that"[i]n a variety of cases where a debtor seeks to sell assets pursuant to § 363(b), courts have denied secured lenders the right to bid their credit" under § 363(k))(citing In re Aloha Airlines, No. 08-00337, 2009 WL 1371950, at *8 (Bank. D.Hawaii May 14, 2009); Greeenblatt v. Steinberg, 339 B.R. 458, 463 (N.D.Ill. 2006); In re Antaeus Technical Servs., Inc. 345 B.R. 556, 565 (Bankr. W.D.Va. 2005 ( denying right tio credit bid to facilitate "fully competitive" cash auction); In re Theroux, 169 B.R. 498, 499 n. 3 (Bankr. D.R.I. 1994) (noting that "there is no absolute entitlement to credit bid").

33.     Additionally, the XSI's Stalking Horse Bid seeks to transfer 20,000 shares of XSI common stock to the Debtor. The Debtor represents that these shares constitute 7.4% of the

outstanding equity of XSI, with a value of approximately $150,000. The Debtor offers no proof of its valuation whatsoever. Further, there are no protections against any dillution of the shares once the proposed Sale to XSI is consummated. The bald assertions as to XSI stock value and percentage of common stock that it represents is essentially valueless.

34. What remains after examining the credit bid, and the share exchange is a cash consideration component of $75,000.

**B.     The Qualified Bid Requirements**

35. The proposed course of action sets the price of participation in the auction too high and will reduce incentives for competing bidders to participate in the process. Not only are bidders expected to place bids by July 19, 2011, a mere 14 days after the hearing on the Bidding Procedures Motion, but they are expected to do that even though there has been zero evidence that any marketing has yet occurred. Certainly, such a short time frame stunts the ability of bidders to investigate the Debtor's assests, making an investment highly unlikely – exactly what XSI is attempting to do – by keeping out other bidders.

36. The Debtor seeks the ability to reject any competing bid that is not valued at least $50,000 higher than XSI's bid. XSI, with a combination of credit bids, stock transfers and only $75,000 in cash values its own bid at $647,050. Meaning a competing bidder must offer value of $697,050. The Debtor also requires that the cash component provided by a competing bidder be at least $487,050. The Committee requests that the amount required to be considered a Qualified Bid (as defined in the Debtor's Bid Procedures Motion) should be lowered from $50,000 over the stalking horse bid to $10,000.

37. The Debtor requires that all competing bids be for all of the Debtor's assets. Such a restriction is not necessary. Rather, the Debtor should look to maximize value regardless of

whether all assets are purchased or not. If a bidder offers more money, but only wants to purchase a portion of the assets, there is no reason the Debtor should not accept that higher bid

**C.     The Purchase of Avoidance Actions Against Insiders is Improper**

38.    XSI also wishes to purchase any avoidance actions that the Debtor's current of former directors may face. Essentially, XSI wants a release of liability for its bad actions leading to this point. These avoidance actions are a potentially valuable asset – an asset that belongs to the Debtor's bankruptcy estate, and ultimately its creditors. In light of the conduct of the former directors, potential avoidance actions may very well be the most valuable asset that the estate has. Regardless, the Committee has a statutory duty to investigate potential causes of actions, and it has 2 years within which to bring them. See 11 U.S.C. § 546(a). Granting the directors such a release at this early stage would be inappropriate. If the Court were to approve the sale of the avoidacne actions, these assets would need to be valued, as neither XSI, nor Kimball has a lien thereunder, and the proceeds would come into the estate free and clear.

**Summary of the DIP Motion Objections**

39.    XSI seeks superpriority claims pursuant to bankruptcy code section 364(c)((1), liens pursuant to section 364(c)(2) and 364(c)(3), and priming liens pursuant to 364(d). The Debtor has not met its burden with respect to any of those code sections. In order to avail oneself of section 364' protections, the Debtor must demonstrate that it "is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense." 11 U.S.C. § 364(c). Similarly, in order to be granted priming lien, under section 364(d), the Debtor must demonstrate that it "is unable to obtain such credit otherwise." 11 U.S.C. § 364(d); <u>see also</u> <u>In re Au Natural Rest.t, Inc.</u>, 63 B.R. 575, 581 (Bankr. S.D.N.Y. 1986) (holding that under section 364(c) and (d)a debtor must show that it is unable to obtain credit "by some other, less drastic means"). Here, the Debtor admits that it has not made any attempts to secure alternative

financing arrangments on better terms. Therefore, its Final DIP Motion cannot be approved in accordance with section 364 (c) and (d).

40. Even if the Court finds that the Final DIP Motion satisfies section 364 (c) and (d), the Final DIP contains several terms and conditions that should not be approved. Among others, the following provisions are particularly objectionable:

    (a)    XSI should not be granted liens on avoidance actions.

    (b)    XSI's should not be granted a cross-collateralization lien on pre and post petition collateral.

    (c)    There should be no limitations on investigations conducted by the Committee other than time limits prescribed in the Bankruptcy Code.

    (d)    There should be no waiver of rights existing under Section 506.

    (e)    XSI should not be granted priming liens, replacement liens or other liens, nor should it be granted any superpriority claims.

    (f)    The Creditors' Committee Professional Fees carve out should be increased to an amount reasonable comparable to the work to be done – compared to the Debtor's, especially since the Debtor has no ongoing operations.

    (g)    The DIP Budget should not be approved in its current form.

    (h)    The interest rate of 12% interest rate, and 5% origination fee should be reduced.

    (i)    The carve out should be funded into escrow upfront by XSI. Otherwise, if it is the ultimate purchaser, its obligation to fund will expire before the amounts come due.

    (j)    XSI should not be granted the right to credit bid.

## **CONCLUSION**

For all the foregoing reasons, the Committee respectfully requests that the Court deny the relief requested in the Bidding Procedures Motion and the Final DIP Motion in their entirety unless the issues raised above have been addressed satisfactorily and grant such other relief as the Court deems just and proper.

Dated: June 30, 2011
       Wilmington, DE

Respectfully submitted,

**THE ROSNER LAW GROUP LLC**

*/s/ Julia Klein*
Julia B. Klein (DE 5189)
Frederick B. Rosner (DE 3995)
824 Market Street, Suite 810
Wilmington, DE 19801
Tel: (302) 777-1111
klein@teamrosner.com

-and-

Schuyler G. Carroll, Esq.
Shan H. Haider, Esq.
**PERKINS COIE LLP**
30 Rockefeller Plaza, 25th Floor
New York, NY 10112
Tel: (212) 262-6900
scarroll@perkinscoie.com

*Counsel to the Official Committee of Unsecured Creditors*