IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| XSTREAM SYSTEMS, INC. | ) | Case No. 11-11086 (CSS) |
| | ) | |
| | ) | **Hearing Date: August 10, 2011 at 10:00 A.M.** |
| | ) | **Rel. Dkt. Nos. 126, 134** |

## KIMBALL'S REPLY IN SUPPORT OF
## ITS MOTION FOR RELIEF FROM STAY AND FOR ABANDONMENT

Kimball International, Inc. and Kimball Electronics, Inc. ("Kimball"), for its Reply in Support of its Motion for Relief from Stay and for Abandonment ("Motion for Relief from Stay"), represents the following to the Court:

### I. SUMMARY OF REPLY

1. Subsequent to filing the Motion for Relief from Stay, Kimball deposed Paul Joseph Micciche ("Micciche"),[1] one of only two agents of Xstream Systems, Inc. ("Debtor") that routinely access the property in Florida where Debtor's tangible assets are stored, including its X-Ray Defraction Machines. The deposition revealed that the assets to which Kimball's security interest attaches, which are all assets that have been in Florida between May 3, 2010 and present (the "Collateral"), has never been inventoried by Debtor, but likely has liquidation value substantially greater than reported by Debtor, is not insured and is not protected against theft. A copy of the transcript from the deposition is attached as Exhibit "A" and incorporated herein.

---

[1] Micciche is the former Senior Vice President and Chief Engineer of the Debtor, which position he maintained through the date the Debtor laid off its employees in December 2010. (Micciche Dep. 5:4-5). He testified that he has worked for the Debtor thirty (30) hours per week post-petition.

2. Micciche testified that the majority of Debtor's assets are stored in a "completely unsecured" portion of an office complex where third parties have access. He further testified that he believes the X-Ray Defraction Machines and other office equipment have a fair market value of $650,000.00 notwithstanding the unequivocal representations by Debtor to this Court that its tangible assets are *de minimus* in value.[2] The deposition transcript further raises serious doubts as to whether Debtor has properly inventoried its assets in accordance with its duties under Section 521 of the Bankruptcy Code.

3. Subsequent to the deposition, Kimball's representative inspected Debtor's premises, took photographs, and confirmed Debtor's affairs are in a state of disarray. True and correct copies of photographs taken from the inspection are attached as Exhibit "B" and incorporated herein.

4. While the recent inspection and 2004 examination reinforces that cause exists to grant Kimball relief from the automatic stay, the Objection filed jointly by the Unsecured Creditors' Committee and the Debtor (collectively "Objecting Parties") does not satisfy the burden of proof under Section 362(g) of the Bankruptcy Code and altogether fails to address the merits of the Motion for Relief from Stay. This is further addressed herein.

## II. SUPPLEMENTAL STATEMENT OF FACTS

5. All of Debtor's tangible personal property that is located in Florida is located in a professional building at 10305 102nd Terrace, Suite 101, Sebastian, Florida (the "Premises"). (Micciche Dep. 11:14-20). The building in which the Premises is located has other tenants, including

---

[2] Debtor seeks to sell all of its office equipment and four (4) of its X-Ray Defraction Equipment for $30,000 to XSI, LLC, an entity controlled by former insiders of the Debtor, in the Stalking Horse Asset Purchase Agreement filed with the Court in connection with its Motion to Sell Assets at a 363 Sale.

2

offices and labs. (*Id.* 11:20-23).

6. As the Court is well aware, Debtor designs x-ray diffraction equipment ("XT250 Systems") that authenticate pharmaceutical drug products. (*Id.* 24:23-25.) Micciche believes there are currently at least four to six "beta quality" XT250 Systems, three to four "controlled introduction quality" XT250 Systems, and one "proof of concept system" being stored at the Premises. (*Id.* 27:25-28:4).

7. In addition to the XT250 Systems, other tangible assets located at the Premises include: tools (*Id.* 11:7), computer servers (*Id.*), computers (*Id.* 11:8), chairs (*Id.*), desks (*Id.*), lab desks (*Id.* 12:8), lab benches (*Id.*), machining equipment (*Id.* 12:14), terminals (*Id.*), file cabinets (*Id.*), software (*Id.* 12:15), milling machines (*Id.* 12:16), ancillary components of the machines and equipment (*Id.*), prescription drugs (*Id.* 16:10), and phone systems (*Id.* 57:18).

8. Micciche testified he believes the aggregate fair market value of the XT250 Machines are $500,000.00 - $600,000.00 (*Id.* 46:14-16), or "less than $10,000" per machine if sold as "scrap," (*Id.* 47:8-11), and the computer and office equipment has a value of $150,000.00-$250,000.00. (*Id.* 43:25.)

9. Notwithstanding this significant value, the "majority" of the assets at the Premises, including the XT250 systems (*Id.* 33:16-18), are kept in "a completely unsecured" area of the Premises (*Id.* 14:2-4), thereby allowing other individuals to have access. (*Id.* 13:18). This open access is a cause of concern that was "noted months ago," yet Debtor has not remedied the situation. (*Id.* 14:8-10.)

