**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>XSTREAM SYSTEMS, INC.<br><br>Debtor. | Chapter 11<br><br>Case No. 11-11086 (CSS) |
| The Official Committee of Unsecured Creditors of Xstream Systems, Inc.,<br><br>Movant<br><br>vs.<br><br>XSI LLC,<br><br>Respondent | **Re: Docket No. 138**<br><br>August 9, 2011 |

**RESPONSE TO MOTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS SEEKING AN ORDER (I) PROHIBITING XSI LLC FROM CREDIT BIDDING; (II) DISALLOWING AND EXPUNGING ALL CLAIMS ASSERTED BY XSI LLC; (III) AVOIDING LIEN ASSERTED BY XSI LLC; (IV) COMPELLING XSI LLC TO PAY DAMAGSE FOR FAILING TO COMPY WITH OBLIGATIONS; AND (V) SURCHARGING XSI LLC'S ASSERTED LIENS UNDER SECTION 506(C)**

XSI, LLC ("XSI"), by and through its undersigned counsel, provides its response (the "Response") to the Motion of the Official Committee of Unsecured Creditors (the "Committee") of XStream Systems, Inc. (the "Debtor") Seeking an Order (i) Prohibiting XSI LLC ("XSI") from credit bidding; (ii) Disallowing and expunging all claims asserted by XSI; (iii) Avoiding liens asserted by XSI; (iv) Compelling XSI to pay damages for failing to comply with its obligations and (v) Surcharging XSI's asserted liens under Section 506(c) of the Bankruptcy Code (the "Motion") and respectfully represent as follows:

## PRELIMINARY STATEMENT

1. In its Motion, the Committee makes unfounded and offensive assertions, attacking the good faith of XSI and accusing XSI of playing games with the Chapter 11 process. However, it is the Committee that seeks to game the system in a transparent attempt to override the rights and protections granted to XSI in the prior orders of this Court—apparently hoping to wrestle away sale proceeds which will be available to pay a small portion of the secured claims of XSI if the proposed transaction closes—in order to pay its own professionals. The Committee's aggressive agenda in this case has delayed the proceedings, significantly increased the expense of the case, and damaged the best prospect for a reasonable result for its own constituency. The Committee's motion is not sustainable on either a factual or a legal basis and should be denied. In any event, it is procedurally defective as filed, and the Committee lacks standing in regard to certain portions of the requested relief.

## BACKGROUND FACTS

2. XSI was formed by two former Debtor insiders. Prior to the Petition Date (as hereinafter defined), XSI loaned the Debtor, on a secured basis, no less than $130,662.00 (the "Prepetition Secured Loan"). A component of the Prepetition Secured Loan was earmarked for certain of the Debtor's engineering staff. In XSI's sound business judgment, a successful acquisition of the Debtor's assets through a Section 363 sale would need to include certain human capital; more than one engineer who possessed critical intellectual property regarding the Debtor's business operations. Without these engineers, any start up would be extraordinarily difficult, if not impossible.

3. On April 8, 2011 (the "Petition Date"), the Debtor filed a voluntary

petition for relief under chapter 11 of the Bankruptcy Code. The Debtor is authorized to operate its business and manage its property as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Committee was appointed on or about May 10, 2011.

4. On April 11, 2011, the Debtor filed its *Motion to Approve Debtor In Possession Financing /Motion for Order (A) Authorizing Debtor to Obtain Interim Post-Petition Financing and Grant Security Interest and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. Sections 105, 346(c) and 364(d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. Section 362; (C) Authorizing Debtor to Enter Into Agreements with XSI LLC; and (D) Scheduling a Final Hearing Filed* (the "Interim DIP Motion").