10. Although Micciche had not previously been involved with performing inventories of Debtor's property, Micciche did create a recent list of Debtor's assets and confirmed the most recent

inventory with Debtor's Chief Restructuring Officer for purposes of this bankruptcy. (*Id.* 18:2, 17-18.) Unfortunately, these most recent inventories of Debtor's current Tangible Assets were created and confirmed solely using Micciche's memory. (*Id.*)

11. In addition to not knowing exactly what was originally included among Debtor's tangible assets, it is not clear that anyone would have the means to recognize if any of the tangible assets actually were missing. Someone on behalf of the Debtor *tries* to get to the Premises "once a week." (*Id.* 49:11-15.) Micciche – one of two people that go to the Premises – himself "do[es]n't go to the office that often, and when [he's] there [he] do[es]n't go and check all 5,000 square feet of what's what." (*Id.* 60:19-21.)

12. It is not clear whether any of the tangible assets have been removed from the Premises. (*Id.* 14:11-13.)

13. Leaving aside the fact that Debtor's assets are not properly inventoried and that most of the assets are stored in a completely unsecured area, it is not clear that there is insurance on the personal property. Micciche is unable to confirm that the insurance on personal property is current (*Id.* 19:21) and indicated that the only other person *might* have that information is Thaw (*Id.* 48:1-3). Debtor has not provided that information to Kimball or the Court despite Kimball's request.

### III. ARGUMENT

14. Relief from stay should be granted because (1) there is no equity in the Collateral and the Collateral is not necessary to an effective reorganization; (2) Kimball is not adequately protected from any risks of loss or depreciation to its Collateral; and (3) cause generally exists because the hardship on Kimball of not getting stay relief greatly outweighs the hardship, if any, caused on Debtor by granting relief from stay.

15. The 2004 examination of Micciche and the related inspection reinforce the need for relief from stay. The Debtor's mismanagement of its affairs and its inability to physically secure the Collateral is causing a significant risk to Kimball's security interest. *See Schewe v. Fairview Estates* (In re Schewe), 94 Bankr. 938, 949 (Bankr. W.D. Mich. 1989) (a "commission of waste" is grounds to find cause for relief from the automatic stay). This makes insurance imperative, although Debtor has not produced any insurance records. *See In re Heinzeroth*, 40 B.R. 518, 520 (Bankr. E.D. Pa. 1984) ("a debtor who fails to provide insurance coverage is not entitled to the protection of the automatic stay under §362(d)(1)").

16. Pursuant to 11 U.S.C. § 362(g), the party moving for relief from stay has the burden of proof on the issue of debtor's equity. The party opposing relief from the automatic stay has the burden of proof on all other issues. *In re Johnson* 196 Fed. Appx. 112, 114 (3d Cir. N.J. 2006); 11 U.S.C. § 362(g). The Objecting Parties do not dispute that there is no equity in the assets subject to Kimball's lien. They further do not dispute in their Objection that Kimball is not adequately protected, or that Debtor will not be prejudiced if the stay is not lifted. Put simply, they have not met their burden of proof.

17. Instead, they rely solely upon the argument that the scheduled auction, set on August 8, 2011 and set for a hearing for approval of the sale on August 10, 2011, should move forward. That auction will be complete by the time Kimball's Motion for Relief from Stay is heard.

18. That Objection overlooks that the sales procedure rests upon a Stalking Horse Asset Purchase Agreement ("APA") executed by XSI, LLC ("XSI"), an entity controlled by Debtor's former insiders, is now invalid on its face. The APA establishes a bid by XSI of $657,000.00, which presumed that XSI would credit bid $457,050.00 based on the DIP credit facility extended to Debtor.

However, XSI has notified the Court that it stopped funding the Debtor and has withdrawn the motion seeking DIP financing (Docket 122). The contention that the APA was negotiated in good faith, represents fair market value, and is the product of an arm's length negotiation is put into question if the sales price under the APA is reduced based on the difference between the maximum XSI could lend under the proposed DIP facility and the amount it unilaterally decided to lend.

19. The Objection further overlooks that Kimball's lien attaches to all tangible assets that were in Florida at any time between May 3, 2010 and the petition date to present. The APA seeks to sell four (4) XT250 Machines, two of which are in Florida, one in Puerto Rico, and one in Ohio. However, it is unclear whether the machines in Puerto Rico and Ohio were in Florida at any point after May 3, 2010, although Kimball suspects they were. The Motion for Relief from Stay seeks relief on *all* assets included in Kimball's Collateral, not just the assets subject to the §363 sale. Debtor has made it impossible to determine if there is a distinction.

Respectfully submitted,

Dated: August 5, 2011

| | |
|---|---|
| | SMITH, KATZENSTEIN & JENKINS LLP |
| | /s/ Kathleen M. Miller |
| | Kathleen M. Miller (I.D. No. 2898) |
| | 800 Delaware Avenue, 10th Floor |
| | P.O. Box 410 |
| James E. Rossow, Jr. | Wilmington, DE 19899 |
| Christopher M. Trapp | Telephone: 302-652-8400 |
| Rubin & Levin, P.C. | Telecopy: 302-652-8405 |
| 342 Massachusetts Avenue, Suite 500 | E-mail: kmiller@skjlaw.com |
| Indianapolis, IN 46204 | |
| Telephone: 317-860-2893 | |
| Telecopy: 317-453-8619 | |
| jim@rubin-levin.net | Attorneys for Kimball |