5. On April 22, 2011, Kimball International, Inc. ("Kimball") filed its *Limited Objection to Motion for Order Authorizing Debtor to Obtain Post-Petition Financing and Grant Security Interests and Superpriority Administrative Expense Status, Etc.* (the "Kimball DIP Objection") and Brian Mayo, a former insider of the Debtor, filed his *Objection Of Motion For Order (A) Authorizing Debtor To Obtain Interim Post-Petition Financing And Grant Security Interests And Superpriority Administrative Expenses Status Pursuant To 11 U.S.C. Sections 105, 364(c) and 364(d); (B) Modifying The Automatic Stay Pursuant To 11 U.S.C. Section 362; (C) Authorizing Debtor To Enter Into Agreements With XSI LLC; and (D) Scheduling A Final Hearing Pursuant To Bankruptcy Rule 4001* (the "Mayo DIP Objection").

6. On May 13, 2011—more than a month after the Interim Dip Motion was filed with the Court and after no less than two contested hearings and protracted negotiations involving Kimball, Mayo, and the Office of the United States Trustee—the Court ultimately entered its *Order (A) Authorizing Debtor to Obtain Interim Post-Petition Financing and Grant*

*Security Interests and Superpriority Administrative Expense Status; (B) Modifying the Automatic Stay; and (C) Scheduling a Final Hearing* (the "Interim DIP Order").

7. The Interim DIP Order made plain that XSI's total funding obligations under the Interim DIP Order was limited to $50,000.00: "**To Remove all doubt, in no event shall [XSI] be obligated to advance funds in excess of the $50,000.00 approved pursuant to the [Interim DIP] Order.** *See* Interim DIP Order, ¶ 2.5 (emphasis supplied).

8. XSI has fully funded its obligations under the Interim DIP Order.

9. On June 21, 2011, the Debtor filed its Amended Motion for an Order (I) Approving Bidding Procedures for the Sale of the Debtor's Assets; and (II) Scheduling an Auction in Connection with the Sale (the "Sale Procedures Motion").

10. Not unlike the Interim DIP Motion, the Sales Procedure Motion was quickly followed by a rash of objections filed by various parties in interest, including Kimball, the State University of New Jersey, and the Committee, which notably filed its *Combined Objection (A) to Amended Motion of Debtors for An Order (I) Approved Bidding Procedures for the Sale of the Debtor's Assets; (II) Scheduling an Auction in Connection with the Sale; and (B) Authorizing the Debtor to Obtain PostPetition Financing on a Final Basis* (the "Committee's Combined Objection") on the same day that the Court approved the retention of its counsel.

11. The Combined Objection contained no less than eight (8) separate objections related to the bidding procedures and additional objections related to XSI's stalking horse bid and the qualified bidding requirements (the "Sale Related Objections"). The Sale Related Objections included demands: (i) extending all auction deadlines out 60 days; (ii)

preventing XSI from credit bidding on any financing ***not yet approved by the Court;*** (iii) preventing XSI from credit bidding any portion of the Prepetition Secured Loan; (iv) requiring back-up of the XSI equity valuations; (v) reducing the over-bid dollar increments; (vi) preventing the sharing of information by and between the Debtor, XSI and the Debtor's investment banker; and (vi) blocking XSI from purchasing chapter 5 claims against insiders.

12. In addition to the Sale Related Objection, the Committee lodged no less than 11 objections regarding the Final DIP Motion. The Objections included demands that: (i) XSI not be granted liens on avoidance actions; (ii) XSI not be granted cross-collateralization liens on pre- and post-petition collateral; (iii) that there be no limitations on investigations conducted by the Committee other than times limits prescribed by the Bankruptcy Code; (iv) that there be no waiver of rights existing under Section 506; (v) that XSI should not be granted priming liens, replacement liens or other liens; (vi) that XSI should not be granted any superpriority claims; (vii) that the Committee's professional fee carve out should be increased to an amount reasonably comparable to the work to be done—compared to the Debtor's work; (viii) that the DIP budget be re-written; (ix) that the DIP interest rate be reduced from 12%, and the origination fee be reduced from 5%; (x) that XSI should fund the carve out; and (xi) that XSI should not be granted the right to credit bid (the "Committee's DIP Objections").

13. Given its experience regarding the Interim DIP Motion, XSI legitimately viewed the machinations of Kimball, the State University of New Jersey, and the Committee as needlessly protracting the case and increasing the costs of the case and the acquisition costs for the assets.

14. More importantly, realizing that a successful acquisition of the Debtor's

assets through a Section 363 sale would need to include certain human capital, XSI held a strong belief that the fragility of the human capital—which ***was*** the collateral securing XSI's Interim DIP loan and ***would be*** the collateral securing the Final DIP Loan—would grow exponentially as the instant bankruptcy case continued to be protracted.

15. Not surprisingly, issues regarding the sale objections filed by Kimball, the State University of New Jersey, and the Committee remained unresolved and on July 5, 2011 the Court presided over a contested evidentiary hearing.

16. Not unlike other hearings, the principals of XSI were in attendance at the July 5, 2011 hearing. Following the July 5, 2011 hearing—which included oral argument and live testimony, and barely scratched the surface regarding the Final DIP Motion—XSI was convinced that the case would continue to be needlessly protracted, and that each day that passed would increase the costs of the case, the ultimate purchase price of the assets, and the likelihood that the Debtor's human capital would exit.

17. Based on the totality of circumstances then in existence, XSI informed the Debtor that it was not intending to proceed with the Sales Procedure Motion or the Final DIP Motion because of the various concerns regarding the case as discussed, supra. Indeed, at the time of this conversation, the Debtor's investment banker had yet to complete the deal book and, based on the Committee's arguments at the July 5, 2011 hearing, there remained true uncertainty regarding the date of the bidding deadline and auction. Moreover, at this time no substantive discussions had commenced between the Debtor, the Committee and XSI regarding the Committee's DIP Objections.

18. The Debtor, however, urged XSI to continue negotiating the terms of the

Sale Procedures Motion, while "de-linking" the Final DIP Motion from the Sale Procedures Motion. Although this recommendation would enable the Debtor to move closer to a bidding procedures deadline and auction, without approval of the Final DIP Motion, there was a clear understanding that XSI would have no further funding obligations. Given that the instant bankruptcy case inextricably linked the funding of the Final DIP Motion with the ultimate sale of the assets, XSI agreed to allow the Sale Motions Procedure to proceed. During this de-linked period, the Debtor authorized XSI to speak directly with the Debtor's human capital so that XSI could better assess its decision to fund the Final DIP Motion.

19. The Bidding Procedures Order, which *did not* include a signed APA, was submitted to the Court for approval on or about July 8, 2011.

20. Between July 8, 2011 and July 13, 2011, XSI worked tirelessly in assessing its options regarding funding the final DIP, the transportability of the Debtor's human capital, and an ultimate sale closing date. In the end, XSI believed and continues to believe that the human capital securing the funds that would be advanced under a Final DIP Order would simply not remain after the sale closing. There would be no sustainable business post-closing without the Debtor's human capital. Further, XSI perceived continued skirmishes with Kimball, Rutgers and, most importantly, the Committee; and was simply not interested in funding those skirmishes or being faced with additional delay as a result of those skirmishes.

21. On July 13, 2011, XSI informed the Debtor that it was not going to continue to negotiate terms for a Final DIP Order (or address the multitude of objections lodged by the Committee) or fund the proposed final DIP. Likewise, because of XSI's legitimate concerns regarding the Debtor's human capital, it stated that it did not intend to continue to

pursue the purchase of the Debtor's assets.

22. On August 5, 2011, the Debtor informed XSI that a bid submitted by Veracity Network, Inc. ("Veracity") was the current high bid. On August 8, 2011, the Debtor informed XSI that Kimball's bid represented the highest and best offer of the Debtor's assets located in Florida and Veracity's bid represented the highest and best offer for the Debtor's assets located outside of Florida.

23. On August 6, 2011, the Committee filed the Motion.

**RESPONSE TO COMMITTEE'S REQUESTED RELIEF**

24. Without providing any factual support substantiating its allegations, or legal analysis substantiating its requested legal relief, the Committee wishes to: (i) disallow XSI's Prepetition Secured Loan; (ii) expunge all claims asserted by XSI; (iii) compel XSI to pay damages for failing to comply with certain undefined obligations; and (iv) surcharge XSI's asserted liens under Section 506(c) of the Bankruptcy Code because XSI "changed its mind and decided not to fund the DIP Financing and consummate the sale, despite the fact nothing changed" *See* Motion, ¶ 2.

25. In the first instance, the Committee has failed to establish that it has standing to assert any of the relief that it is requesting in the Motion. *See e.g.* 11 U.S.C. 506(c)("The *Trustee* may recover from property securing an allowed secured claim.")(emphasis added); Hartford Underwriters Insurance Co. v. Union Planters Bank, N.A., 530 U.S. 1, 7-14 (2000) (holding that only the Trustee may pursue a cause of action under 11 U.S.C. 506(c).); *See also* Official Committee of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics

Corp. v. Chinery 330 F.3d 548, 568 (3d Cir. 2003)(outlining the bankruptcy court approvals a committee needs as a condition precedent to commencing an action on behalf of a bankruptcy estate); Bd. of Tmrs. v. Foodtown, Inc., 296 F.3d 164, 169 (3d Cir. 2002) ("[O]nce a company or individual files for bankruptcy, creditors lack standing to assert claims that are 'property of the estate.'"). Without standing, the Committing lacks the legal ability to set the judicial machinery in motion. *See* Common Cause v. Pennsylvania, 558 F.3d 249, 257 (3d Cir. 2009) (stating that "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.") (citing Kowalski v. Tesmer, 543 U.S. 125, 128 (2004)).

26. Assuming, arguendo, that the Committee has standing to seek the requested relief (which it does not), the Committee cannot seek money damages or avoid liens via a motion. Such relief must be raised by way of an adversary proceeding. *See* Fed. R. Bankr. P. 7001 (1) and (2).

27. More importantly, in order for the Committee to seek any relief under bankruptcy or non-bankruptcy law, it must have a factual basis giving rise to the requested relief. Here, there is none. XSI had a legal obligation to fund the Interim DIP, which it has previously done— nothing more. As discussed, supra, no signed APA obligates XSI to close on a purported sale and no Final DIP Order compels it to fund ongoing Debtor obligations. There are simply no facts that provide the Debtor or the Committee with the requisite authority under Rule 9011 of the Federal Rules of Bankruptcy Procedure to seek, let alone obtain, the relief sought in the Motion.

28. Because the Committee filed its Motion on August 6, 2011 without any

notice or objection deadline but the Debtor has nevertheless listed it on the agenda for the August 10, 2011 hearing, XSI respectfully reserves its right to amend, modify, or supplement its Response to the Motion.

## CONCLUSION

For the reasons stated herein, XSI, LLC respectfully requests that the relief sought in the Motion be denied and that the Court grant XSI, LLC such other and further relief it deems just and proper.

August 9, 2011
Wilmington, Delaware

ARCHER & GREINER, P.C.

*/s/ Charles J. Brown, III*

Charles J. Brown, III (No. 3368)
300 Delaware Avenue, Suite 1370
Wilmington, DE 19801
Telephone: 302.777.4350
Facsimile: 704.343.4352

-and-

Patrick M. Birney, Esquire
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103-3597
Telephone (860) 275-8290
Fax (860) 275-8299

*Attorneys for XSI, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 9th day of August 2011, I caused a copy of the foregoing to be served upon the following via e- mail postage prepaid:

Jamie Lynne Edmonson
Bayard PA
222 Delaware Avenue
Wilmington, DE 19801

Paul Rachmuth
Gersten Savage LLP
600 Lexington Avenue
New York, NY 10022-6018

Julia Klein
The Rosner Law Group LLC
824 Market Street, Suite 810
Wilmington, DE 19801

Schuyler G. Carroll
Perkins Coie LLP
30 Rockefeller Plaza
25th Floor
New York, NY 10112

August 9, 2011
Wilmington, Delaware

*_/s/ Charles J. Brown, III_*
Charles J. Brown, III (No. 3368)